**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------- x
                                                     :
CANADA DRY DELAWARE VALLEY                           :
BOTTLING COMPANY and CANADA                          :
DRY POTOMAC CORPORATION,                             :          07 Civ. 8037 (SHS)
                                                     :
                        Petitioners,                :          **MEMORANDUM OF LAW**
                                                     :          **IN SUPPORT OF**
           -against-                                 :          **MOTION TO COMPEL**
                                                     :          **COMPLIANCE AND FOR**
HORNELL BREWING CO., INC., D/B/A                     :          **CONTEMPT**
FEROLITO, VULTAGGIO & SONS,                          :
                                                     :
                        Respondent.                  :
---------------------------------------------------- x

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................... 2

    A.  The Parties ................................................................................ 2

        1.  Hornell ........................................................................... 2

        2.  CDDV and CDP and their Distribution Agreements ................ 3

    B.  Exclusivity Under The Distribution Agreements ......................... 3

        1.  Hornell's Grant of Exclusive Distribution Rights ................... 3

        2.  The Exclusive Products ..................................................... 4

    C.  The Parties' Relationship Prior to Arbitration ........................... 5

    D.  The Arbitration, Award and Judgment ...................................... 7

        1.  The Arbitration and Settlement ........................................... 7

        2.  The Consent Award and Judgment ...................................... 9

    E.  Violations of the Court's Judgment .......................................... 10

III.  ARGUMENT .................................................................................. 11

    A.  This Court is Empowered to Enforce the Consent Award .............. 12

    B.  Hornell Has Not Complied With the Judgment ........................... 13

        1.  Hornell's recent sales are not permitted under the parties' agreements ... 14

        2.  Hornell's asserted justifications are without merit ................... 14

    C.  Remedies for Noncompliance ................................................. 16

IV.  CONCLUSION ............................................................................... 19

Canada Dry Delaware Valley Bottling Company ("CDDV") and Canada Dry Potomac Corporation ("CDP") submit this Memorandum of Law in Support of their Motion to Compel Compliance with this Court's Judgment and for Contempt against Hornell Brewing Co., Inc. ("Hornell").

## I.    INTRODUCTION

For the past decade, CDDV and CDP have been Hornell's exclusive distributors of AriZona Iced Tea and other products in most of the mid-Atlantic region.  Together the parties have enjoyed remarkable success as the AriZona brand has grown.  Over the years, however, there have been significant ongoing disagreements caused by Hornell's efforts to side-step Petitioners' distribution rights.  Unable to reach an accord with respect to these disputes, CDDV and CDP commenced an arbitration proceeding in June 2005.  The parties settled the arbitration in November 2006 by confirming the exclusivity granted to CDDV and CDP but allowing a limited number of exceptions whereby Hornell could sell certain specified AriZona packages to certain specified accounts.

The arbitration panel incorporated the terms of the parties' settlement agreement as a consent award on August 20, 2007.  As agreed to by the parties, the consent award was confirmed by Order of this Court on September 28, 2007, and, pursuant to that Order, judgment was entered on October 1, 2007.

Less than six months after entry of the judgment, Hornell resumed its practice of selling exclusive packages in violation of the parties' agreements.  This time, however, it appears that Hornell has engaged in a corporate strategy to transition the focus of its "single-serve" business (package sizes of one liter or less) away from the traditional glass packages that CDDV and CDP have been selling for over a decade and toward new plastic packages in identical sizes, which

Hornell now claims are not covered by the exclusivity granted to CDDV and CDP. Hornell does not deny that it has been selling its new 16 ounce and 20 ounce plastic packages of AriZona Iced Tea to BJ's Wholesale Club, Sam's Club, Costco, Wegmans and Exxon/Mobil for distribution within the territories of CDDV and CDP. To the contrary, recent correspondence from Hornell suggests that it is intent on selling its new packages directly to chain accounts on a widespread basis.

If left unchecked, Hornell's new strategy will eviscerate the exclusivity granted to CDDV and CDP and will render this Court's judgment moot. Based on the brazen nature of Hornell's disregard for the parties' settlement agreement and this Court's judgment, Petitioners seek entry of an order compelling compliance with the judgment and finding Hornell to be in civil contempt.

