UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x
CANADA DRY DELAWARE VALLEY            :
BOTTLING COMPANY and CANADA           :
DRY POTOMAC CORPORATION,              :     07 Civ. 8037 (SHS)
                                      :
            Petitioners,              :
                                      :
      -against-                       :
                                      :
HORNELL BREWING CO., INC., D/B/A      :
FEROLITO, VULTAGGIO & SONS,           :
                                      :
            Respondent.               :
------------------------------------------------ x

## DECLARATION OF JOHN TAGLIENTI

I, John Taglienti, declare and affirm under the penalties of perjury that:

1.    I am the Executive Vice President for Sales and Marketing for Canada Dry Delaware Valley Bottling Company ("CDDV") and Canada Dry Potomac Corporation ("CDP") and am therefore authorized to make the following statements on behalf of CDDV and CDP.

2.    I submit this Declaration in support of CDDV and CDP's Motion to Compel Compliance with this Court's Judgment and for Contempt against Hornell Brewing Co., Inc. ("Hornell").

### THE PARTIES

3.    Hornell is a New York corporation with its principal place of business located at 5 Dakota Drive, Lake Success, New York 11042.

4.    Hornell is in the business of producing, marketing and selling beverages and other products.

5. Hornell's core product line is AriZona Iced Tea in a variety of flavors and package sizes.

6. In 1997 and 1998 when CDDV and CDP started selling AriZona Iced Tea, the core packages were 16 ounce and 20 ounce glass bottles.

7. These packages, along with a 23.5 ounce can, have been AriZona's best-selling single-serve packages over the past decade.

8. As of 2007, AriZona Iced Tea was the top-selling iced tea brand in the United States, with annual sales of almost $300 million.

9. Hornell also sells a variety of other non-alcoholic product lines, including juices, energy drinks, sports drinks and coffee.

10. CDDV is a Pennsylvania corporation with its principal place of business located at 8275 U.S. Route 130, Pennsauken, New Jersey 08110.

11. CDDV is in the business of distributing Hornell's products and those of other beverage manufacturers in southern New Jersey, Delaware and the Philadelphia metropolitan area.

12. CDP is a Pennsylvania corporation with its principal place of business located at 3600 Pennsy Drive, Landover, MD 20785.

13. CDP is in the business of distributing Hornell's products and those of other beverage manufacturers in Maryland, Virginia and the District of Columbia.

## THE DISTRIBUTION AGREEMENTS

14. Hornell executed an exclusive distribution agreement with CDDV on March 17, 1997, granting CDDV distribution rights in the following counties in Pennsylvania: Bucks,

Chester, Delaware, Montgomery and Philadelphia. A true and correct copy of this agreement is attached as Exhibit 1.

15. Hornell executed a similar exclusive distribution agreement with CDDV on March 17, 1997, granting CDDV distribution rights in the following counties in New Jersey: Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester and Salem; and the following counties in Delaware: Kent, New Castle and Sussex. A true and correct copy of this agreement is attached as Exhibit 2.[1]

16. Combined, these counties in Pennsylvania, New Jersey and Delaware (collectively, the "CDDV Territory") comprise the territory for which CDDV is the exclusive distributor of Hornell products defined in Schedule A-1 of the CDDV Pennsylvania and New Jersey/Delaware Agreements as "Exclusive Products."

17. Hornell executed an exclusive distribution agreement with CDP on December 23, 1998 (the "CDP Agreement"; all three agreements collectively referred to as the "Distribution Agreements"). A true and correct copy of the CDP Agreement is attached as Exhibit 3.

18. The "CDP Territory" as defined in the CDP Agreement includes the District of Columbia and the following counties in Maryland: Anne Arundel, Baltimore, Baltimore City, Carroll, Frederick, Howard, Montgomery, and Prince George's. Ex. 3, Schedule B.

19. Pursuant to section one of the CDDV and CDP Agreements, CDDV and CDP have been appointed by Hornell as its "sole and exclusive" distributors in their territories of

---

[1] The contract language relevant to this dispute is identical in CDDV's Pennsylvania and New Jersey/Delaware Agreements. Accordingly, references to specific contractual language in both agreements will be cited as the "CDDV Agreements."

those specific AriZona Beverages and other products identified as the "Exclusive Products" on Schedule A-1. *See* Exs. 1, 2 and 3 at § 1.1.

