# EXHIBIT 2

# HORNELL BREWING CO., INC.
## DISTRIBUTOR AGREEMENT

This Agreement effective the 17th day of March, 1997, ("Effective Date") is entered into by and between HORNELL BREWING CO., INC. d/b/a FEROLITO, VULTAGGIO & SONS, a New York corporation ("Manufacturer"), with its principal place of business located at 5 Dakota Drive, Lake Success, New York 11042, and Canada Dry Delaware Valley Bottling Company, a Pennsylvania corporation ("Distributor"), with its principal place of business located at 8275 U.S. Route 130, Pennsauken, New Jersey 08110.

WHEREAS, the Manufacturer is the licensee of certain trademarks and copyrights, applying to ARIZONA ICED TEA and other beverages utilizing the name ARIZONA (hereinafter referred to as "AriZona Beverages"), and is in the business of producing, marketing and selling AriZona Beverages in the United States; and

WHEREAS, the Manufacturer is also in the business of marketing and selling other products, with and without the ARIZONA name (the "Other Products").

WHEREAS, Distributor desires to become the distributor of certain AriZona Beverages and of certain Other Products, all within the confines of the Territory, all as set forth below.

NOW, THEREFORE, for and in consideration of the terms and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

\91\34191\027\WAWA\DISTCCC.001

1.    APPOINTMENT.

1.1    Subject to the terms and conditions provided herein, Manufacturer hereby appoints Distributor, and Distributor hereby accepts such appointment, as (a) the sole and exclusive distributor in the Territory of those specific AriZona Beverages and Other Products identified as the "Exclusive Products" on Schedule A-1 attached hereto, and (b) the non-exclusive distributor in the Territory of those specific AriZona Beverages and Other Products identified as the "Non-Exclusive Products" on Schedule A-2.  For the purposes hereof, "Products" shall mean the Exclusive Products and the Non-Exclusive Products, together, and the "Territory" shall be the channels of distribution and geographic area more fully described on Schedule B hereto.  The within appointment shall be perpetual subject to the further provisions hereof respecting termination.

2.    DISTRIBUTION NETWORK

2.1    Distributor shall at all times diligently and aggressively promote and actively solicit the sale and distribution of Products in accordance with the Business Plan, as defined below, within and throughout the Territory.

2.2    Distributor shall not directly or indirectly, including through any Affiliate, produce, promote, advertise, distribute, sell or offer for sale, directly or indirectly, without the prior written consent of the Manufacturer, any item bearing a trademark or trade dress that infringes the Manufacturer's intellectual property interest in, or otherwise creates confusion with, the trademark and copyright "ARIZONA" or the trade dress utilized by Manufacturer in its packaging of AriZona Beverages.  Attached hereto as Schedule C is a list of all items presently sold or offered for sale in the Territory by Distributor or any Affiliate

\91\34191\027\WAWA\DISTCCC.001

2

of Distributor on a direct store basis. At Manufacturer's reasonable request from time to time following the date hereof, Distributor shall disclose to Manufacturer the names of all items that it or any of its Affiliates holds out for sale in the Territory on a direct store basis. For the purposes hereof, "Affiliate" means a person or entity Controlling, Controlled by or under common Control with, another person or entity; and "Control" shall mean having the ability (whether or not exerted) to direct or substantially influence the business or affairs of a person or entity regardless of the actual percentage ownership in the entity.

2.3    Distributor shall not sell or distribute Products directly or indirectly to persons located outside of the Territory. It is specifically understood that pursuant to the foregoing prohibition, Distributor shall use its good faith efforts to prevent any person to which it sells Product from reselling any such Product outside the Territory; and shall follow such policies as Manufacturer may from time to time adopt, for application to its system of distributors, to prevent the transshipment of products out of each such distributor's respective territory.

2.4    Manufacturer shall use its good faith efforts to protect the territorial exclusivity granted to Distributor hereunder in respect of the Exclusive Products. Manufacturer shall not, except with the written consent of Distributor, grant any distribution rights for the Exclusive Products to any other distributor for any portion of the Territory; provided, however, that if in the Manufacturer's good faith determination the needs of any customer (or potential customer) of Exclusive Products within the Territory are not satisfied because Distributor refuses to service or otherwise inadequately services any such customer (or potential customer) or the Territory as a whole, Manufacturer shall have the right to

191\34191\027\WAWA\DISTCCC.001

deliver Exclusive Products directly to the customer or to appoint another distributor to service said account(s) with Exclusive Products which sale and/or service shall not constitute a violation of the territorial exclusivity provisions of this Agreement applicable to Exclusive Products; provided that the foregoing shall not entitle Manufacturer to permit the sale of Exclusive Products within the Territory by other(s) than Distributor to accounts which Distributor has, in the exercise of its reasonable good faith discretion, elected not to sell for good business reasons relative to matters specific to such accounts.

2.5    There shall be no restriction on the Manufacturer's right to sell, or to authorize others to sell, any Non-Exclusive Products within the Territory.

3.    <u>APPOINTMENT OF SUBDISTRIBUTORS.</u>

3.1    Manufacturer recognizes that the Distributor, in determining the manner in which it will service the channels of distribution set forth in <u>Schedule B</u>, may wish to enter into one or more subdistribution relationships. Distributor may, but only with the prior written consent of Manufacturer, enter into arrangements under which another person shall purchase Products from Distributor and market and distribute such Products within the Territory, but then only in accordance with the provisions of this Agreement (any such approved person is hereinafter referred to as a "Subdistributor"). Manufacturer hereby consents to Distributor's designation as Subdistributors those persons identified on <u>Schedule B-1</u>.

3.2    Distributor acknowledges that the conduct of a Subdistributor designated by the Distributor shall be unequivocally imputed to Distributor. Accordingly, the Distributor shall be responsible for strictly and vigorously monitoring and regulating the

\91\34\91\027\WAWA\DISTCCC.001

4

conduct of the business of each such Subdistributor. All of the terms, conditions and provisions of this Agreement must be strictly adhered to by each such Subdistributor designated by the Distributor. In that connection, Distributor agrees to enter into an agreement with each Subdistributor, in which, inter alia, such Subdistributor shall agree to be bound by the terms, conditions and provisions of this Agreement; provided that, in any event, if a Subdistributor acts inconsistently with the terms, conditions and provisions of this Agreement, (a) Manufacturer shall have the right to instruct Distributor to terminate the rights of such Subdistributor to sell any Products, and (b) for purposes of determining the Distributor's compliance with this Agreement, Subdistributor's actions shall in all events be deemed to be the actions of the Distributor; provided that Manufacturer shall have no right to terminate this Agreement by virtue of the acts or omissions of a Subdistributor so long as Distributor complies with the provisions of subparagraph (a) above. Upon request by Distributor, a sample form of subdistributorship agreement may be supplied by Manufacturer.

