UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

CANADA DRY DELAWARE VALLEY :
BOTTLING COMPANY and CANADA :  07 Civ. 8037 (SHS)
DRY POTOMAC CORPORATION :
 :
 :
     Petitioners, :
 :
 :
  - against - :
 :
 :
HORNELL BREWING CO., INC. d/b/a :
FEROLITO, VULTAGGIO & SONS, :
 :
     Respondent. :

-------------------------------------------------------------- X

## RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION TO COMPEL COMPLIANCE AND FOR CONTEMPT

# MorrisonCohen LLP

909 Third Avenue, New York, NY  10022-4731  •  p:212.735.8600  •  f:212.735.8708

# TABLE OF CONTENTS

**Page**

Statement of Facts.................................................................................................................2

   A.  Background – The Parties.............................................................................................2

   B.  The Distributor Agreements ......................................................................................4

   C.  The Arbitration Before The
      American Arbitration Association ...............................................................................5

   D.  Petitioners' Unsuccessful Attempt To Amend The Arbitration
      Panel's February 8, 2007 Decision To Incorporate The Distributor
      Agreements Into The Settlement Agreement And Consent Award.......................9

   E.  The Consent Award .................................................................................................11

   F.  Hornell's New Line of 20 Ounce Plastic Products ................................................11

   G.  AriZona's New line of 16 Ounce Plastic Products ...............................................15

      I.   PETITIONERS' MOTION SHOULD BE DENIED BECAUSE IT INVOLVES
          A NEW DISPUTE BETWEEN THE PARTIES THAT IS NOT THE PROPER
          SUBJECT OF A MOTION FOR ENFORCEMENT OR CONTEMPT
          AND THAT IS SUBJECT TO ARBITRATION .......................................17

      II.  EVEN IF THE COURT BELIEVES THAT THIS DISPUTE IS PROPERLY
          BEFORE IT INSTEAD OF BEFORE AN ARBITRATION PANEL,
          PETITIONERS' MOTION SHOULD BE DENIED.................................20

        A.  The Motion for Contempt Should Be Denied.......................................20

          1.  By Petitioners' Own Admission, The Consent Award
             Is Not Clear And Unambiguous.................................................21

          2.  The Proof Of Non-Compliance Is Not Clear and Convincing.......21

        B.  The Court Should Deny Petitioner's Motion for Enforcement...............22

   CONCLUSION.........................................................................................................25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

CANADA DRY DELAWARE VALLEY      :
BOTTLING COMPANY and CANADA      :    07 Civ. 8037 (SHS)
DRY POTOMAC CORPORATION        :
                                         :
                 Petitioners,     :
                                         :
       - against -             :
                                         :
HORNELL BREWING CO., INC. d/b/a    :
FEROLITO, VULTAGGIO & SONS,     :
                                         :
                 Respondent.    :

------------------------------------------------------------ X

## RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION TO COMPEL COMPLIANCE AND FOR CONTEMPT

The instant motion is a disingenuous attempt by the Petitioners to recast a new dispute between the parties into a motion for contempt or enforcement in an effort to avoid the arbitration clause in the parties' Distributor Agreements. Recognizing that this is a new dispute requiring a fresh arbitration, Petitioners have concocted the argument that the Distributor Agreements were incorporated into a Consent Award that terminated a prior arbitration and that was confirmed in this Court.

The Distributor Agreements were not incorporated into the Consent Award. Just to the contrary, the Arbitration Panel struck a provision incorporating the Distributor Agreements into the Settlement Agreement and/or Consent Award and then denied Petitioners' motion requesting that the Panel reconsider its decision. These critical facts and procedural history are studiously omitted from Petitioners' papers.

The instant motion raises a new dispute involving two (2) new product lines that was not raised in the prior arbitration because the products were not even in existence at the time.

Petitioners argue that these products are exclusive under Schedules A-1 and A-2 of their Distributor Agreements with Respondent. Respondent disagrees. Regardless of who is right, this claim arises out of the terms of the Distributor Agreements -- not the Consent Award -- and must be resolved under Paragraph 20.3(b) of the Distributor Agreements by arbitration in New York City.

### Statement of Facts

The following statement of facts is based upon the accompanying Declarations of Howard S. Wolfson, Esq. ("Wolfson Dec."), Don Vultaggio ("Vultaggio Aff.") and John Welsh ("Welsh Dec.") and the exhibits annexed thereto.

**A.    Background – The Parties**

Respondent Hornell Brewing Co. Inc. ("Hornell") is a private, family operated business headquartered in Lake Success, New York. It was founded in the early 1970's in a small warehouse in Brooklyn and first began manufacturing and marketing its AriZona brand of iced teas in 1992. (Vultaggio Dec. ¶ 3.) Without the benefit of any television, radio or other advertising, Hornell has built AriZona Iced Tea into the industry leader in iced tea sales. Hornell's recipe for success has been simple: work hard and offer high quality products at a reasonable price. (Vultaggio Dec. ¶ 3.)

The Petitioners, Canada Dry Delaware Valley Bottling Company ("CDDV") and Canada Dry Potomac Corporation ("CDP") (collectively "Petitioners" or "Canada Dry"), are bottlers and distributors of soft drinks and other beverage products in New Jersey, Maryland, Ohio, Delaware, Virginia and the District of Columbia. They are part of the so-called "Honickman Group," which includes the behemoth Pepsi Cola Bottling Company of New York, Inc. and other Canada Dry bottling companies, including Canada Dry of New York, Inc. The Honickman

Group bottles and distributes Pepsi-Cola and Cadbury Schweppes brand products and is the 6th largest bottler in the United States with net sales of over $1 billion. (Vultaggio Dec. ¶ 4.)