## II.    FACTUAL BACKGROUND

### A.    **The Parties**

#### 1.    **Hornell**

Hornell is a New York corporation with its principal place of business in Lake Success, New York. Declaration of John Taglienti ("Taglienti Decl."), ¶ 3. Hornell is in the business of producing, marketing and selling beverages and other products. *Id.* at ¶ 4. Its core product line is AriZona Iced Tea in a variety of flavors and package sizes. *Id.* at ¶ 5. In 1997 and 1998 when CDDV and CDP started selling AriZona Iced Tea, the core packages were 16 ounce and 20 ounce glass bottles. *Id.* at ¶ 6. These packages, along with a 23.5 ounce can, have been AriZona's best-selling single-serve packages over the past decade. *Id.* at ¶ 7.

As of 2007, AriZona Iced Tea was the top-selling iced tea brand in the United States, with annual sales of almost $300 million. *Id.* at ¶ 8. Hornell also sells a variety of other non-alcoholic product lines, including juices, energy drinks, sports drinks and coffee. *Id.* at ¶ 9.

### 2.     CDDV and CDP and their Distribution Agreements

CDDV and CDP are distributors of Hornell's products and those of other beverage manufacturers in the mid-Atlantic region. *Id.* at ¶¶ 11, 13. Hornell executed two agreements with CDDV on March 17, 1997, granting CDDV exclusive distribution rights in southern New Jersey, southeastern Pennsylvania and Delaware (the "CDDV Agreements"). *Id.*, Exs. 1 and 2. Combined, these counties in Pennsylvania, New Jersey and Delaware (collectively, the "CDDV Territory") comprise the territory for which CDDV is the exclusive distributor of most AriZona package sizes. *Id.* at Schedules A and B. Hornell executed an exclusive distribution agreement with CDP on December 23, 1998 (the "CDP Agreement"; all three agreements collectively referred to as the "Distribution Agreements"). *Id.*, Ex. 3. The "CDP Territory" as defined in the CDP Agreement includes the District of Columbia and most of Maryland.[1] *Id.* at Schedule B.

### B.     Exclusivity Under The Distribution Agreements

### 1.     Hornell's Grant of Exclusive Distribution Rights

Pursuant to section one in each of the Distribution Agreements, CDDV and CDP have been appointed by Hornell as its "sole and exclusive" distributors in their territories of the specific AriZona beverages and other products identified as the "Exclusive Products" on Schedule A-1. *See* Taglienti Decl., Exs. 1, 2 and 3 at § 1.1. Likewise, in each of the Distribution Agreements, Hornell promised to "use its good faith efforts to protect the territorial exclusivity granted to Distributor hereunder in respect of the Exclusive Products." *Id.* at § 2.4.

Territorial exclusivity is extremely important to a distributor like CDDV or CDP. *Id.* at ¶ 20. Distributors rely on exclusivity to justify the significant investment associated with

---

[1]     Collectively, the CDDV Territory and the CDP Territory will be referred to as the "Exclusive Territories."

introducing an emerging brand — as AriZona Iced Tea was in 1997 and 1998 — and building its position in the market. *Id.* at ¶ 21. Maintaining exclusive distribution rights for top selling brands — as AriZona Iced Tea is now — is vital to CDDV and CDP, as they compete with Coca-Cola and Pepsi Cola distributors for access to accounts and for cooler space. *Id.* at ¶ 22. The significance of territorial exclusivity is evidenced by Congress's passage of the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501 *et seq.*, which exempts soft drink distributors from antitrust laws.[2]

The grant of exclusive distribution rights to CDDV and CDP is unconditional. Even so, Hornell is not without protection. Among other safeguards, Hornell negotiated the right to terminate the Distribution Agreements for underperformance by CDDV or CDP. Taglienti Decl., Exs. 1, 2 and 3 at § 6. The standards for underperformance are set forth in the volume of cases sold and do not differentiate between package sizes, product lines or flavors. *Id.* Hornell is not claiming that either CDDV or CDP is underperforming under the terms set forth in the Distribution Agreements.