20. Territorial exclusivity is extremely important to a distributor like CDDV or CDP.

21. Distributors rely on exclusivity to justify the significant investments and overhead associated with taking on an emerging brand — as AriZona Iced Tea was in 1997 and 1998 — and building its position in the market.

22. Maintaining exclusive distribution rights for top selling brands — as AriZona Iced Tea is now — is vital to CDDV and CDP, as they compete with Coca-Cola and Pepsi Cola distributors for access to accounts and for cooler space.

23. "Exclusive Products" are defined slightly differently in the CDDV and CDP Distribution Agreements.

24. Schedule A-1 to the CDDV Agreements defines "Exclusive Products" as "[a]ll non-alcoholic beverage products in all product sizes, except those set forth in Schedule A-2." Exs. 1 and 2, Schedule A-1.

25. In other words, products that fall within the broad definition in Schedule A-1 and are not specifically exempted in Schedule A-2 are Exclusive Products in the CDDV Territory.

26. This includes 16 ounce and 20 ounce plastic bottles, neither of which is listed as an exception in Schedule A-2. Exs. 1 and 2, Schedule A-2.

27. Schedule A-1 to the CDP Agreement defines "Exclusive Products" as all non-alcoholic, non-carbonated Hornell products and product sizes, "except those set forth on Schedule A-2." Ex. 3, Schedule A-1.

28. Because 16 and 20 ounce plastic bottles of AriZona Iced Tea are not covered by any of the exceptions listed in Schedule A-2 to the CDP Agreement, they are Exclusive Products in the CDP market as well.

### THE PARTIES' RELATIONSHIP PRIOR TO ARBITRATION

29. CDDV and CDP have been highly successful in building the AriZona brand in their markets.

30. As AriZona's exclusive distributors, CDDV and CDP have consistently increased sales of AriZona products.

31. In 2007, CDDV and CDP sold a total of over 1.4 million cases of AriZona Products, generating more than $14 million in gross revenues to CDDV and CDP.

32. As one of the top selling "new age" products offered by CDDV and CDP, AriZona is an extremely important part of their businesses.

33. Thanks to the high quality of the AriZona products, Hornell's creative packaging, and the efforts of distributors like CDDV and CDP, AriZona has become the number one iced tea brand in the United States. A true and correct copy of US RTD Dollar Sales in 2007 is attached as Exhibit 4.

34. This success has created opportunities for Hornell to negotiate national distribution and promotions with a number of large chain accounts, such as club stores, supermarkets, drug stores and mass merchandisers.

35. It is not uncommon for chain accounts to seek to negotiate lower prices by buying products directly from beverage manufacturers.

36. In such an arrangement, the manufacturer delivers products directly to the account's regional warehouses, which then ship the products to the account's individual stores for resale.

37. A direct sale to a regional warehouse often results in exclusive products being resold at hundreds of individual stores within a distributor's exclusive territories.

38. When chain accounts request direct sales, every other manufacturer with whom CDDV and CDP has an exclusive distribution agreement has avoided breaching its contractual obligations by: a) negotiating "invasion fees" to compensate CDDV and CDP for their lost profits; b) entering into agreements with national accounts that do not include CDDV's and CDP's territories; c) negotiating with the national account to permit CDDV and CDP to distribute to the stores within their territories; or d) simply rejecting these overtures.

39. Hornell has not pursued any of these options; rather, it has ignored its grant of territorial exclusivity and persisted in selling Exclusive Products directly to national accounts.

40. Since the beginning of the parties' business relationship, CDDV and CDP have insisted on strict compliance with the terms of their agreements and have objected to Hornell's efforts to sell Exclusive Products directly to chain accounts.

41. For a number of years the parties engaged in letter writing campaigns and negotiations to resolve these disputes.

42. In 2005, Hornell introduced a new package for AriZona Iced Tea in a one liter plastic bottle and refused to acknowledge that this new package was an Exclusive Product under the Distribution Agreements.

43. CDP discovered evidence that Hornell was selling this new package to a national drug store chain (Walgreens) for resale in CDP's exclusive territory and demanded that Hornell refrain from further violations.