3.3    It is specifically understood and agreed that notwithstanding the provisions of this Paragraph 3, nothing herein contained shall be construed to constitute authorization for subdistribution except as otherwise provided in accordance with the terms of this Agreement. In the event that this Agreement is terminated for any reason, all Subdistributors designated by the Distributor shall be deemed terminated concurrently therewith, such Subdistributors shall have no recourse against Manufacturer by reason thereof, and Distributor shall indemnify Manufacturer and hold Manufacturer harmless from and against any claims made by any such Subdistributors by reason of such termination.

\91\34191\027\WAWA\DISTCCC.001

3.4    Without limiting the foregoing, it is understood and agreed by the parties hereto that the Manufacturer has no privity of contract with any Subdistributor and that there shall be no contractual relationship with any Subdistributor which has any binding effect or obligation upon the Manufacturer. Distributor shall reimburse Manufacturer for any costs incurred by Manufacturer (including attorneys' fees) in the course of any dealings that the Manufacturer has with a Subdistributor, including to effect a termination of Subdistributor's activities by the Territory in accordance with Paragraphs 3.2 or 3.3 above.

4    <u>PURCHASE OF PRODUCT</u>.

4.1    Distributor shall purchase Products at the price applicable to each Product (the "Agreed Price") and upon payment terms, each as periodically communicated by Manufacturer to Distributor. Manufacturer retains the right unilaterally to change the prices applicable to each Product upon forty-five (45) days prior written notice to the Distributor; and to modify the applicable payment terms, but only in the event that Distributor's financial condition justifies such change, and then only upon prior notice to Distributor.

4.2    Under the initial payment terms, Distributor shall pay in full to Manufacturer the Agreed Price for all Products within ten (10) days from the date of shipment of such Products from the Manufacturer to the Distributor. Payment by the Distributor shall be by wire transfer of good, collectible funds or by other means acceptable to the Manufacturer. Notwithstanding the foregoing, and as set forth in Paragraph 4.1 above, Manufacturer may modify the foregoing payment terms, including by limiting the

\91\34191\027\WAWA\DISTCCC.001

maximum amount that may be owing at any time and/or by reducing or extending the applicable payment period.

4.3    Manufacturer's limitation on the amount that may be owed or extension of the applicable payment period as provided in Paragraph 4.2 above shall not constitute a permanent limitation or extension of such payment terms on any other occasion. No limitation or extension shall be deemed effective unless by an instrument in writing signed by the Manufacturer.

4.4    INTENTIONALLY OMITTED.

4.5    Distributor shall make all payments of any sums when due hereunder. Manufacturer shall apply all such payments against such invoices as may be designated by Distributor. Distributor may not under any circumstances set-off against, or otherwise reduce payments in respect of, amounts specified in Manufacturer's invoices amounts that it believes are due it (a "Distributor Setoff"), regardless of the nature of such amounts (including without limitation on account of claimed shortages in deliveries, breakages, amounts due from Manufacturer on account of promotional allowance or the like, etc.), without providing Manufacturer sixty (60) days prior written notice of such intent to effect a Distributor Setoff; provided that no such Distributor Setoff shall be permitted if during such sixty (60) day notice period Manufacturer provides Distributor with notice of its intent to arbitrate any dispute giving rise to such intended Distributor Setoff pursuant to the terms of Section 20.3(b) below.

4.6    All orders placed by Distributor for Product shall be delivered by Manufacturer in a reasonably diligent fashion subject to Manufacturer's then current

\91\34191\027\WAWA\DISTCCC.001

7

production conditions and scheduling, and Manufacturer shall not be liable to Distributor for any delays in completing or shipping any orders for Product. If, because of circumstance beyond its reasonable control, the Manufacturer is not able to supply the Distributor with Distributor's requirements, the Manufacturer shall use its reasonable efforts to seek to allocate the sale of Products fairly and equitably (as determined by Manufacturer in its discretion) among all of its distributors.

5.    TERMINATION BY DISTRIBUTOR.

The Distributor may terminate this Agreement with or without cause upon not less than one hundred twenty (120) days' prior written notice to the Manufacturer (a "Distributor Termination"). Upon Distributor's delivery to Manufacturer of its notice of a Distributor Termination, Manufacturer may, at its option, elect to accelerate termination of this Agreement by providing the Distributor with written notice setting forth an earlier effective date of termination.

6A.    TERMINATION WITH CAUSE BY MANUFACTURER; NO OPPORTUNITY TO CURE.

6A.1  Manufacturer shall have the right, upon giving written notice to Distributor, to terminate this Agreement (such termination hereinafter being referred to as an "Immediate Termination") which termination shall be effective immediately upon delivery of notice thereof, upon the occurrence of any of the following events ("Immediate Termination Events"):

\91\34191\027\WAWA\DISTCCC.001

8

(a)    Fraud or willful misconduct of the Distributor directly or indirectly relating to, or affecting Distributor's performance of, this Agreement;

(b)    The voluntary or involuntary assignment or attempted assignment by Distributor for the benefit of creditors (other than a voluntary grant of security interests in Distributor's assets in the ordinary course of Distributor's business as collateral for commercial financing transactions), the institution of proceedings in bankruptcy by or against Distributor, or the insolvency of Distributor;

(c)    The institution of an action, or receipt of any notice of threatened action, by any state or federal governmental agency asserting the Distributor's noncompliance with laws or regulations applicable to the performance of this Agreement in general;

(d)    Conviction of Distributor or of any owner, officer or director of Distributor of a felony which, in the reasonable judgment of Manufacturer, may adversely affect the goodwill or interests of Distributor or Manufacturer;

(e)    The dissolution or liquidation of Distributor;

(f)    A Transfer, as hereinafter defined, in violation of Paragraph 19.1 hereof; or

\191\34191\027\WAWA\DISTCCC.001

(g)     The repeated occurrence (i.e. on three or more occasions) of one or more Notice Termination Events, as hereinafter defined, within any consecutive twelve (12) month period to an extent that, in Manufacturer's discretion, Distributor is failing to abide by the provisions hereof in a manner that could have a material adverse affect on Manufacturer.

6A.2  Manufacturer's failure on one or more occasions to enforce its rights by reason of an Immediate Termination Event shall not constitute a waiver of such rights on any other occasion.  No waiver of Manufacturer's rights on account of an Immediate Termination Event shall be deemed to be effective unless by an instrument in writing signed by the Manufacturer.