The various Cadbury Schweppes brands that Petitioners distribute include many recognizable brands, such as Canada Dry, 7 Up, A&W, Dr. Pepper, Hawaiian Punch, Yoo Hoo and Welch's. Petitioners also distribute beverages for a few independent companies, like Hornell. However, sales of Hornell's Arizona products account for a small percentage of the Petitioners' overall business. (Vultaggio Dec. ¶ 5.) Petitioners distribute multiple Cadbury Schweppes brands that compete directly with Hornell's AriZona Iced Teas, including Snapple Iced Teas, Mistic Iced Teas and Nantucket Nectars. They also distribute other competitive products, including Glaceau's Vitamin Water in 20 oz plastic packages and Honest Tea. The Honickman Group's Pepsi Bottling companies distribute multiple brands that compete with AriZona Iced Teas, including Lipton Iced Teas and Sobe beverages. (Vultaggio Dec. ¶ 5.)

There are two (2) different systems or ways to distribute beverages: the DSD system and direct delivery to a chain account's warehouse. "DSD" or direct store door distribution means that the product being distributed is delivered to the customer's individual retail stores, whether the store is part of a chain or simply a mom and pop account like a deli. Petitioners are "DSD" distributors. "Direct" delivery means that the product is being delivered to a chain account's warehouse, either by the manufacturer or by an intermediary, rather than to the chain's individual retail stores. Many large chains like club stores, mass merchandisers and drug stores maintain their own warehouse distribution systems through which they receive the manufacturer's products on a direct basis and then distribute the products themselves to their retail stores. Chain accounts have increasingly moved to direct delivery and many will not accept DSD delivery

3

from a different distributor in each locale where the chain account has a store. (Vultaggio Dec. ¶ 6.)

**B.**    **The Distributor Agreements**

In March of 1997, Hornell entered into two (2) Distributor Agreements with CDDV (the "CDDV Agreements"). At the time, Hornell believed that with its substantial manpower and resources, CDDV had the wherewithal to successfully market and distribute Hornell's AriZona products. Under the CDDV Agreements, Hornell appointed CDDV its exclusive distributor with respect to certain products in five (5) counties in Pennsylvania, seven (7) counties in Southern New Jersey and all of Delaware. However, CDDV's appointment was not exclusive with respect to all existing Hornell products or with respect to new products that might be developed in the future. (Vultaggio Dec. ¶ 7.)

With respect to then existing product lines, Schedule A-2 of the CDDV Agreements provides that CDDV's rights with regard to products that are sold in 7.7 ounce cans, 64 ounce bottles, 128 ounce bottles and 16 ounce glass bottles are non-exclusive. In the case of 16 ounce glass bottles, Schedule A-2 further provides that sales to non-traditional beverage outlets such as club stores and stores such as K-Mart, Wal-Mart, Target, Caldor and the like are non-exclusive. (Vultaggio Dec. ¶ 8.)

On or about December 23, 1998, Hornell entered in a Distributor Agreement with CDP (the "CDP Agreement"). The territory covered by the CDP Agreement is the District of Columbia and seven (7) counties in Maryland. Schedule A-1 of the CDP Agreement provides that Hornell may sell all AriZona "products in all product sizes" directly to six (6) club store chains (BJ's, Costco, WalMart, K-Mart, Caldor, Sam's Club) and pay CDP $1.50 for each case

#1350029 v1 \016932 \0003

4

that it sells. Further, Schedule A-2 of the CDP Agreement provides that products larger than 1

liter, 7.7 ounce cans and tetra packs are also non-exclusive. (Vultaggio Dec. ¶ 9.)

While Petitioners' failure to successfully market Hornell's products would have little or

no impact on Petitioners' business, it would be disastrous for Hornell. Accordingly, in Paragraph

2.1 of the Distributor Agreements, Hornell obtained Petitioners' explicit promise that they:

> [s]hall at all times diligently and aggressively promote and
> actively solicit the sale and distribution of Products    . . .
> within and throughout the Territory.

Most importantly for purposes of this motion, Paragraph 20.3(b), which appears in

identical form in each Distributor Agreement, contains a broad arbitration clause. It provides

that "[a]ny and all disputes hereunder other than a failure by the Distributor to satisfy its payment

obligations to the Manufacturer . . . shall be resolved by arbitration . . . in New York City before

three arbitrators." (Vultaggio Dec. ¶ 11; Wolfson Dec. ¶ 5.)

## C.    The Arbitration Before The
## American Arbitration Association

On or about June 21, 2005, Petitioners commenced an arbitration proceeding against

Hornell before the American Arbitration Association ("AAA") in New York City (hereinafter the

"Arbitration."). Contrary to the statements in Petitioners' papers, the issue of whether Hornell

may sell directly to a national chain account, like Exxon/Mobil, because Petitioners refuse to

abide by a national price that Hornell has negotiated directly with the account, was neither

explicitly raised nor decided in the Arbitration. (Wolfson Dec. ¶ 3; cf., June 24, 2008

Declaration of Dana Klinges ("Klinges Aff.") at ¶ 5.) Nor did Hornell argue in the Arbitration

that "exclusivity had been entirely eliminated from the agreements." (Id.) Rather, the Arbitration

involved specific disputes described below.

In their detailed Statement of Claim for Arbitration, Petitioners argued that Hornell had breached the Distributor Agreements by refusing to recognize Petitioners' alleged exclusive distribution rights to two (2) new products: (1) AriZona "Fresh Choice" Iced Tea product that, like milk and other dairy products (and unlike shelf-stable iced tea products), requires constant refrigeration during manufacture, delivery, sale and following purchase; and (2) a new line of 1 liter plastic products. (Wolfson Dec. ¶ 9.) To highlight just how unreasonable Petitioners' claim was in the Arbitration, products like Fresh Choice require special refrigerated delivery trucks that Petitioners did not own or use since they did not distribute dairy or refrigerated products. (Vultaggio Dec. ¶ 13.)

Petitioners' real goal in filing the Arbitration was not to obtain the exclusive rights to the Fresh Choice product line so that they could distribute it for Hornell, but to instead prevent Hornell from distributing this new product line in Petitioners' territory because Petitioners were afraid that it would compete with the Snapple and Mistic Iced Tea products that Petitioners distribute. Petitioners had no interest in aggressively distributing this new AriZona product line, they just wanted to tie the product up so that nobody else could successfully distribute it in their territory. (Vultaggio Dec. ¶ 14.)