### 2.    The Exclusive Products

"Exclusive Products" are defined slightly differently in the CDDV and CDP Distribution Agreements. *Id.* at ¶ 23. In the CDDV Agreements, "[a]ll non-alcoholic beverage products in all product sizes" are Exclusive Products, except for 7.7 ounce cans, tetra packs, 64 ounce bottles, and 128 ounce bottles. *Id.*, Exs. 1 and 2 at Schedules A-1 and A-2. In addition, Hornell may distribute "16 ounce glass bottles . . . to non-traditional beverage outlets such as club stores and stores such as K-Mart, Walmart, Target, Caldor and the like . . . ." *Id.*, Exs. 1 and 2 at Schedule

---

[2]    The exclusive distribution agreements here were entered into pursuant to the provisions of the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501 *et seq.* Taglienti Decl., Exs. 1, 2 and 3 at § 20.1.

A-2.  In other words, products that fall within the broad definition in Schedule A-1 and are not

specifically exempted in Schedule A-2 are Exclusive Products in the CDDV Territory.  *Id.* at

¶ 25.  This includes 16 ounce plastic bottles and 20 ounce plastic bottles, neither of which is

listed as an exception in Schedule A-2.  *Id.* at ¶ 26.

Similarly, Schedule A-1 to the CDP Agreement defines "Exclusive Products" as all non-

alcoholic, non-carbonated Hornell products and product sizes, "except those set forth on

Schedule A-2."  *Id.*, Ex. 3 at Schedule A-1.  Schedule A-2 to the CDP Agreement defines the

following Hornell product and package sizes as non-exclusive: "all 7.7 ounce cans, tetra packs,

and all packages of Products larger than 1-Liter."[3]  *Id.* at Schedule A-2.  Because 16 and 20

ounce plastic bottles of AriZona Iced Tea are not covered by any of the exceptions listed in

Schedule A-2 to the CDP Agreement, they are Exclusive Products in the CDP market as well.

*Id.* at ¶ 28.

### C.    The Parties' Relationship Prior to Arbitration

CDDV and CDP have been highly successful in building the AriZona brand in their

markets.  *Id.* at ¶ 29. As AriZona's exclusive distributors, both companies have consistently

increased sales of AriZona products.  *Id.* at ¶ 30.  In 2007, CDDV and CDP sold a total of over

1.4 million cases of AriZona Products, generating more than $14 million in gross revenues to

CDDV and CDP.  *Id.* at ¶ 31.  As one of the top selling "new age" products offered by CDDV

and CDP, AriZona is an extremely important part of their businesses.  *Id.* at ¶ 32.

Thanks to the high quality of the AriZona products, Hornell's creative packaging, and the

efforts of distributors like CDDV and CDP, AriZona has become the number one iced tea brand

in the United States.  *Id.* at ¶ 33; Ex. 4.  This success has created opportunities for Hornell to

---

[3]        A liter equals 33.8 ounces.

negotiate national distribution and promotions with a number of large chain accounts, such as club stores, supermarkets, drug stores and mass merchandisers. *Id.* at ¶ 34. It is not uncommon for chain accounts to seek to negotiate lower prices by buying products directly from beverage manufacturers. *Id.* at ¶ 35. In such an arrangement, the manufacturer delivers products directly to the account's regional warehouses, which then ship the products to the account's individual stores for resale. *Id.* at ¶ 36. A direct sale to a regional warehouse often results in exclusive products being resold at hundreds of individual stores within a distributor's exclusive territories. *Id.* at ¶ 37. Even one such sale is a breach of exclusivity.

When chain accounts request direct sales, every other manufacturer with whom CDDV and CDP have an exclusive distribution agreement has avoided breaching its contractual obligations by: a) negotiating "invasion fees" to compensate CDDV and CDP for their lost profits; b) entering into agreements with national accounts that do not include CDDV's and CDP's territories; c) negotiating with the national account to permit CDDV and CDP to distribute to the stores within their territories; or d) simply rejecting these overtures. *Id.* at ¶ 38. Hornell has not pursued any of these options; rather, it has ignored its grant of territorial exclusivity and persisted in selling Exclusive Products directly to national accounts. *Id.* at ¶ 39.

Since the beginning of the parties' business relationship, CDDV and CDP have insisted on strict compliance with the terms of their agreements and have objected to Hornell's efforts to sell Exclusive Products directly to chain accounts. *Id.* at ¶ 40. For a number of years the parties engaged in letter writing campaigns and negotiations to resolve these disputes. *Id.* at ¶ 41. By 2005, the parties had reached an impasse.