## DISTRIBUTION OF PLASTIC PRODUCTS

44. In the fall of 2007, CDDV and CDP learned that Hornell was planning to introduce 16 and 20 ounce plastic packages of its core product line, AriZona Iced Tea.

45. The initial presentation to CDDV and CDP included: (1) a nationwide program with Exxon/Mobil to sell cases of 20 ounce plastic/24-packs; and (2) a program with grocery stores and mass merchandisers to sell cases of 16 ounce plastic/12-packs.

46. In initial conversations with Rob Marciano, Hornell's Executive Vice President and Chief Sales and Marketing Officer, CDDV and CDP insisted on strict compliance with the Settlement Agreement between the parties and would not permit distribution of these packages within CDDV's and CDP's exclusive distribution territories should CDDV and CDP decide not to distribute these plastic products unless Hornell was specifically authorized to do so under the Settlement Agreement.

47. Throughout January and February 2008, CDDV and CDP repeatedly asserted that these new plastic packages were Exclusive Products under the terms of the Distribution Agreements entered into between CDDV, CDP and Hornell, and Hornell made no assertion to the contrary.

48. On February 4, 2008, and February 20, 2008, the parties met to discuss the pricing of these new packages.

49. Ultimately, CDDV, CDP and Hornell could not agree on pricing for either plastic package.

50. Hornell attempted to dictate both the price at which CDDV and CDP would buy these new packages from Hornell and the resale price at which CDDV and CDP were required to sell these packages to their customers.

51. This required pricing simply was not acceptable.

52. CDDV and CDP expressed their interest in distributing these new packages, but they rejected Hornell's required pricing scheme.

53. In more than 40 years in the beverage distribution business, CDDV and CDP have never agreed to permit a manufacturer to set their resale prices to their customers, to dictate their profit margins, or to condition a grant of exclusivity on whether an agreeable price can be negotiated.

54. On March 27, 2008, I had a conversation about the plastic packages with Robert Marciano where he confirmed that, based on CDDV's and CDP's decision not to accept Hornell's marketing plan, Hornell had decided to sell the 20 ounce plastic/24-pack directly to Exxon/Mobil and the 16 ounce plastic/12-pack directly to various stores.

55. The profit margins sought on these packages by CDDV and CDP are entirely in line with profit margins on other New Age products and on other AriZona packages.

56. I questioned Mr. Marciano about Hornell's direct sales of the 16 ounce plastic to BJ's Wholesale Club Stores, to which he claimed that these sales were a "pure swap" for 16 ounce glass packages, which Hornell is permitted to sell directly to BJ's Wholesale Club Stores.

57. I stated that the Settlement Agreement between the parties did not permit such a swap, to which Mr. Marciano replied that he would raise the issue with Martin Cunningham, counsel for Hornell.

58. I also questioned Mr. Marciano about Hornell's direct sales of the 20 ounce plastic/24-pack to Sam's Club, to which he stated that he was unaware of this issue and would raise it with Mr. Cunningham.

59. In May, CDDV and CDP attempted to place orders for these plastic packages.

60. Hornell refused to fill the orders.

61. Since June 4, 2008, I have confirmed that Hornell has continued selling these new plastic packages for resale within CDDV's and CDP's Exclusive Territories, new evidence of which is contained in the table below:

| Location | Territory | Package |
|---|---|---|
| National Wholesale Liquidators, Philadelphia, PA, and Cherry Hill, NJ | CDDV | 16 ounce plastic (12 pack) |
| Wegmans, Cherry Hill, NJ | CDDV | 16 ounce plastic (12 pack) |
| Sam's Club, Deptford, NJ, Cinnaminson, NJ and Philadelphia, PA | CDDV | 16 ounce plastic (24 pack) |
| Sam's Club, Catonsville, MD | CDP | 16 ounce plastic (24 pack) |
| BJ's Wholesale Club, Philadelphia, PA | CDDV | 16 ounce plastic (24 pack) |
| BJ's Wholesale Club, Pasadena, MD | CDP | 16 ounce plastic (24 pack) |
| Exxon/Mobil (multiple locations) | CDP | 20 ounce plastic (24 pack) |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 24, 2008.

_____
John Taglienti