6B.     <u>TERMINATION WITH CAUSE BY MANUFACTURER;
OPPORTUNITY TO CURE.</u>

6B.1   Manufacturer shall have the right to terminate this Agreement (a "Notice Termination") upon the failure by Distributor to comply with any provision of this Agreement that does not constitute an Immediate Termination Event (a "Notice Termination Event"), but only after providing Distributor with written notice specifying in detail the particular Notice Termination Event (the "Violation Notice"), and the subsequent failure by Distributor to cure any such failure within thirty (30) days (the "Cure Period") following delivery of the Violation Notice (the "Cure Right"); provided that (i) if such Notice Termination Event involves Distributor's alleged failure to pay amounts due to Manufacturer, and Distributor disputes the amount thereof, Manufacturer shall at Distributor's request meet

\91\34191\027\WAWA\DISTCCC.001

10

with Distributor and seek to resolve such dispute in an amicable fashion, (ii) there shall be no Cure Right or Cure Period as to any Notice Termination Event that is by its nature not curable, (iii) there shall be no Cure Right as to any Notice Termination Event that by operation of Paragraph 6A.1(i) is an Immediate Termination Event, (iii) the Cure Period shall instead be ten (10) days on account of any failure by Distributor to make a monetary payment hereunder (a "Monetary Failure"); provided, however, that without limiting the generality of Paragraph 6A.1(i), a Monetary Failure on more than 3 occasions during any 12 month period shall constitute an Immediate Termination Event.

6B.2    During the Cure Period, and without limiting Manufacturer's rights otherwise contained herein, (a) Manufacturer may immediately upon notice to Distributor require special payment assurances including, without limitation, the requirement for prepayments prior to delivery of Products, and (b) Manufacturer may impose restrictions on the quantity of new orders and deliveries of Products.

6B.3    Manufacturer's failure on one or more occasions to enforce its rights by reason of a Notice Termination Event shall not constitute a waiver of such rights on any other occasion.  No waiver of Manufacturer's rights on account of a Notice Termination Event shall be deemed to be effective unless by an instrument in writing signed by the Manufacturer.

6C.    <u>TERMINATION BY MANUFACTURER BY REASON OF UNDERPERFORMANCE.</u>

6C.1    The Manufacturer shall have the right unilaterally to terminate this Agreement in the event of an Uncured Distributor's Underperformance, as hereinafter

defined (a "Performance Termination", and together with a Distributor Termination, an Immediate Termination, a Notice Termination, and a Withdrawal Termination, as hereinafter defined, a "Termination").

6C.2   Whether or not Distributor suffered an "Uncured Underperformance" shall be determined in accordance with the following:

(a)   Distributor's Sales of Products in the Territory shall be determined for each consecutive twelve (12) month period during the term hereof (the "Base Performance Period").

(b)   Distributor's Sales of Products in the Territory shall be determined for the prior same consecutive twelve (12) month period (the "Prior Performance Period").

(c)   Sales of Products in the Comparable Territories, as hereinafter defined, (in the aggregate) shall be determined for each of the Base Performance Period and the Prior Performance Period. The "Comparable Territories" shall be the territories of the metropolitan areas of Boston, Massachusetts, New York, New York and Baltimore, Maryland/Washington, D.C., as established pursuant to Manufacturer's standard geographical territory designations.

(d)   Distributor's percentage sales increase or decrease in the Territory from the Prior Performance Period to the Base

\91\34191\027\WAWA\DISTCCC.001

12

Performance Period shall be determined ("Distributor's Percentage Change").

(e)     The percentage sales increase or decrease in the Comparable Territories from the Prior Performance Period to the Base Performance Period shall be determined (the "Comparable Percentage Change").

(f)     An "Underperformance" shall be deemed to have occurred if the Distributor's Percentage Change is more than thirty (30) points less than the Comparable Percentage Change. Such calculation shall be made by converting the Distributor's Percentage Change and the Comparable Percentage Change into points (e.g. a 30% percentage increase would be 30 points; and a 10% percentage decrease would be a negative 10 points), and determining if the Comparable Percentage Change is more than 30 points higher than the Base Percentage Change.

(g)     In the event of an Underperformance, Manufacturer may so notify Distributor (the "Underperformance Notice") within forty five (45) days following the end of the applicable Base Performance Period; and Distributor shall be obligated to prepare and present to Manufacturer a marketing plan intended to increase Distributor's sales of products in the Territory (the "Revised Marketing Plan").

\91\34191\027\WAWA\DISTCCC.001

13

(h)    an Underperformance shall be an "Uncured Underperformance" if either (i) Distributor fails within thirty (30) days following delivery of the Underperformance Notice to present a Revised Marketing Plan that is satisfactory to Manufacturer in the exercise of its reasonable discretion, or (ii) the Revised Marketing Plan is acceptable to Manufacturer, but there shall have been Underperformances with respect to at least two (2) of the six (6) Performance Periods following the delivery of the Underperformance Notice.

6C.3    The Manufacturer may effect a Performance Termination by providing notice thereof (a "Performance Termination Notice") at any time within sixty (60) days following the Distributor's Uncured Underperformance; and the effective date for such Performance Termination shall be as specified in the Performance Termination Notice.

6C.4    The Manufacturer recognizes that the Distributor may have invested time and effort in developing distribution within the Territory during the term that it operated as a Distributor in accordance with this Agreement. The parties have agreed that, only with respect to a Performance Termination, the Manufacturer will make a payment to Distributor (the "Performance Payment") in recognition of, inter alia, said time and effort. Such Performance Payment shall be based upon the number of cases of Exclusive Products sold by the Distributor during the Base Performance Period.

6C.5    The Performance Payment shall be the following:

\91\34191\027\WAWA\DISTCCC.001

14

(a)    payment shall be equal to four dollars ($4.00) per case for each case of Exclusive Products sold by the Distributor during the Base Performance Period if the Performance Notice is delivered within the first six (6) years after the Commencement Date, as defined below; and

(b)    if the Performance Notice is delivered more than six (6) years after the Commencement Date, payment shall be equal to a (i) percentage of (ii) four dollars ($4.00) per case for each case of Exclusive Products sold by the Distributor during the Base Performance Period, where such percentage is 100 minus the number of points by which the Comparable Percentage Change exceeded the Distributor's Percentage Change, as determined pursuant to Section 6C.2(f) above.