Canada Dry is one of the largest distributors of Snapple and Mistic Iced Tea products. The Snapple and Mistic Iced Tea products they distribute compete directly with many of Hornell's AriZona Iced Tea products. Petitioners make no effort to aggressively distribute certain of the AriZona products to which they nonetheless claim to have the exclusive distribution rights in their territory. Instead, whether they aggressively market and distribute a particular AriZona product often depends upon whether that product competes head-to-head with

a best selling Snapple or Mistic product or whether Snapple or Mistic offer a directly competitive product. (Vultaggio Dec. ¶ 15.)

Before the Arbitration hearings began and when Hornell would not buckle under to Petitioners' threats, Petitioners amended their Statement of Claim for Arbitration to assert that Hornell's direct sales of certain AriZona products to drug stores, club stores and mass merchandisers was in breach of the Distributor Agreements. Exxon/Mobil was not one of the chain accounts at issue. In many cases, Hornell had been selling AriZona products directly to the chain account for years. Petitioners asserted that they possessed the exclusive distribution rights to the following specific AriZona product lines: 16 ounce glass bottles, 23.5 ounce Big Cans, 20 ounce glass bottles and 42 ounce plastic bottles. This was in addition to Petitioners' original claim that the Fresh Choice and 1 liter plastic product lines were also exclusive under their Distributor Agreements with Hornell. (Wolfson Dec. ¶ 10.)

The new 16 oz PET and 20 oz PET product lines at issue on this motion were not raised or at issue in the Arbitration. These product lines were not even in existence at the time. There was, accordingly, no dispute between the parties concerning whether the new 16 oz PET and 20 oz PET were exclusive product lines under the Distributor Agreements. (Wolfson Dec. ¶ 11; Vultaggio Dec. ¶ 21.)

The Arbitration was heard by a Panel of three (3) AAA arbitrators, Hon. E. Leo Milonas, Hon. Walter Schackman and Eugene Ginsberg, Esq. Following six (6) hearing days and while Petitioners were presenting their direct case, the parties reached a settlement. The business terms of the settlement were negotiated directly between the principals and officers of the parties and not by outside counsel. (Wolfson Dec. ¶ 12; Vultaggio Dec. ¶ 19.)

The business terms of the settlement were set forth in a letter agreement dated November 14, 2006, that Petitioners' Chairman, Harold Honickman, forwarded to Hornell's Chairman, Don Vultaggio, and in a one (1) page handwritten Rider (written by Mr. Honickman's wife) also dated November 14, 2006 (collectively the "Letter Agreement"). The only terms not set forth in the Letter Agreement were standard, boilerplate legal provisions --i.e., discontinuance of the Arbitration, mutual releases, notices, etc. These legal provisions were set forth in an undated Settlement Agreement and Mutual Release that was drafted by Petitioners' counsel and forwarded to Hornell's counsel on November 17, 2006 (the "Settlement Agreement"). (Wolfson Dec. ¶ 13.)

The settlement did not include any provision eliminating Paragraph 20.3(b) of the Distributor Agreements, requiring arbitration of "[a]ny and all disputes" under the Distributor Agreements. In negotiating the settlement, the parties never discussed or agreed to eliminate the arbitration provision in the Distributor Agreements. (Vultaggio Aff. ¶ 23.)

Subsequent to executing the Letter Agreement, Petitioners sought to back-out-of the settlement and argued that the Letter Agreement was a non-binding "term sheet." The parties thereafter agreed that the Arbitration Panel would decide whether the parties were bound by the settlement. In their January 5, 2007 Brief in Opposition to Respondent's Motion to Enforce Settlement Agreement, Petitioners argued that the Letter Agreement was "sloppy, incomplete and, in some places, incoherent" and "was always intended merely as a summary of the parties' deal." (Wolfson Dec. ¶¶ 14-15.) One of the provisions that Petitioners argued was ambiguous was Paragraph 3 of the Letter Agreement, which authorizes Hornell to sell certain exclusive

products to certain chain accounts in Petitioners' territory "on a direct basis." (Wolfson Dec. ¶ 15.)[1]

In its January 12, 2007 Reply Memorandum in the Arbitration, Hornell argued that:

> Once the Panel determines that the Letter Agreement and accompanying Settlement Agreement set forth the terms of the parties' settlement and that no material terms were left open for future negotiation or drafting, the only appropriate relief is the entry of a Consent Award adopting these agreements.    That will conclude this arbitration. Thereafter, if Claimants genuinely believe that the Letter Agreement is ambiguous and that their nonsensical interpretation of certain of its terms has merit, they may commence a new arbitration if Hornell allegedly breaches the amended Distributor Agreements.    By the parties' agreement, however, the only issue that is before the Panel on this motion is whether a settlement was reached -- not whether the parties' conduct in the future may or may not violate the terms of their amended Distributor Agreements.

(Wolfson Dec. ¶ 17.)

Following an evidentiary hearing, on February 8, 2007, the Arbitration Panel ruled that the parties were bound by the Letter Agreement and the Settlement Agreement -- except that Paragraph 1 of the Settlement Agreement was stricken. (Wolfson Dec. ¶ 18.)

**D.    Petitioners' Unsuccessful Attempt To Amend The Arbitration Panel's February 8, 2007 Decision To Incorporate The Distributor Agreements Into The Settlement Agreement And Consent Award**

In the Arbitration Panel's February 8, 2007 decision, the Panel ruled that the parties were not bound by Paragraph 1 of the Settlement Agreement, which provided as follows (Wolfson Dec. ¶ 19):

---

[1]    In their January 5, 2007 Brief in Opposition to Respondent's Motion to Enforce Settlement Agreement, Petitioners further argued that the handwritten language in the Rider stating that "any package greater than 1 liter shall be excluded from the distribution agreements," really meant that packages greater than 1 liter were "not-exclusive" -- as opposed to "excluded." (Wolfson Dec. ¶ 16.)  On this motion, Petitioners now argue in their memorandum of law that it means that any new product smaller than 1 liter is exclusive. (Petitioners' Memorandum of Law at p. 8 & fn. 5.)  There is not a word in the Letter Agreement, including the Rider, concerning whether new products smaller than 1 liter are exclusive or non-exclusive.