D.    **The Arbitration, Award and Judgment**

1.    **The Arbitration and Settlement**

The facts before this Court are remarkably similar to the facts leading up to the parties'

17-month arbitration.  In 2005, Hornell introduced a new package for AriZona Iced Tea in a one

liter plastic bottle and refused to acknowledge that this new package was an Exclusive Product

under the Distribution Agreements.  *Id.* at ¶ 42.  CDP discovered evidence that Hornell was

selling this new package to a national drug store chain (Walgreens) for resale in CDP's exclusive

territory and demanded that Hornell refrain from further violations.  *Id.* at ¶ 43.  When Hornell

refused to honor their territorial exclusivity, CDP and CDDV (which had similar concerns)

commenced arbitration on June 22, 2005.  Declaration of Dana Klinges ("Klinges Decl."), ¶ 3.

Pursuant to the terms of the parties' Distribution Agreements, the arbitration was conducted by

the American Arbitration Association before three neutral arbitrators in New York, New York.

*Id.* at ¶ 4.

Hornell asserted in its defense, among other things, that exclusivity had been entirely

eliminated from the agreements or, in the alternative, that if Hornell negotiated directly with a

particular chain account a price that CDDV or CDP refused to accept, Hornell had the right to

sell its packages to that account.  *Id.* at ¶ 5.

The arbitration was extremely costly and time consuming.  *Id.* at ¶ 6.  After 17 months of

discovery, motion practice and six days of hearings, the parties reached a settlement in

November 2006.  *Id.* at ¶ 7.  The business terms of the settlement were set forth in a letter dated

November 14, 2006 (the "Letter Agreement") and a set of handwritten amendments (collectively,

the "Settlement Agreement").  *Id.* at ¶ 8; Ex. 3.  The exclusivity originally granted to CDDV and

CDP was confirmed, and the parties agreed that such exclusivity extended to the new one liter

plastic package.  *Id.* at ¶ 9.  The Settlement Agreement incorporated the Distribution

Agreements. *Id.* at ¶ 10. Significantly, however, the parties agreed to delete key language in Section 2.4 of the Distribution Agreements. *Id.* at ¶ 11. Hornell claimed during the arbitration that this language gave it the right to sell products directly to retailers in numerous circumstances, including instances where the parties could not agree on pricing. *Id.* at ¶ 12.[4]

As for the chain accounts, the parties agreed to a limited number of exceptions to exclusivity ("carve outs") whereby Hornell could continue to sell specified packages directly to specifically enumerated accounts. *Id.* at ¶ 14. For example, Hornell negotiated for the right to sell 16 ounce glass bottles and 15.5 ounce cans directly to Sam's Club, BJ's Wholesale Club and Costco. *Id.* at ¶ 15; Ex. 3 at ¶ 3. In addition, Hornell is permitted to sell all of its products, packages and flavors on a direct basis to certain accounts, including CVS, Walgreens, Brooks, Eckerd, Rite Aid, Aldi's and certain military bases. *Id.* at ¶ 16; Ex. 3 at ¶ 3.

The Letter Agreement anticipates that new packages may be developed and explicitly makes them Exclusive Products unless they are larger than one liter.[5] It sets forth a series of provisions that distinguish between new packages, new flavors and new product lines. *Id.*, Ex. 3 at ¶¶ 7-9. Despite this very specific language, there are no provisions in the Letter Agreement requiring CDDV or CDP to carry new single-serve packages, no provisions permitting Hornell to dictate the distributor's resale price for such packages, and no provisions permitting Hornell to sell such packages directly if the parties cannot agree on that price. *Id.*

---

[4]    In response to another concern raised by CDDV and CDP, new language was added to aid in the prevention of transshipment. Klinges Decl. at ¶ 13. Transshipment occurs when Exclusive Products are sold to a third party outside the territory and thereafter shipped or resold into the Exclusive Territories. *Id.*

[5]    The handwritten amendment to paragraph five of the Letter Agreement states that "any package greater than 1 liter shall be excluded from the distribution agreements." *Id.*, Ex. 3.