6C.6   The Manufacturer shall make the Performance Payment in cash, subject to offset pursuant to Paragraph 7.3 below, such payment to be made not more than ten (10) days following such time that the Distributor shall have satisfied all of its obligations to the Manufacturer under this Agreement; provided that in order to assure Manufacturer's payment thereof, Manufacturer shall place the amount thereof in escrow, pending satisfaction of all such obligations, subject to a mutually acceptable escrow agreement, within ten (10) days following determination of the amount of the Performance Payment. In addition, as a further condition to such payment the Distributor shall be obligated to execute a release in Manufacturer's favor, and in form specified by Manufacturer, releasing the Manufacturer from any claims whatsoever under this Agreement or otherwise; and Manufacturer shall execute a release in Distributor's favor in similar form.

\91\34191\027\WAWA\DISTCCC.001

15

6C.7   During the period between the delivery of the Performance Notice and the effective date of the Performance Termination, the Distributor shall provide the Manufacturer with full and complete access to such of the sales records of the Distributor as may be necessary in order for the Manufacturer to determine the amount of the Performance Payment.  Manufacturer's obligation to make the Performance Payment hereunder shall be specifically subject to its having had sufficient access to the Distributor's sales records in order to calculate the amount of such Performance Payment.

6C.8   Without limiting any other provision hereof to the contrary, it is specifically understood that Manufacturer's sole obligation to the Distributor by reason of a Performance Termination shall be to make the Performance Payment as herein provided.

6C.9   For the purposes hereof, the "Commencement Date" is the first date on which Distributor purchased AriZona Beverages from the Manufacturer for resale in the Territory.

6D.   <u>DISCONTINUANCE OF SALES</u>.

6D.1   Manufacturer shall have the unlimited right in its sole discretion to discontinue marketing in the Territory a portion of the Products that includes all of the Exclusive Products ("Withdrawal Termination") or to discontinue marketing in the Territory a portion of the Products that does not include all of the Exclusive Products (a "Partial Cessation"), in either case upon not less than thirty (30) days prior written notice to Distributor (the "Cessation Notice").  The effective date of such Partial Cessation or Withdrawal Termination shall be as set forth by the Manufacturer in the Cessation Notice. In the event of any such Partial Cessation or Withdrawal Termination, Manufacturer shall

have no liability of any kind or nature to Distributor, other than as set forth in Paragraph 7.1 with respect to the repurchase of Distributor's inventory of Products in the case of a Withdrawal Termination; i.e. without limiting the foregoing, Manufacturer shall have no obligation for the payments set forth in Paragraph 6C above.

6D.2   If Manufacturer elects within forty eight (48) months after the effective date of a Partial Cessation or Withdrawal Termination to reintroduce Products into the Territory that were the subject of such Partial Cessation or Withdrawal Termination, Manufacturer must offer to Distributor the right to be the distributor thereof on the terms set forth herein provided that Distributor is at such time still a distributor of Products hereunder.

7.    REPURCHASE OF INVENTORY UPON TERMINATION AND OTHER POST-TERMINATION PROVISIONS.

7.1    (a)    Upon a Termination (but not a Partial Cessation), Manufacturer shall purchase and Distributor shall sell to Manufacturer its entire inventory of Products ("Inventory") at Distributor's laid-in-cost; provided that the within obligation shall apply only as to those Products that the Manufacturer is continuing to sell in other areas within the United States following the effective date of such Termination.  The Distributor shall be permitted to sell the Inventory not so repurchased by the Manufacturer, but in all events subject to all other provisions of this Agreement.

(b)    For the purposes of this Agreement, "laid-in-cost" shall be determined on a first-in, first-out basis as the aggregate of (i) the purchase price invoiced by Manufacturer to Distributor for the Inventory, (ii) to the extent not invoiced by the Manufacturer to Distributor, the cost incurred by Distributor, if any, of transporting

\91\34191\027\WAWA\DISTCCC.001

17

Inventory to Distributor's warehouse, (iii) to the extent not invoiced by the Manufacturer to Distributor, any taxes paid by the Distributor by virtue of its purchase of the Inventory, and (iv) a deemed handling charge of Ten Cents ($0.10) per case.

(c)     Manufacturer's obligation to purchase the Inventory pursuant to subparagraph (a) above shall apply only in respect of such Products that are good and saleable in the normal course, and, without limiting the foregoing, are not Overage Products or Damaged Products, as hereinafter defined, or are otherwise subject to recall as provided in Paragraph 14 below.

(d)     Manufacturer shall acquire the Inventory, and pay for such Inventory, all as limited by the above, within 30 days following the effective date of the applicable Termination, in accordance with such reasonable procedures as shall be established by the Manufacturer.

7:2     Upon a Termination for any reason, Distributor shall immediately furnish the Manufacturer with current sales information by channel and by package for all of its customers who purchased Products from the Distributor during the ninety (90) day period immediately preceding the Termination (the "Customer Information"). The foregoing obligation on the part of the Distributor to provide the Customer Information is in full recognition of Manufacturer's rights thereto, as set forth in Paragraph 10.4 below.

7.3     Notwithstanding anything contained herein or elsewhere to the contrary, Manufacturer shall have the unlimited right to set off and apply any and all amounts owed to it by the Distributor for any reason whatsoever against any of

\91\34191\027\WAWA\DISTCCC.001

18

Manufacturer's obligations to Distributor upon Termination whether under this Paragraph 7, Paragraph 6C above, or otherwise.

7.4    Distributor acknowledges and agrees that its sole relief in the event of a Termination pursuant to Paragraph 5 (if without cause) and 6 is the repurchase by Manufacturer of its Inventory in accordance with this Paragraph 7 and compensation, if applicable, as provided in Paragraph 6.C, and that Distributor shall be entitled to no other legal or equitable relief, including, but not limited to, relief in the form of lost profits, lost savings or other consequential damages, or injunctive relief.

8.    <u>MARKETING OF OTHER PRODUCTS.</u>

This Agreement shall extend only to those Products specifically set forth in <u>Schedules A-1 and A-2</u>. Manufacturer shall offer to Distributor the right to distribute on an exclusive basis other non-alcoholic beverage products sold in single serve (32 ounces or less) packages that do not require refrigeration which Manufacturer may, at any time in the future during the term hereof, decide to sell in the Territory. At such time in the future as Manufacturer may decide to sell and Distributor may decide to buy any other products produced by Manufacturer, such other products shall be entered on <u>Schedules A-1 and A-2</u> as either Exclusive Products or Non-Exclusive Products, as applicable (i.e. depending upon packaging and channel of distribution), and these other products shall be deemed to be included in the term Product used throughout this Agreement. Such additional entries on <u>Schedules A-1 and A-2</u> shall not constitute an amendment of this Agreement.