1.    **Amendments to the Distribution Agreements:**
The CDDV Agreements and the CDP Agreement
are modified by the amendments set forth in Exhibit A and B
(the "Amendments"), which will be executed
simultaneously with the execution of this Agreement. *The
Amendments,* along *with the CDDV Agreements and the
CDP Agreement which are amended thereby, are
incorporated into and made part of this Agreement.*

Subsequent to the Arbitration Panel's February 8, 2007 decision, Petitioners' counsel requested that the Panel reconsider their decision and add a provision providing that the Distributor Agreements "are incorporated into and made part of" the Settlement Agreement. (Wolfson Dec. ¶ 20.) Hornell opposed Petitioners' motion and argued that:

the November 14 [, 2006] Letter Agreement and
handwritten Rider can be searched in vain for any provision
in which the parties agreed that the CDP and CDDV
Distributor Agreements would be incorporated into the
Settlement Agreement. Incorporating the entire CDP and
CDDV Distributor Agreements into the Settlement
Agreement has nothing whatsoever to do with enforcing the
settlement. Moreover, rather than correcting the Panel's
Order, it instead attempts to add a settlement term that the
parties did **not** agree to.

(Wolfson Dec. ¶ 20.) By Order dated July 12, 2007, the Arbitration Panel denied Petitioners' motion to add a provision incorporating the Distributor Agreements into the Settlement Agreement or Consent Award. (Wolfson Dec. ¶ 21 and Exh. "J").

In Petitioners' counsel's declaration in support of the instant motion (and in their memorandum), Petitioners misrepresent that "[t]he Settlement Agreement incorporated the Distribution Agreements." (Klinges' Declaration at ¶ 10.) This contention is wrong and misstates the Arbitration Panel's rulings.

#1350029 v1 \016932 \0003

10

**E.**   **The Consent Award**

On or about August 29, 2007, the Panel entered a "Consent Award of Arbitrators." The Consent Award consisted simply "of the terms set forth" in the Letter Agreement and Settlement Agreement, which were attached to and comprise the Consent Award along with the Arbitration Panel's July 12, 2007 decision. (Wolfson Dec. ¶ 23 & Exh. "K"). Consistent with the Panel's February 8, 2007 and July 12, 2007 decisions, Paragraph 1 of the Settlement Agreement was stricken *Accordingly, the parties' Distributor Agreements were explicitly __not__ incorporated into the terms of the Settlement Agreement or Consent Award.* (Wolfson Dec. ¶ 24.)

Pursuant to the terms of the Settlement Agreement, a petition to confirm the Consent Award was filed by the Petitioners and granted without opposition from Hornell by Order dated September 28, 2007. Judgment confirming the Consent Award was entered on October 1, 2007. (Wolfson Dec. ¶ 25.)

**F.**   **Hornell's New Line of 20 Ounce Plastic Products**

In February 2008, Hornell introduced a new line of AriZona Iced Teas in 20 ounce plastic bottles (the "20 oz. PET"). While the AriZona 20 ounce glass bottle retails to consumers at a price from $1.49 to $1.99 a bottle, depending upon the retail account, and is available in twenty (20) different flavors, the 20 oz PET is priced to retail to consumers at $1.19 and is available in only eight (8) flavors. (Welsh Dec. ¶ 2.) The 20 oz PET is intended to provide consumers with another alternative to the line of 23 oz AriZona Big Cans that retail to consumers at .99¢, and to the far more expensive line of 20 ounce glass bottles. The 20 oz PET is not intended to replace AriZona's line of 20 ounce glass products, but to instead provide an alternative product line for consumers. The non-breakable plastic package creates numerous additional distribution

opportunities, including golf courses, gyms, beaches, schools, parks, pool and beach clubs and similar locations. (Welsh Dec. ¶ 3.)

On February 4, 2008, John Welsh of Hornell met with Petitioners' representatives, John Taglienti and Mike Dooley, to inform them of Hornell's introduction of the new 20 oz PET. Mr. Welsh further informed Petitioners that the laid-in cost for each 24 pack case would be $15.00 and that the suggested selling price would be $18.99, resulting in a profit to Petitioners of $3.99 per case. At this meeting, Mr. Taglienti informed Mr. Welsh that Petitioners were "not interested" in selling another AriZona single serve product at less than a gross profit margin of 30% and that Petitioners would not agree to sell the new 20 oz PET at less than $21.99 per case - - $3.00 per case higher than Hornell's recommended price. Accordingly, Mr. Taglienti informed Mr. Welsh that Petitioners would not accept the 20 oz PET. (Welsh Dec. ¶¶ 5-6.)

By letter dated February 27, 2008, Mr. Taglienti reiterated that Petitioners "are not interested in selling another AriZona single serve package for less than our gross margin percentage standards" of 30%. (Welsh Dec. ¶ 7 & Exh. "A".) Although Petitioners would not agree to Hornell's recommended pricing, Mr. Taglienti informed Mr. Welsh that "[p]rior to introduction, we will forward AriZona a contract amendment, adjusting Schedule A of our CDP and CDDV contracts" to include the 20 oz PET. (Welsh Dec. ¶ 7.) Mr. Taglienti's letter was consistent with Paragraph 8 of the Distributor Agreements and Paragraph 7 of the Letter Agreement, which provides that if Petitioners intend to accept a new product line, the product must be added to Schedule A of the Distributor Agreements. A month later, however, Mr. Taglienti informed Mr. Welsh that he was not going to send him an amendment adding the 20 oz PET to Schedule A to the Distributor Agreements because he now contended that it was already an exclusive product. (Welsh Dec. ¶ 9.)

It was not until April 23, 2008, and more than thirty (30) days after introduction of the new 20 oz PET, that CDP first placed an order with Hornell for the new 20 oz PET. CDP did not place an order for one trailer load of each of the flavors as required under Paragraph 9 of the Letter Agreement. In fact, CDP did not place an order for one trailer load of any flavor. CDDV never placed any order for the 20 oz PET. (Welsh Dec. ¶ 10.) Neither CDP nor CDDV ever committed to offer a 30 day price promotion to the trade for the new 20 oz PET so long as a margin of $1 per case was maintained. (Welsh Dec. ¶ 12.)