2.    **The Consent Award and Judgment**

The arbitration panel entered the consent award (the "Award") on August 20, 2007. *Id.*,

Ex. 1. The Award states that the parties are bound by the Letter Agreement, the handwritten

amendments thereto, and an unsigned and undated document entitled "Settlement Agreement and

Mutual Release."[6] *Id.* This third document contains the following provisions:

> 3.    **Confirmation:**    Any party may file a petition
> to confirm the Consent award. The Parties agree that the amount
> in controversy in the Action exceeds the sum or value of $75,000,
> exclusive of interest and costs, and that the preferred forum for
> confirmation is the United States District Court for the Southern
> District of New York. . . .

> 10.    **Claims Arising out of the Enforcement of this
> Agreement:**    The Parties do not release each other from any
> claims, counterclaims, demands, causes of actions and rights of
> action arising out of the enforcement of the terms of this
> Agreement or the Consent award as confirmed by a court of
> competent jurisdiction. Prior to commencing any action relating to
> the enforcement of this Agreement of the Consent award as
> confirmed, the party alleging breach must provide notice to the
> party alleged to have breached, specifying in sufficient detail the
> allegation and the basis therefor, and must provide no less than 60
> days to cure the alleged breach.

*Id.*, Ex. 4, at 2, 5.

In an Order dated September 28, 2007, this Court granted CDDV and CDP's Petition to

Confirm the Arbitration Award pursuant to 9 U.S.C. § 9 and directed the clerk to enter judgment

confirming the Award (the "Judgment"). *See id.*, Ex. 1. Judgment was entered confirming the

Award on October 1, 2007. *See id.*, Ex. 2.

---

[6]    With respect to this document, the panel's Award redacted certain language that is
irrelevant here.

E.    **Violations of the Court's Judgment**

In the fall of 2007, CDDV and CDP learned that Hornell was planning to introduce 16 and 20 ounce plastic packages of its core product line, AriZona Iced Tea. Taglienti Decl. at ¶ 44. While discussing the introduction of these new packages with Hornell in December 2007 and January 2008, CDDV and CDP repeatedly asserted that they were Exclusive Products under the terms of the Distribution Agreements. *Id.* at ¶ 47. Hornell made no assertion to the contrary. *Id.* The parties met twice in February 2008 to discuss pricing for these new packages. *Id.* at ¶ 48. Hornell attempted to dictate both the price at which CDDV and CDP would buy these new packages from Hornell and the resale price at which CDDV and CDP were required to sell these packages to their customers. *Id.* at ¶ 50. This required pricing simply was not acceptable. *Id.* at ¶ 51.

CDDV and CDP expressed their interest in distributing these new packages, but they rejected Hornell's required pricing scheme. *Id.* at ¶ 52. Hornell then disclosed its plan to sell the 20 ounce plastic package directly to Exxon/Mobil and the 16 ounce plastic package directly to various stores. *Id.* at ¶ 54. In fact, Hornell proceeded to do much more. *Id.* at ¶¶ 56, 58, 61. On April 1, 25, and May 19, 2008, counsel for CDDV and CDP sent notices to Hornell of the following sales in violation of the Settlement Agreement:

- 16 ounce plastic to BJ's Wholesale Club and Sam's Club;

- 20 ounce plastic to Exxon/Mobil;

- 16 ounce plastic to National Wholesale Liquidators; and

- 16 ounce plastic to Costco and Wegmans.

Klinges Decl., Exs. 5, 6 and 7.

The Settlement Agreement provides for a 60-day period to cure any default, a period which expired on June 2, 2008.[7] On June 4, 2008, Hornell responded for the first time to Petitioners' notices of default, admitting that it is making the disputed sales and asserting justifications which, as will be shown below, have no merit whatsoever. Klinges Decl., Ex. 8.