\91\34191\027\WAWA\DISTCCC.001

19

9.    ADVERTISING.

Manufacturer shall determine, in its sole discretion, whether and to what extent to participate in promotional activities with Distributor for the marketing of the Product within the Territory.  Any such programs shall be specified in the Business Plan from time to time.  Manufacturer and Distributor shall participate in all programs to which they have agreed in accordance with such programs.

10.    Business Plan.

10.1    Manufacturer and Distributor acknowledge that for the successful marketing and distribution of the Products, it is crucial and in the best interests of both parties to establish a business plan for the sale and distribution of the Products in Distributor's Territory.  Therefore, Manufacturer and Distributor have adopted a business plan (the "Business Plan").  Such Business Plan shall be reviewed and revised by representatives of Manufacturer and Distributor on not less than an annual basis.  The present Business Plan, and as it is reviewed, revised and mutually agreed to from time to time, shall automatically become part of this Agreement.  Without limiting the overall applicability of the Business Plan, Schedule D hereto includes the AriZona Sales Development Budget, as presently in effect, which is a schedule to the Existing Business Plan.  Manufacturer will use its expertise in selling and promoting the Products to assist Distributor in developing or improving the Business Plan in a manner that in Manufacturer's opinion is appropriate for Distributor's Territory.

10.2    Without limiting the generality of the above description of the Business Plan, (a) it is specifically understood that the Manufacturer shall establish annual

\91\34191\027\TWAWA\DISTCCC.001

20

sales goals for the Distributor (the "Sales Goals"), stated in cases, applicable to each calendar year (a "Marketing Period") during the term hereof.  Schedule D hereto includes the AriZona Sales Development Budget, as presently in effect, which is a schedule to the Existing Business Plan.  If for any reason Manufacturer fails to notify the Distributor of the Sales Goal for a Marketing Period prior to thirty (30) days before the beginning of such Marketing Period, the Sales Goal for that Marketing Period shall be conclusively set at 115% of the greater of (i) the Sales Goal for the prior Marketing Period, and (ii) the Distributor's actual case sales of Products during such prior Marketing Period.

(b)     The Business Plan, as mutually agreed to, shall also include, without limitation, the extent to which Distributor shall be required (i) to acquire and utilize marketing equipment and materials including visicoolers, other refrigeration items, and the like, and (ii) to participate in, and contribute funds to, advertising programs established by the Manufacturer from time to time.

10.3    Any data or plan obtained or developed by Manufacturer and Distributor pursuant to this Agreement shall be kept in confidence by Manufacturer and Distributor and their respective employees and shall not be disclosed to any other party without the prior written consent of the other party, unless such disclosure is compelled by a court or governmental agency and upon prior written notice to the other party.  The foregoing shall not restrict the Manufacturer (a) as to matters not specific to Distributor that have application outside of the Territory, and (b) following the Termination of this Agreement, regardless of the reason for Termination.

\91\34191\027\WAWA\DISTCCC.001

21

10.4     (a)      Distributor hereby agrees that, without regard to the actual ownership of the Customer Information, Manufacturer shall at all times, and without limitation, have the right of access to all such Customer Information. Without limiting the foregoing, upon Manufacturer's request at any time Distributor shall deliver in a timely fashion to Manufacturer any and all aspects of the Customer Information, in such form as may be requested by the Manufacturer.

         (b)      The Manufacturer shall have the right to use all of the Customer Information in such fashion as it may reasonably deem appropriate in connection with the sale of the Products. Further, and without limiting the foregoing, in the event of a Termination, for any reason, there shall be no restrictions of any kind or nature whatsoever applicable to Manufacturer's rights to use of the Customer Information, which rights shall include, without limitation, the right to transfer any and all such Customer Information to any successor to the Distributor in respect of the resale of the Products in the Territory.

         (c)      Distributor and Manufacturer acknowledge that the Customer Information is fundamental to the success of the sale of Products in the Territory. Therefore, the Distributor and Manufacturer shall take all appropriate steps in order to maintain the confidentiality of all such Customer Information.

\191\341\91\027\WA\WA\DISTCCC.001

22

11.   MANUFACTURER'S REPRESENTATIONS AND WARRANTIES.

Manufacturer represents and warrants that:

(a)   The AriZona Beverages supplied under this Agreement shall not be adulterated or misbranded within the meaning of the Federal Food, Drug Cosmetic Act (including the Pesticide and Food Additive Amendment of 1958) or within the meaning of any substantial similar federal, state or municipal law or regulation,

(b)   All Products supplied under this Agreement shall be fit and sufficient for the purposes intended, merchantable and of good quality,

(c)   Manufacturer shall have good title to all Products supplied hereunder; and

(d)   Manufacturer has the full right and authority to (i) grant to Distributor the distribution rights set forth herein, and (ii) grant to Distributor the rights to the trademarks, as limited by and as set forth in this Agreement.

12.   OVERAGE PRODUCTS.

12.1   Distributor shall be exclusively responsible for assuring that no Overage Products, as hereinafter defined, are sold to consumers by the Distributor or by any customers or Subdistributors of the Distributor.   Towards such end, Distributor shall establish a monitoring plan, subject to Manufacturer's reasonable approval, to monitor the age of Products in its inventory as well as of Products held for resale by its customers and Subdistributors.   Distributor shall immediately destroy (or, as the case may be, cause the destruction of) any Overage Product in accordance with the Overage Product Policy, hereinafter defined, and with all applicable laws and regulations and replace any such

\91\34191\027\WAWA\DISTCCC.001

23

Overage Product which had been in the possession of any of its customers and Subdistributors with fresh Products at no cost to such customers and Subdistributors.

12.2   For purposes of this Agreement, "Overage Product" shall be as defined in the policy attached hereto as Exhibit E (the "Overage Product Policy"), which Overage Product Policy may be unilaterally changed by the Manufacturer at any time and from time to time.

12.3   The cost of destroying and replacing Overage Product shall be borne by Distributor or by Manufacturer, depending upon which party was responsible for the overage condition, as follows:

(a)   Manufacturer shall be responsible for such costs only (i) as to AriZona Beverages that are shipped by the Manufacturer to the Distributor more than the number of days following manufacture thereof that are set forth in the Overage Product Policy, where such date of manufacture shall be as set forth in the packaging thereof, and (ii) if Distributor shall have sent written notification of such late shipment, via certified mail, return receipt requested, within forty-eight (48) hours following the delivery of such AriZona Beverages to the Distributor.  Upon receipt of such written notification, Manufacturer shall direct Distributor as to how to handle the Overage Product.