On April 24, 2008, Mr. Welsh met again with the Petitioners. Mr. Dooley reiterated that Petitioners would not accept and distribute the new 20 oz PET on a non-exclusive basis. In light of the above, including Petitioners' statements that they would not accept and distribute the new 20 oz PET on a non-exclusive basis, Hornell did not process the insufficient order placed by CDP. (Welsh Dec. ¶¶ 13-14.)

Hornell believes that Petitioners have no intention of aggressively promoting and actively soliciting the sale and distribution of the 20 oz PET. Petitioners' real interest is in preventing Hornell from aggressively distributing the new 20 oz PET in their territory in order to protect Petitioners' sales of competitive products. For example, although Mr. Taglienti argued in one of his letters that retailers will not agree to carry the same flavor in multiple AriZona product lines, that has not been Hornell's experience to date. Distributors that carry AriZona Big Cans have agreed to carry the new 20 oz PET in the same flavors and are selling the 20 oz PET at $18.99 per case, including Canada Dry of Asbury Park which distributes products in the territory contiguous to Petitioners' territory. (Welsh Dec. ¶¶ 15-16.) Petitioners' refusal to distribute the 20 oz PET, unless they can do so on an exclusive basis, is further consistent with an intention not to aggressively distribute the new product line.

#1350029 v1 \016932 \0003

The following statistics graphically illustrate that Petitioners' argument about their gross profit margin is contrived:  In 2007, Petitioners' sales of AriZona's Big Cans accounted for almost 72% of their total sales of AriZona products.  According to Petitioners, their gross profit margin on the sale of AriZona Big Cans is 21.3%.  (Welsh Dec. ¶ 17.)  At the recommended price of $18.99 per case, Petitioners' gross profit margin on the new 20 oz PET would be 23.6% -- substantially higher than their margin on AriZona Big Cans.  These statistics lead Hornell to believe that Petitioners' refusal to distribute the 20 oz. PET on a non-exclusive basis, or exclusively at Hornell's recommended price, is really intended to protect their competitive sales of other products.

To date, Hornell has not distributed the new 20 oz PET to DSD accounts in Petitioners' territory nor has Hornell offered this new product line to another distributor in Petitioners' territory on a DSD basis.  (Welsh Dec. ¶ 20.)  Although Petitioners correctly note that Hornell has been selling the new 20 oz PET to Exxon/Mobil, Petitioners neglect to inform the Court as to the circumstances surrounding this.  In 2007, Exxon/Mobil removed AriZona Iced Tea as an approved product throughout its locations countrywide.  Thus, in their territory, Petitioners were unable to obtain any orders for AriZona products from Exxon/Mobil, but they were able to continue to sell competitive Snapple products to this account.  (Welsh Dec. ¶ 21.)

In 2008, Hornell met directly with Exxon/Mobil and was able to convince this chain account to once again begin carrying AriZona products by offering the new 20 oz PET.  In order to secure this deal, Hornell had to agree to supply all of Exxon/Mobil's locations at a price of $18.99 per case.  Notwithstanding the foregoing, Petitioners would not agree to distribute the 20 oz PET to the 37 Exxon/Mobil locations in their territory at $18.99 per case.    (Welsh Dec. ¶ 22.)

Exxon/Mobil will not purchase the 20 oz PET except at the national price of $18.99 per case. Accordingly, Petitioners' refusal to distribute the 20 oz PET to Exxon/Mobil at this price means that Petitioners will be unable to sell this product line to Exxon/Mobil even if they distribute it exclusively. If Hornell is prevented from selling this product line to Exxon/Mobil, Petitioners will obtain no benefit -- except possibly in their sale of competitive Snapple products. Instead, the 37 Exxon/Mobil locations in Petitioners' territory will not be supplied with the 20 oz PET and Hornell's relationship with this critical account will be placed in jeopardy. Hornell has informed Petitioners that if they will agree to supply Exxon/Mobil on the terms agreed to nationally, Hornell will allow them to distribute the 20 oz PET to the 37 Exxon/Mobil locations in their territory. (Welsh Dec. ¶ 25.)

## G.    AriZona's New Line Of 16 Ounce Plastic Products

Petitioners' complaint about the new 16 ounce plastic product line ("16 oz PET") is contrived. Petitioners do not actively distribute AriZona's line of 16 ounce glass bottles and they have not done so for many years. In 2007, in a territory that includes all or part of four (4) States and the District of Columbia, Petitioners purchased from Hornell for distribution in their territory a grand total of 23,166 cases of AriZona's 16 ounce glass bottles. The 16 ounce glass bottle accounts for approximately 1% of Petitioners' sales of AriZona products.

Petitioners' sole concern is with protecting their sales of Snapple's flagship product line - - **the 16 ounce bottle**. Hornell believes that Petitioners sold millions of cases of Snapple's 16 oz glass bottle in 2007, at the same time they purchased the miniscule number of 23,166 cases of AriZona's 16 ounce bottle for distribution in their territory. The numbers speak for themselves and highlight that Petitioners do not aggressively promote the sale of AriZona 16 ounce products.

The new 16 oz PET is intended to eventually replace AriZona's line of 16 ounce glass bottles. The 16 oz PET is also targeted to compete with the Lipton Iced Tea 16 oz/12 pack that can be found clogging the aisles of virtually every supermarket. This Lipton product is distributed by Petitioners' affiliate, Pepsi Cola Bottling Co. of New York, and sales of this product are likely to be impacted by AriZona's new 16 oz PET. (Welsh Dec. ¶ 29.)

Hornell offered Petitioners the exclusive distribution rights to the 16 oz PET on the same terms and conditions under which Petitioners agreed to and have been selling AriZona 16 ounce glass bottles to supermarkets in 2007 and 2008. Hornell simply requested that Petitioners adhere to the same terms and conditions for the 16 oz PET that they had been following for the 16 ounce glass bottle product line that it will eventually replace. (Welsh Dec. ¶¶ 31-32.)