Since June 4, CDDV and CDP have confirmed that Hornell has continued selling its 20 ounce plastic package to Exxon/Mobil, and the 16 ounce plastic package is still being sold to the following chain stores: National Wholesale Liquidators in Philadelphia, Pennsylvania, and Cherry Hill, New Jersey; Wegmans in Cherry Hill, New Jersey; Sam's Club in Deptford, New Jersey, Cinnaminson, New Jersey and Philadelphia, Pennsylvania; BJ's Wholesale Club in Philadelphia, Pennsylvania; Sam's Club in Catonsville, Maryland; and BJ's Wholesale Club in Pasadena, Maryland. Taglienti Decl. at ¶ 61. Attached to the Klinges Declaration are receipts from these sales and pictures of the new plastic 16 ounce bottle being sold in 24 pack cases at BJ's Wholesale Club in Philadelphia, Pennsylvania, and in 12 pack cases at Wegmans in Cherry Hill, New Jersey. Klinges Decl., Ex. 9.

## III. ARGUMENT

The facts here are undisputed. The legal issues involve the interpretation of a simple settlement agreement which was entered by this Court as a Judgment less than a year ago. Hornell's past disregard for the parties' private agreements was a serious matter in its own right. Hornell's present conduct, however, crosses a different line — violating this Court's Judgment. The appropriate remedy here is an order compelling strict compliance with the Judgment and a

---

[7]     The violation asserted here is that Hornell is selling its new 16 and 20 ounce plastic packages directly to multiple accounts for resale within the Exclusive Territories. This violation was noticed properly on April 1, 2008, and the 60-day cure period expired on

contempt award in an amount that is sufficiently large to compensate Petitioners for injuries

caused by past noncompliance and to prevent continued disobedience.

### A.    This Court is Empowered to Enforce the Consent Award

Once a district court confirms an arbitration award, the award is docketed as if it is a

judgment of that court and has the "same force and effect, in all respects, and [is] subject to all

the provisions of law relating to, a judgment in an action; and it may be enforced as if it has been

rendered in an action in the court in which it is entered." 9 U.S.C. § 13.1. Since the Award in

this matter was confirmed by this Court, this Court has "ancillary jurisdiction over subsequent

proceedings necessary . . . to enforce the judgment." *Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d

Cir. 2007) (quoting *Dulce v. Dulce*, 233 F.3d 143, 146 (2d Cir. 2000)). When asked to enforce

confirmed arbitration awards, "a court is entitled to require actions to achieve compliance with

them." *Id.*; *see also* Fed. R. Civ. P. 70 (providing that the district court may hold a party in

contempt for failing to obey a judgment to perform a specific act).

Consent awards embody elements of both contracts and judicial decrees. *Berger v.

Heckler*, 771 F.2d 1556, 1567-68 (2d Cir. 1985) (noting that "consent decrees are a hybrid in a

sense that they are at once both contracts and orders; they are construed largely as contracts, but

are enforced as orders."). Judgments of this sort reflect not only an agreement of the parties, but

also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a

judicial decree that is subject to the rules generally applicable to other judgments and decrees."

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). It is clear from the terms of

the parties' Settlement Agreement that the parties intended to have their Agreement entered as a

---

June 2, 2008. Klinges Decl., Ex. 5. More recent letters regarding additional examples of
what appears to be a corporate strategy do not start anew Hornell's 60-day cure period.

consent award and confirmed in this Court.  *See* Klinges Decl., Ex. 4 at ¶ 3 ("Any party may file

a petition to confirm the consent award . . . [in] the United States District Court for the Southern

District of New York.").

Because a consent decree is a court-approved order, "a district court has broad equitable

discretion to enforce the obligations of the decree."  *King v. Allied Vision*, 65 F.3d 1051, 1058

(2d Cir. 1995).  As the Court of Appeals for the Second Circuit has explained:

> The Court has inherent power to enforce consent
> judgments, beyond the remedial 'contractual' terms agreed
> upon by the parties.  Unlike a private agreement, a consent
> judgment contemplates judicial interests apart from those
> of the litigants.  Until parties to such an instrument have
> fulfilled their express obligations, the court has continuing
> authority and discretion — pursuant to its independent,
> juridical interests — to ensure compliance.

*EEOC v. Local 580,* 925 F.2d 588, 593 (2d Cir. 1991).

When analyzing a consent award, a court may consider normal aids to contract

construction such as "the circumstances surrounding the formation of the consent order, any

technical meaning words used may have had to the parties, and any other documents expressly

incorporated in the decree."  *United States v. Int'l Bhd. of Teamsters*, 998 F.2d 1101, 1106 (2d

Cir. 1993).