(b)   In all other cases, Distributor shall be responsible for the costs associated with destroying and replacing Overage Products.

12.4   In order to assist Distributor in complying with its obligations under this Section 12, Manufacturer shall provide Distributor with appropriate information

\91\34191\027\WAWA\DISTCCC.001

24

concerning recommended remaining shelf life (consistent with the Overage Product Policy) of all Products shipped to Distributor hereunder.

### 13.   DAMAGED PRODUCTS.

Manufacturer shall bear the risk of loss on Products until delivery to Distributor.  In the event that upon delivery Distributor discovers that any Products are no longer commercially marketable ("Damaged Products"), Distributor shall provide written notice (the "Damage Notice") to Manufacturer.  Manufacturer shall have no responsibility in respect of Damaged Products, either to Distributor or Distributor's direct or indirect customers, and Distributor shall indemnify Manufacturer and hold Manufacturer harmless for all costs and liabilities associated with, or resulting from, Damaged Products, unless such Damage Notice is sent to Manufacturer via certified mail, return receipt requested, within forty-eight (48) hours following the delivery of such Damaged Products to Distributor, along with photographic evidence identifying the Damaged Products.  Provided that the Damage Notice has been timely provided, Manufacturer shall replace the Damaged Products at no cost to Distributor, and Distributor shall dispose of the Damaged Products per Manufacturer's direction.  The foregoing procedure applicable to the identification and handling of Damaged Product may be unilaterally changed by the Manufacturer at any time and from time to time.

### 14.   RECALL.

If any governmental agency determines that Product constituting AriZona Beverages (i) is not fit for human consumption, (ii) is contaminated in excess of acceptable levels by such contaminants, (iii) constitutes a human health hazard or (iv) is otherwise not

\91\34191\027\WAWA\DISTCCC.001

saleable, or if the Manufacturer determines Product constituting AriZona Beverages is not

saleable or for any other reason should be recalled, the Manufacturer shall repurchase the

AriZona Beverages from Distributor at Distributor's laid-in-cost (as defined in Paragraph 7.1

above, but in lieu of the deemed "handling charge" set forth in Paragraph 7.1(b)(iv)).

Without limiting Manufacturer's obligations under paragraph 18.1 hereof, Manufacturer shall

reimburse Distributor for all out-of-pocket costs incurred by Distributor by reason thereof

(but only to the extent the incurrence of such costs is consistent with Manufacturer's

directions in connection therewith).  Distributor agrees that if a recall occurs its sole remedy

shall be the purchase by Manufacturer of the recalled AriZona Beverages.  Notwithstanding

the foregoing, Distributor shall be responsible for all costs associated with any such recall

involving Overage or Damaged Products for which it is responsible pursuant to Paragraphs

12 or 13 above, or if it is otherwise responsible for the cause giving rise to such recall.

15.  TRADEMARKS, COPYRIGHTS AND OTHER PROPRIETARY
RIGHTS.

15.1    Distributor acknowledges the proprietary nature and exclusivity

of Manufacturer's license to, and rights in, the trademarks, trade dress, trade names, service

marks, copyrights, labels, logos and the like (hereinafter collectively referred to as the

"Trademark") associated with Products, including Products bearing the AriZona name.

Distributor acknowledges that it has no right, title or interest in the Trademark; and that

Distributor is granted only a limited, nonassignable, nontransferable right to use the

Trademark solely in distributing, advertising and promoting the Products, including Products

\91\34191\027\WAWA\DISTCCC.001

26

bearing the AriZona name in strict accordance with the permission granted by Manufacturer hereunder.

15.2   Distributor shall not without the prior written consent of the Manufacturer:

(a)   Alter the labeling or packaging of any of the Products displaying the Trademark from the form of labeling or packaging approved by the Manufacturer;

(b)   Make any additions to the Products which would vary the Products from the formulations provided by the Manufacturer;

(c)   Alter, deface or remove in any manner any reference to the Manufacturer or Trademark associated with the Products or its labeling or packaging;

(d)   Use any advertising or promotional materials in association with the Products unless the same has been previously approved in writing by the Manufacturer.

15.3   The Distributor shall not take any action which may in any way impair, dilute or undermine the validity or enforceability of the Trademark.

15.4   The Distributor shall not during the term of this Agreement or thereafter, adopt, use or register the Trademark or any word, name, symbol or combination thereof which is similar to the Trademark.

15.5   The Distributor shall immediately notify the Manufacturer of any apparently unauthorized use by any person of the Trademark in the Territory, and the Distributor will at the request of the Manufacturer assist the Manufacturer in taking all steps

\91\34191\027\WAWA\DISTCCC.001

27

to defend the rights of the Manufacturer, including the institution (at the Manufacturer's cost and expense) of any actions which the Manufacturer in its sole discretion may deem advisable or necessary for the protection of its rights in and to the Trademark.

15.6   Upon a Termination for any reason, the Distributor shall immediately discontinue or cause to be discontinued, at Distributor's expense, all use by it of the Trademark.  Thereafter, Distributor shall not directly or indirectly use the Trademark or any other trademark or trade dress similar to, or that could cause confusion with, the Trademark.

15.7   In connection with this Agreement, Manufacturer and Distributor may from time to time exchange proprietary data or confidential information. The parties agree to keep in confidence all such proprietary data or confidential information received in accordance with this Agreement.  This provision shall survive the termination or expiration of this Agreement.

## 16.   RELATIONSHIP BETWEEN PARTIES

16.1   Distributor is an independent contractor.  This Agreement does not constitute Manufacturer and Distributor as joint venturers, partners, agents, servants, employees or fiduciaries of each other and neither shall have authority to act for or bind or obligate the other, except as set forth in this Agreement.

16.2   It is specifically understood and agreed that this Agreement shall not establish, nor shall the relationship between the parties be construed as establishing, a franchise under any applicable law.

\91\34191\027\WAWA\DISTCCC.001

17.   <u>NOTICES</u>.