In his February 27, 2008 letter, Mr. Taglienti confirmed that Petitioners are not interested in selling the new 16 oz PET on the same terms and conditions under which they have been selling 16 ounce glass bottles. Mr. Taglienti informed Hornell that Petitioners could not accept these terms "for all of our customers and channels on a everyday basis." (Welsh Dec. ¶ 34.) Mr. Taglienti's reference to "all" customers and "channels" was meaningless because Petitioners do not sell AriZona 16 ounce products to "all of their customers and channels" -- they sell it to a tiny percentage of their active accounts and almost exclusively through the supermarket channel. (Welsh Dec. ¶ 34.)

It was not until April 23, 2008, and more than thirty (30) days after introduction of the new 16 oz PET, that CDP first placed an order for the 16 oz PET. CDP did not order one trailer load of the 16 oz PET and of each flavor thereof. CDDV never placed any order for the 16 oz PET. (Welsh Dec. ¶ 37.) Neither CDP nor CDDV ever committed to offer a 30-day price promotion to the trade for the 16 oz PET so long as a margin of $1 per case was maintained.

Instead, they specifically refused to sell the 16 oz PET at a gross margin of $1.14 per case. (Welsh Dec. ¶ 38.)  In light of the above, including Petitioners' statements that they would not agree to accept and distribute the 16 oz PET on a non-exclusive basis, Hornell did not process the insufficient order placed by CDP.  (Welsh Dec. ¶ 39.)

Hornell is not selling the 16 oz PET through any DSD distributors in Petitioners' territory.  Consumers looking for the new 16 oz PET in neighborhood stores, delis and similar locations will not find it available for purchase.  (Welsh Dec. ¶ 40.)  Hornell's sales of the new 16 oz PET in the territory covered by Petitioners has been limited to a handful of chain accounts. (Welsh Dec. ¶ 41.)  Although the 16 oz PET, like the 20 oz PET, has been available to Petitioners if they will agree to accept and distribute it on a non-exclusive basis, they have not agreed to do so nor placed any orders on that basis.  (Welsh Dec. ¶ 43.)

## I.

### PETITIONERS' MOTION SHOULD BE DENIED BECAUSE IT INVOLVES A NEW DISPUTE BETWEEN THE PARTIES THAT IS NOT THE PROPER SUBJECT OF A MOTION FOR ENFORCEMENT OR CONTEMPT AND THAT IS SUBJECT TO ARBITRATION

It is well-settled that "[w]hen a petition for enforcement involves a new dispute . . . enforcement must be denied."  Hellman v. Program Printing, Inc., 400 F. Supp. 915, 918 (S.D.N.Y. 1975); see Schiavone Constr. Co. v. Impresit-Girola-Lodigiani, Inc., No. 91 Civ. 8455, 1992 U.S. Dist. LEXIS 5154, at *13 (S.D.N.Y. Apr. 15, 1992).  As explained by the Second Circuit,

> unless it is beyond argument that there is no material factual difference between the new dispute and the one decided in the prior arbitration that would justify an arbitrator reaching a different conclusion, the case must go to fresh arbitration rather than to the court for judicial enforcement.

International Chemical Workers Union, Local No. 227 v. BASF Wyandotte Corp., 774 F.2d 43, 46 (2d Cir. 1985) (citation omitted) (quoting Derwin v. General Dynamics Corp., 719 F.2d 484, 490 (1st Cir. 1983). In Derwin, the First Circuit refused to confirm an arbitration award where confirmation of the award was the "first step in a clever ploy to subvert the arbitral process" and present later grievances "as acts of contempt in violation of the order of confirmation" instead of as new disputes. See Derwin, 719 F.2d at 490-491. As explained by the Court (id.):

> The company is clearly correct that where the parties have agreed to arbitrate disputes over the meaning of their collective bargaining agreements, established labor policy significantly restricts the role of the federal courts...The courts, moreover, have carefully scrutinized suits to "enforce" past awards where the facts suggest that the nominal enforcement proceeding is, in truth, an attempt to extend the award to a new, previously unresolved dispute. For example, in United Paperworkers, Local 675 v. Westvaco Corp., 461 F. Supp. 1022 (W.D. Va. 1978), an arbitrator had directed the employer to reexamine its seniority practices with respect to certain jobs. When a dispute arose as to the result of the reexamination, the court held that the grievance procedure was the proper mode for resolving the conflict. See also International Association of Machinists Lodge No. 1893 v. Aerojet-General Corp., 263 F. Supp. 343, 347 (C.D. Cal. 1966) (denying enforcement where dispute at the heart of the controversy was not presented to arbitration); District 50, United Mine Workers v. Revere Copper & Brass, Inc., 204 F. Supp. 349, 352 (D. Md. 1962) (denying enforcement where previous arbitral award stated general rules for application by the parties and therefore required further interpretation and arbitration).

> Only where an arbitral award is both clearly intended to have a prospective effect and there is no colorable basis for denying the applicability of the existing award to a dispute at hand, will a court order compliance with the award rather than require the parties to proceed anew through the contract grievance procedure.

Petitioners' motion involves a new dispute over products that were not at issue in the Arbitration. The dispute must be resolved in a "fresh arbitration" in accordance with the arbitration clause in the parties' Distributor Agreements.

Under the Federal Arbitration Act, "questions of arbitrability must be addressed with a healthy regard for the federal policy [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995); David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991), cert. dismissed, 501 U.S. 1267 (1991); Vaughn v. Leeds, Morelli & Brown, P.C., No. 04 Civ. 8391, 2005 U.S. Dist. LEXIS 16792, at *6-7 (S.D.N.Y. Aug. 12, 2005). Here, the broad arbitration clause in the parties' Distributor Agreements "creates a presumption of arbitrability which can be overcome only if it may be said 'with positive assurance' that the arbitration clause is not susceptible to the interpretation that it covers the asserted dispute." Orange County Choppers, Inc. v. Goen Techs. Corp., 374 F. Supp. 2d 372, 374 (S.D.N.Y. 2005) (quoting Collins & Aikman Prods. Co., 58 F.3d at 19); see also AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986); Mehler v. Terminix Int'l Co. L.P., 205 F.3d 44, 49 (2d Cir. 2000), cert. denied 533 U.S. 911 (2001); David L. Threlkeld & Co., 923 F.2d at 248; Roso-Lino Beverage Distributors, Inc. v. Coca Cola Bottling Co., 749 F.2d 124, 126 (2d Cir. 1984).