### B.    Hornell Has Not Complied With the Judgment

It is undisputed that Hornell has been selling its new 16 ounce and 20 ounce plastic

packages of AriZona Iced Tea to multiple retailers for distribution within the CDDV and CDP

territories.  Klinges Decl., Exs. 5, 6 and 7.  Based on the June 4, 2008 letter from Hornell's

counsel, it appears that Hornell has no plans to discontinue these sales.  *Id.*, Ex. 8.  The only

questions before this Court are whether such sales violate the terms of the Judgment and, if so,

what relief should be granted.

### 1.    Hornell's recent sales are not permitted under the parties' agreements

Undoubtedly, the new 16 ounce and 20 ounce plastic packages are Exclusive Products. Under the terms of the CDDV and CDP Distribution Agreements, which are incorporated into the Consent Award (and therefore the Judgment) by reference, all packages smaller than one liter are Exclusive Products unless specifically exempted on Schedule A-2. Taglienti Decl., Exs. 1, 2 and 3. Neither package appears on Schedule A-2 of the Distribution Agreements. *Id.* at Schedule A-2.

Further, the sales of these new packages to the particular accounts at issue are not subject to any exceptions to exclusivity. Paragraph 3 of the Letter Agreement lists specific packages that Hornell may sell directly to specific accounts. Klinges Decl., Ex. 3 at ¶ 3. There is no mention of 16 ounce or 20 ounce plastic bottles, nor may Hornell sell its "Full Product Line" to any of the accounts at issue. *Id.*

### 2.    Hornell's asserted justifications are without merit

In response to Petitioners' notice letters, Hornell has asserted four arguments. *See* Klinges Decl., Ex. 8. Two of these arguments misstate the clear and unambiguous terms of the confirmed Agreement. The remaining two arguments restate positions asserted by Hornell in the arbitration — positions that have been rejected by virtue of the Settlement Agreement. All four of these arguments are baseless and do not excuse noncompliance with this Court's Judgment.

First, Hornell asserts that exclusivity has been waived with respect to the 16 ounce and 20 ounce plastic packages pursuant to a provision in the Settlement Agreement applicable to new "product lines" which CDDV or CDP decline to carry. *Id.*; *see* Ex. 3 at ¶ 7. This nonsensical argument ignores the plain meaning of the Letter Agreement, which differentiates between new product lines, new flavors and new packages. *Id.* at ¶¶ 7-9. These are unambiguous terms that must be interpreted according to their plain meanings. A new 16 or 20 ounce plastic bottle of the

flagship product line (AriZona Iced Tea) in its top selling flavors can only be considered a new package of an existing product line.[8]

In an equally disingenuous argument, Hornell claims that paragraph 3 of the Letter Agreement authorizes it to sell "16 oz. products to various accounts, including club stores." *Id.*, Ex. 8. The terms the parties agreed to, however, specified the only type of 16 ounce package that Hornell may distribute directly — glass. *Id.*, Ex. 3 at ¶ 3. We need not tell this Court that plastic is not glass. Hornell's argument rewrites the unambiguous terms of the confirmed Settlement Agreement and must fail.[9]

The arguments asserted in the second and fourth paragraphs of Hornell's letter renew Hornell's prior attempts to create conditions to exclusivity and must be rejected. First, Hornell argues that it is permitted to sell its 16 ounce plastic package directly if the parties cannot agree on the distributor's resale price. *Id.*, Ex. 8. Second, Hornell attempts to justify sales of its 20 ounce plastic package to Exxon/Mobil because other distributors in other regions of the country allegedly agreed to resell this package to their customers at a price that CDDV and CDP rejected.

---

[8]    A list of Hornell's product lines can be found on wikipedia, <http://en.wikipedia.org/wiki/Arizona_Beverage_Company>, which divides various products into the following categories: tea, coffee, juice, sports drinks and water. Although perhaps not a scholarly treatise, wikipedia certainly suggests a common understanding of the phrase "product line" that cannot be confused with the word "package."

The Merriam-Webster Online Dictionary defines "package" as "a commodity or a unit of a product uniformly wrapped or sealed." <http://www.merriam-webster.com/dictionary/package>.

[9]    Furthermore, this argument only attempts to justify sales to club stores and does not apply to any account like Wegmans or National Wholesale Liquidators, to which Hornell is not even permitted to sell its 16 ounce glass bottles.