Any notice, request, instruction or other communication to be given hereunder by any party to another shall be given by hand delivery, telecopy, telefax, certified or registered mail (return receipt requested) or by overnight express service, addressed to the respective party or parties at the following addresses:

TO MANUFACTURER:   a)   DON VULTAGGIO
                        HORNELL BREWING CO., INC.
                        d/b/a FEROLITO, VULTAGGIO & SONS
                        5 Dakota Drive, Suite 205
                        Lake Success, Long Island, NY  11402

                   b)   LAWRENCE I. FOX, ESQ.
                        McDERMOTT, WILL & EMERY
                        (Attorney for Manufacturer)
                        50 Rockefeller Plaza
                        New York, NY  10020


TO DISTRIBUTOR:    a)   Canada Dry Delaware Valley Bottling Company
                        8275 U.S. Route 130
                        Pennsauken, New Jersey  08110
                        Facsimile:  (609) 661-4560
                        Attention:  Robert Brockway, President

                   b)   Kent Walker, Esquire
                        Buchanan Ingersoll Professional Corporation
                        Eleven Penn Center Plaza
                        1835 Market Street
                        Philadelphia, Pennsylvania  19103
                        Facsimile:  (215) 665-8760

or to such other address or addresses as any party may designate to the others by like notice as hereinabove set forth.  Any notice given hereunder shall be deemed given and received on the date of hand delivery or transmission by telecopy, or three (3) days after deposit with the United States Postal Service, or one (1) day after delivery to an overnight express service for next day delivery, as the case may be.

\91\34191\027\WAWA\DISTCCC.001

29

18.    INDEMNIFICATION; INSURANCE.

18.1    Each party shall indemnify the other and shall hold the other harmless from any and all demands, suits, claims, damages and liability (including attorneys' fees) asserted by any person or entity as a result of any loss, damage, injury or death caused directly or indirectly by (i) the negligence or misconduct of the other party in the manufacture, sale or delivery of Product, or (ii) otherwise by virtue of a violation of such party's obligations under this Agreement; provided that the foregoing subparagraph (i) shall not in any fashion change or expand the respective rights and obligations of the parties specifically set forth elsewhere herein.

18.2    In the event that any action is brought by either party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover court costs, arbitration expenses and reasonable attorneys' fees from the non-prevailing party.  The provisions of this Paragraph 18 shall survive any termination of this Agreement.

18.3    The Manufacturer may from time to time establish requirements for Distributor to maintain specific types and amounts of insurance coverage consistent with normal industry standards.  In such event, Distributor shall be obligated to follow such requirements.

18.4    [Manufacturer Insurance Requirement]

19.    ASSIGNMENT.

19.1    Distributor shall not transfer any of its rights or obligations under this Agreement without the prior written consent of Manufacturer, which consent may be withheld by Manufacturer in its sole discretion, it being understood that Manufacturer has

\91\34191\027\WAWA\DISTCCC.001

30

a legitimate interest in the identity, qualifications, financial and marketing strength, etc., of its distributors.

19.2  For the purposes hereof, a transfer shall be deemed to include (a) any transfer of all or any portion of Distributor's rights under this Agreement, (b) any voluntary or involuntary encumbrance on, or other security interest in, or restriction on, all or any portion of Distributor's rights under this Agreement, (c) a transfer of all or substantially all of Distributor's assets or business in respect of the sale and distribution of the Products, or (d) a transfer of any ownership interests in, affecting, or respecting the Distributor by reason of which (i) the persons owning the ownership interests of Distributor on the date hereof would own less than 67% of the aggregate ownership interests of the Distributor, or (ii) following the date hereof there shall have been transfers of ownership interests representing more than 50% of the aggregate ownership interests of Distributor, or (iii) there shall have been a change in Control from that existing on the date hereof. Attached hereto as Schedule F is a list of all of the present owners of ownership interests in Distributor, together with the amount of their respective ownership interests.  Without limiting the prohibitions set forth herein, but instead to assure the Distributor's compliance with the provisions hereof, the Distributor shall notify the Manufacturer in writing of any anticipate changes in ownership interests applicable to Distributor (even if not requiring the consent of the Distributor) not less than ten (10) days prior to the effective date thereof. Notwithstanding the foregoing, nothing contained herein shall prohibit or limit transfers to or among existing owners, spouses, lineal descendants or spouses of lineal descendants of any

\91\34191\027\WAWA\DISTCCC.001

31

of the present owners or to trusts or other entities where any of the foregoing own the

economic benefit thereof and possess all governance rights therein.

19.3    Any purported or attempted transfer, as aforesaid, if undertaken

without the consent of the Manufacturer shall constitute a "Transfer" for purposes of

Paragraph 6A(g) above.

20.    <u>GOVERNING LAW; ENFORCEMENT</u>.

20.1    The grant by the Manufacturer to the Distributor of an exclusive

geographic distributorship is made pursuant to the provisions of 15 U.S.C. 3501, cited as

"SOFT DRINK INTERBRAND COMPETITION ACT".

20.2    To the extent that the laws governing rights of distributor of soft

drink beverages adopted by the state in which Distributor primarily conducts its operations

would restrict Manufacturer's ability to exercise any of its rights hereunder, including

without limitation its rights to terminate this Agreement, such laws shall govern the exercise

of such rights, superseding the applicable provisions of this Agreement.  In all respects other

than the exercise of rights under such laws, this Agreement is to be governed and construed

according to the laws of the State of New York and is to be considered as a New York

contract without regard to New York's conflict of laws principles.  The illegality or

unenforceability of any provision of this Agreement, in whole or to any extent, shall not

operate to impair the legality or enforceability of any other provision of this Agreement or

said provision except to such extent.

20.3    (a)    Any action by Manufacturer to obtain collection from

Distributor of amounts due hereunder may be brought and pursued by Manufacturer in the

Federal District Court for the Eastern or Southern Districts of New York or in the Supreme Court, State of New York, County of Nassau, and for this purpose Distributor hereby expressly and irrevocably consents to the jurisdiction of said courts.

(b)    Any and all disputes hereunder other than a failure by the Distributor to satisfy its payment obligations to the Manufacturer (which shall be resolved pursuant to subparagraph (a) above) shall be resolved by arbitration in accordance with the following:

(i)    Such arbitration shall be conducted in New York City before three arbitrators, one of whom shall be appointed by the Manufacturer, one of whom shall be appointed by the Distributor, and the third of whom shall be appointed by the first two arbitrators.

(ii)    Except as otherwise provided herein, such arbitration shall be conducted in accordance with the rules then obtaining of the American Arbitration Association.

(iii)    The finding of the arbitrators shall be final and binding upon the parties to any such arbitration.

(iv)    The arbitrators shall have the authority to provide that the prevailing party to any such arbitration shall be reimbursed by the other party for all costs and expenses incurred in connection therewith, including attorneys' fees.  Absent any such award, each party shall be responsible for its own costs and expenses, except that each party shall bear the costs of the arbitrator designated by it, and the costs of the third arbitrator shall be borne equally by the Manufacturer and the Distributor.