Under Paragraph 20.3(b) of the parties' Distributor Agreements, "any and all disputes . . . other than a failure by [Petitioners] to satisfy its payment obligations to [Hornell] . . . shall be resolved by arbitration." Plainly, the instant dispute does not fall under the narrow exception to arbitration.[2] As such, Petitioners' remedy is to commence an arbitration.

---

[2]      Paragraph 13 of the Settlement Agreement provides that "[n]otwithstanding the arbitration provisions in the CDDV Agreements and the CDP Agreement, the venue for any action arising out of the interpretation, enforcement or a breach of this Agreement or the Consent Award" shall be the United States District Court for the Southern District of New York. The instant motion is not an "action" and Petitioners do not rely on this provision in their moving papers. Suffice to say, the parties did not agree in Paragraph 13 that disputes "arising out of the interpretation, enforcement or a breach of the Distributor Agreements" would be venued in the Southern District of New York or that such disputes would no longer be subject to arbitration under Paragraph 20.3(b). Moreover, Petitioners' motion does not "arise out of" the Consent Award because Petitioners' own statement of their claim is

## II.

## EVEN IF THE COURT BELIEVES THAT THIS DISPUTE IS PROPERLY BEFORE IT INSTEAD OF BEFORE AN ARBITRATION PANEL, PETITIONERS' MOTION SHOULD BE DENIED

Should the Court determine that it rather than three (3) arbitrators should address the new dispute between the parties and that it should do so on this motion, Petitioners' motion should nonetheless be denied.

### A.    The Motion for Contempt Should Be Denied

To warrant a finding of contempt, Petitioners' must establish that (1) the order Hornell allegedly failed to comply with is clear and unambiguous, (2) the proof of non-compliance is clear and convincing, and (3) Hornell has not diligently attempted to comply in a reasonable manner. Independent Living Aids, Inc. v. Maxi Aids, Inc., 349 F. Supp. 2d 509, 515 (E.D.N.Y. 2004); Monsanto Co. v. Haskel Trading, Inc., 13 F. Supp. 2d 349, 363 (E.D.N.Y. 1998); Red Ball Interior Demolition Corp. v. Palmadessa, 947 F. Supp. 116, 121 (S.D.N.Y. 1996).

### 1.    By Petitioners' Own Admission, The Consent Award Is Not Clear And Unambiguous

In the Arbitration, Petitioners argued that the Letter Agreement, the terms of which became the Consent Award, was **"sloppy"**, **"incomplete"**, **"incoherent"** and **"ambiguous."** In fact, Petitioners argued that the Letter Agreement was too ambiguous to even constitute a binding agreement. Hornell recognized that although the Consent Award would resolve the pending Arbitration, that future disputes were possible.

---

that the 16 oz PET and 20 oz PET are exclusive products under Schedule A to the Distributor Agreements -- not the Consent Award. That Hornell may assert a defense based upon the Letter Agreement does not change that Petitioners' claim arises under the Distributor Agreements. See e.g., Sullivan v. American Airlines, Inc., 424 F.3d 267, 276 (2d Cir. 2005) (whether claim "arises under" federal law is determined by allegations in plaintiff's complaint and not by defendant's defenses); Altman v. Bayer Corp., 125 F. Supp. 2d 666, 670 (S.D.N.Y. 2000) (whether a claim "arises under" patent law is determined from plaintiff's statement of his own claim and not by defenses interposed by defendant, "even if both parties admit that the defense is the only question truly at issue in the case.")

#1350029 v1 \016932 \0003

20

Petitioners cannot in good faith base a contempt motion on the Letter Agreement/Consent Award that they characterized as anything other than clear and unambiguous. "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." <u>Fonar Corp. v. Deccaid Servs., Inc.</u>, 983 F.2d 427, 429 (2d Cir. 1993), <u>cert. denied</u> 510 U.S. 917 (1993). "'An unclear order provides insufficient notice to justify a sanction as harsh as contempt.'" <u>Id.</u> (citing <u>United States v. International Bhd. of Teamsters</u>, 899 F.2d 143, 146 (2d Cir. 1990)). Based upon their own arguments in the Arbitration, Petitioners should be estopped from arguing that the Consent Award is clear and unambiguous.

## 2. The Proof of Non-Compliance Is Not Clear and Convincing

"The <u>contempt</u> power is a grave responsibility and a 'potent weapon,' which should not be used 'where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct'." <u>Stein Indus., Inc. v. Jarco Indus.</u>, 33 F. Supp. 2d 163, 170 (E.D.N.Y. 1999). For that reason, noncompliance must be "proved clearly and convincingly." <u>Red Ball Interior Demolition Corp.</u>, 947 F. Supp. at 121.

Although they label this a "contempt" motion, Petitioners cannot point to any provision in the Consent Award providing that the 16 oz PET or 20 oz Pet are exclusive products. Petitioners' claim is based on Schedules A-1 and A-2 of the Distributor Agreements and not the Consent Award. Regardless of which party is correct concerning the alleged exclusivity of the 16 oz PET and 20 oz PET, Hornell has not violated any provision in the Consent Award.

In what were characterized as "default notices," Petitioners' counsel did claim in letters to Hornell's counsel that Hornell's sale of the 16 oz and 20 oz PET allegedly violated Paragraphs 1 and 3 of the Letter Agreement. Importantly, this argument is not made in Petitioners' moving

papers in this Court. These paragraphs have not been violated. First, Paragraph 1 of the Letter Agreement addresses the issue of "transshipment" -- i.e., the situation where an exclusive product is properly being sold by Hornell to a distributor outside Petitioners' territory who then "transships" the product into the Petitioners' territory for resale. The claims at issue here have nothing to do with alleged transshipping.