*Id.* These assertions rehash old arguments that the parties left behind when they settled their protracted arbitration.

In more than 40 years in the beverage distribution business, CDDV and CDP have never agreed to permit a manufacturer to set their resale prices to their customers, to dictate their profit margins,[10] or to condition a grant of exclusivity on whether an agreeable price can be negotiated. Taglienti Decl. at ¶ 53. Hornell is no exception. Further, agreements between Hornell and distributors in different retail markets, who may or may not have exclusive distribution rights, are irrelevant here. If Hornell intended to negotiate customer pricing or a ceiling on CDDV or CDP's profit margin as a condition of exclusivity, or to provide a remedy in the event CDDV or CDP did not agree to pricing on a new package, these terms should have been raised in settlement negotiations in November 2006. Even had such terms been proposed, CDDV and CDP cannot conceive of any circumstance in which this would have been acceptable.

The absence of any such language speaks volumes.

### C.    Remedies for Noncompliance

Based on the undisputed facts and the plain meaning of the Court's Judgment, the only remaining unanswered question for this Court is how to fashion an appropriate remedy for Hornell's noncompliance. A district court has the inherent power to hold a party in civil contempt for noncompliance with a court order. *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984). Civil contempt is appropriate where, as here, "the order being enforced is 'clear and unambiguous,' the proof of non-compliance is 'clear and convincing,' and

---

[10]    Though it is clear from the terms of the Settlement Agreement that CDDV and CDP's profit margin is irrelevant to the Court's analysis, it should be noted that the profit margins sought by CDDV and CDP on these packages are entirely in line with their profit margins on other New Age products and on other AriZona packages. Taglienti Decl. at ¶ 55.

[Hornell has] not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *EEOC v. Local 580,* 925 F.2d at 594 (quoting *EEOC v. Local 638*, 753 F.2d 1172, 1178 (2d Cir. 1985)).  "It need not be established that the violation was willful," *Paramedica Electromedicina Comercial*, 369 F.3d 645, 655 (2d Cir. 2004) (citation omitted), but here, of course, it is.  Klinges Decl., Ex. 8.

It is well settled that civil contempt hearings must be "remedial and compensatory, and not punitive, and that any award resulting from such a proceeding should be for the benefit of the complainant."  *Manhattan Indus. v. Sweater Bee By Banff*, 885 F.2d 1, 5 (2d Cir. 1989) (citations omitted).  "Monetary sanctions for civil contempt traditionally have been awarded to compensate the plaintiff for injury caused by past noncompliance or to prevent continued disobedience."  *Id.* Where a court finds that noncompliance with its Judgment has been willful, an award of the reasonable costs of prosecuting the contempt, including attorneys' fees, is generally awarded.  *Id.* at 8.

There is no question that Hornell is selling its new packages into Petitioners' Exclusive Territories in direct violation of the Judgment.  Hornell does not deny that it is making these sales.  Upon notice and the expiration of the 60-day cure period, Hornell flatly refuses to comply.  Klinges Decl., Ex. 8.  At the time of this filing, these new plastic packages may be purchased at numerous accounts throughout the Exclusive Territories.  *Id.*, Ex. 9.  Based on the facts already before this Court, an Order compelling compliance with the Judgment is appropriate.

In order to fashion an appropriate contempt order, the Court will need to receive additional evidence, including the number of cases that Hornell improperly sold and the profits from those sales.  Therefore, we propose a limited discovery schedule in anticipation of a contempt hearing.  Further, based on Hornell's refusal to comply and the alleged justifications

put forth, Petitioners assert that noncompliance with this Court's Judgment has been willful and that an award of costs and fees is appropriate.

IV.     **CONCLUSION**

For the foregoing reasons, CDDV and CDP respectfully request entry of an Order compelling compliance with this Court's Judgment and scheduling a contempt hearing.


WOLFBLOCK LLP


By:   /s/ Dana B. Klinges
         Dana B. Klinges
         Jennifer F. Beltrami
250 Park Avenue
New York, New York 10177
dklinges@wolfblock.com
(212) 986-1116
Attorneys for Petitioners


Dated:         New York, New York
               June 24, 2008