\91\34191\027\WAWA\DISTCCC.001

33

20.4    Without expanding or increasing specifically limiting provisions hereof to the contrary, any claim by or against the Manufacturer hereunder by or against the Distributor, as the case may be, must be formally asserted pursuant to Paragraph 20.3(b) not later than 180 days following the event or circumstance giving rise to the underlying claim; the failure to abide by such time requirement shall constitute a waiver by the Distributor of any rights in respect of, and shall constitute a bar on, any claims by Distributor on the basis of such event or circumstance.

21.    FORCE MAJEURE.

Either party shall be excused from performance (except for payment of money) and liability under this Agreement while and to the extent that such performance is prevented by an Act of God, strike or other labor dispute, war or war condition, riot, civil disorder, embargo, fire, flood, accident or any other casualty beyond the reasonable control of such party, provided that the disabled party exercises its good faith reasonable efforts to overcome the circumstances which create the disability.

22.    ENTIRE AGREEMENT.

This Agreement together with the Schedules attached hereto set forth the entire agreement between parties with respect to the matters provided herein and there are no understandings or other agreements except as expressly herein provided.  This Agreement may not be modified or amended except, in writing, by both parties.

23.    FORMALITIES

23.1    If any of the provisions of this Agreement shall be held unenforceable by a court of competent jurisdiction, such invalidity shall not affect any other

\91\34191\027\WAWA\DISTCCC.001

34

provisions which can be given effect without the invalid provisions, and to this end, the provisions of this Agreement are intended to be and shall be deemed severable, all of which shall be liberally construed to effect the provisions of this Agreement.

23.2    The failure of either party, in any one or more instance, to insist upon full performance of any of the terms, covenants or conditions of this Agreement or to exercise any right to terminate this Agreement, shall not be deemed a waiver of such provisions.  No waiver by either party at any time or with respect to any right or any condition or requirement contained in this Agreement shall be deemed a waiver at any other time or with respect to any other right or any other condition or requirement or as a waiver of estoppel to exercise any present or future right to terminate this Agreement.  Such waiver shall not be valid unless in writing and signed by authorized officers of the Manufacturer and Distributor, and the other party's obligation with respect to future performance of the same and all other terms, covenants and conditions shall continue in full force and effect.

23.3    This Agreement shall be binding upon and inure to the benefit of successor and assigns of the Manufacturer and the permitted successor and assigns of the Distributor.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the day and year first above written.

HORNELL BREWING CO. INC.

By: _____
Don Vultaggio, Chairman

_Canada Dry Delaware Valley_

By: _____
Robert ~~Brochway~~
President / COO

## SCHEDULE A-1

Hornell Brewing Co. Inc. PRODUCT AND PACKAGES SIZES Distributor is authorized to distribute on an exclusive basis:  All non-alcoholic beverage products in all product sizes, except those set forth on Schedule A-2.

\191\341911027\WAWA\DISTCCC.001

37

## SCHEDULE A-2

Hornell Brewing Co. Inc. PRODUCT AND PACKAGES SIZES Distributor is authorized to distribute on a non-exclusive basis: All products in 7.7 ounce cans, tetra packs, 64 ounce bottles, 128 ounce bottles and 16 ounce glass bottles; provided that products in 16 ounce glass bottles are non-exclusive only as to sales to so-called non-traditional beverage outlets such as club stores and stores such as K-Mart, Walmart, Target, Caldor and the like; provided that such non-exclusivity shall not apply as to any such stores located only in the Philadelphia and New York Metropolitan areas.

\191\34191\027\WAWA\DISTCCC.001

MAR 20 '97 19:36                                                          PAGE.02

## SCHEDULE B

I.    Channels of Distribution through which Distributor is authorized to distribute the Product:

| Yes | No | |
|-----|-----|-----|
| [x] | ☐ | On-premise licensed accounts |
| [x] | ☐ | Off-premise licensed accounts |
| [x] | ☐ | On-premise non-licensed accounts |
| [x] | ☐ | Off-premise non-licensed accounts |
| [x] | ☐ | Vending machine accounts (non-exclusive) |
| ☐ | ☐ | Other (describe) |

II.    Distributor's Territory (be specific)*:

The following counties of New Jersey and Delaware:

New Jersey:
> Atlantic
> Burlington
> Camden
> Cape May
> Cumberland
> Gloucester
> Salem

Delaware:
> Kent
> New Castle
> Sussex

*Territory should coincide with attached map.

\91\34191\027\WAWA\DISTCCC.001

39

SCHEDULE C

Exempted Beverages

| | | | |
|---|---|---|---|
| Canada Dry | Oragina | Snapple | Crystal Light |
| Sunkist | Boku | Gatorade | Bubble Up |
| No Cak | Nantucket Nectars | Mistic | Motts |
| Stewart's | Tropicana | Welch's | A&W |
| Yoo Hoo | Naya | Vintage | San Pellegrino |
| Arizona | Coors | Hawaiian Punch | Tetley |
| Perrier | Vermont Pure | Country Time | Nescafe |
| Squirt | Sunny Delight | Artica | H2Joe |
| Java Cola | Smooties | South Beach | Rebound |
| Hire's Root Beer | Wink | Tahatian Treat | Country Pure |
| R.C. Cola | Nehi | Pennsylvania Birch Beer | Sundance |
| Castle Springs | Evian | Tiger Ale | Orange Crush |

191\341911027\WAWA\DISTCCC.001

40

# SCHEDULE D

AriZona Sales Development Budget;
AriZona Sales Goals


To be completed mutually
by the parties

\91\34191\027\WAWA\DISTCCC.001

## SCHEDULE E

### Overage Product Policy

The following shelf life standards, measured in days from the date of production, apply to AriZona Products:

|  | Diet Products | Iced Teas/Juice Drinks | Chocolate Drink | Tetra Packs |
|---|---|---|---|---|
| Production Inventory | 45 Days | 60 Days | 60 Days | 60 Days |
| Distributor Inventory | 90 Days | 120 Days | 120 Days | 120 Days |
| Retail Inventory | 120 Days | 180 Days | 180 Days | 180 Days |

"Production Inventory" means the number of days following production within which the indicated Products must be delivered to Distributor.

"Distribution Inventory" means the number of days following production within which the indicated Products must be delivered by the Distributor to retailers.

"Retail Inventory" means the number of days following production within which the indicated Products must be sold by the retailers.

\91\34191\027\WAWA\DISTCCC.001

42

## SCHEDULE F
### Ownership of Distributor

All stock in the Distributor is owned legally by Harold Honickman, individually, and pursuant to a voting trust agreement.  Mr. Honickman and various other persons are beneficial owners of equity interests in the Distributor.

\91\34191\027\WAWA\DISTCCC.001

43