Second, Paragraph 3 of the Letter Agreement -- a paragraph that Petitioners argued in the Arbitration was "sloppy," "incomplete" and "incoherent" -- sets forth a list of certain chain accounts to which Hornell is permitted to distribute certain exclusive products on a direct basis. This paragraph creates exceptions to exclusivity *in addition* to those set forth in the Distributor Agreements. But there is no provision in Paragraph 3 that Hornell allegedly is violating.

**B.    The Court Should Deny Petitioners' Motion For Enforcement**

To the extent the Consent Award addresses this new dispute, its terms actually support Hornell's position as do the equities.

Under Paragraphs 7 and 9 of the Letter Agreement, Hornell agreed to offer new products to Petitioners on an exclusive basis -- but with two (2) conditions: First, the new products would be offered on an exclusive basis and could be accepted by Petitioners, but "on the same terms and conditions as other Exclusive Products." Second, if Petitioners agreed to take on a new product on an exclusive basis, they were required to purchase one trailer load of each new product (including each new flavor) within thirty (30) days of the product's introduction by Hornell and to also "offer a 30-day price promotion to the trade . . . so long as a margin of $1.00 case is maintained during the promotion." (Vultaggio Dec. ¶ 26)

The 16 oz PET and 20 oz PET are "product" lines under the Distributor Agreements and, therefore, new "products" or "product lines" under Paragraph 7 of the Letter Agreement. Indeed,

Schedule A-1 of both the CDP Distributor Agreement and the CDDV Distributor Agreements, when describing what is exclusive, refer to "products in all product sizes." There is nothing in the Distributor Agreements that differentiates between products in "new packages" and "new products," as Petitioners contend. A product in a new package is a new "product" under the Distributor Agreements and Paragraph 7 of the Letter Agreement.

When offered to them, Petitioners refused to distribute the new 16 oz and 20 oz PET on the same terms and conditions as they distribute other exclusive AriZona products. For example, Petitioners have refused to adhere to Hornell's recommended pricing because, they contend, it will result in their achieving less than a 30% gross profit margin. However, Petitioners distribute the bulk of the AriZona products to which they claim to have the exclusive rights at a gross profit margin that is significantly less than 30%. Petitioners distribute AriZona 23 oz Big Cans at a gross profit margin that is lower than the margin Petitioners would realize on 20 oz PET on the terms offered by Hornell. Moreover, the terms on which Hornell offered the new 16 oz PET to Petitioners are the very same terms and profit margin under which Petitioners have been selling AriZona's line of 16 ounce glass bottles.

Further, Petitioners did not comply with the conditions in Paragraph 9 of the Letter Agreement. First, they each did not place an order for one trailer load of the 16 oz PET and 20 oz PET (and of each flavor in the lines) within thirty (30) days of Hornell's introduction of the new product lines in February 2008. (Welsh Dec. ¶¶ 10,11, 36, 37; Vultaggio Dec. ¶ 33.) CDP ordered less than one trailer and CDDV placed no orders. Second, Petitioners failed to offer a price promotion for the trade, which they were required to do so long as a margin of $1.00 per case was maintained during the promotion. Petitioners refused to distribute the products unless

they could maintain a profit margin of at least $1.25 a case on 16 oz PET and $6.99 a case on 20 oz PET. (Welsh Dec. ¶¶ 12, 38; Vultaggio Dec. ¶ 33.)

Hornell has not treated Petitioners differently than it has treated its other DSD distributors, who have been offered the new product lines on the same terms as Hornell has offered them to Petitioners. (Vultaggio Dec. ¶ 34.) Hornell has also offered to sell the 16 oz PET and 20 oz PET to Petitioners on a non-exclusive basis. This offer was reiterated as recently as June 4, 2008. Petitioners have refused to distribute the products on a non-exclusive basis. (Vultaggio Dec. ¶ 35.)[3]

Under the Letter Agreement, Hornell is expressly permitted to sell 16 ounce glass bottles directly to various chain accounts, including Sam's Club and BJ's. The 16 oz PET will replace the line of 16 ounce glass bottles that Hornell is already selling directly to these chains. Petitioners should, therefore, have no legitimate reason for objecting to Hornell's sale of the 16 oz PET to these accounts. These sales will have no impact on Petitioners' AriZona business because Petitioners do not distribute AriZona 16 ounce products to these accounts.

Petitioners' sole motivation is to try and prevent these chain accounts from selling the 16 oz PET in their territory in order to protect Petitioners' sales of Snapple 16 ounce products and the Honickman Group's sale of Lipton 16 oz products. Under New York law, however, Petitioners may not claim the exclusive right to a product for the purpose of tying it up. When a product is placed exclusively with a distributor for the purpose of exploitation and profit, the exclusive distributor has an implied obligation to exploit the product in good faith and to

---

[3]     Contrary to Petitioners' papers, economic success is not dependent on exclusivity. CDP has entered into distributor agreements with Hornell for Virginia under which it distributes AriZona products, including Big Cans, on a non-exclusive basis. CDP's sales of Big Cans have grown substantially notwithstanding that it's rights are non-exclusive. Economic success is dependent on whether the distributor aggressively promotes and sells the products at issue -- not exclusivity. (Vultaggio Dec. ¶ 17.)

#1350029 v1 \016932 \0003

generate income. See e.g., Havel v. Kelsey-Hayes Co., 83 A.D.2d 380, 382-383, 445 N.Y.S.2d

333, 335 (4th Dep't 1981); Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214

(1917); Tauchner v. Burnett, 32 Misc.2d 839, 840, 223 N.Y.S.2d 800, 802 (Sup. Ct. Queens Co.

1961).

Finally, if the 16 oz PET is not a different product line than the 16 ounce glass bottle, as

Petitioners contend, then there is no reason why Hornell should not be allowed to continue to sell

16 ounce products -- plastic or glass -- to these chain accounts.

## CONCLUSION

Petitioners' motion should be denied.

Dated: New York, New York
      July 23, 2008

Respectfully submitted

MORRISON COHEN LLP

By: _Howard S. Woff_

Howard S. Wolfson (HW - 8858)
David Goldstein (DG - 9958)
909 Third Avenue
New York, New York 10022
(212) 735-8872

*Attorneys for Respondent Hornell Brewing
Co., Inc. d/b/a/ Ferolito, Vultaggio & Sons*