UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

CANADA DRY DELAWARE VALLEY            :
BOTTLING COMPANY and CANADA           :          07 Civ. 8037 (SHS)
DRY POTOMAC CORPORATION               :
                                                               :
                              Petitioners,          :
                                                               :
           - against -                                 :
                                                               :
HORNELL BREWING CO., INC. d/b/a        :
FEROLITO, VULTAGGIO & SONS,          :
                                                               :
                              Respondent.         :
------------------------------------------------------------- X

## DECLARATION OF JOHN WELSH IN OPPOSITION TO PETITIONERS' MOTION TO ENFORCE COMPLIANCE AND FOR CONTEMPT

I, John Welsh, declare and affirm under the penalties of perjury that:

1. I am the Mid-Atlantic Regional Sales Manager for Hornell Brewing Co., Inc. ("Hornell"). I am authorized to make this declaration on Hornell's behalf and to do so on personal knowledge in opposition to Petitioners' motion to enforce compliance and for contempt.

## A.    AriZona's New Line Of 20 Ounce Plastic Products

2. In approximately February 2008, Hornell introduced a new line of AriZona Iced Teas in 20 ounce plastic bottles (the "20 oz. PET"). (Prior to February 2008, the 20 oz PET was only available on a limited basis in several test markets). Prior thereto, Hornell did not produce or sell a line of 20 ounce plastic AriZona Iced Tea products. The 20 oz PET is a single serve product that Hornell believes will appeal to all consumers, both children and adults. This resealable, light plastic product line provides an alternative to the much heavier line of 20 ounce glass bottles.

3.     The AriZona 20 ounce glass bottle line retails to consumers at a price from $1.49 to $1.99 a bottle, depending upon the retail account, and is available in twenty (20) different flavors.  The 20 oz PET is priced to retail to consumers at $1.19 and is available in only eight (8) flavors.  The 20 oz PET is intended to provide consumers with another alternative to the 23 oz AriZona Big Can that retails to consumers at .99¢, and to the far more expensive line of 20 ounce glass bottles.  For some consumers, the 20 oz PET may eliminate the sticker shock of going from a .99¢ can to a $1.99 bottle.  Moreover, the non-breakable plastic package creates numerous additional distribution opportunities, including golf courses, gyms, beaches, schools, parks, pool and beach clubs and similar locations.

4.     The 20 oz PET is not intended to replace AriZona's line of 20 ounce glass bottles, but to instead provide an alternative product line for consumers.

5.     On February 4, 2008, I met with John Taglienti, the Executive Vice President for Sales and Marketing for Canada Dry Delaware Valley ("CDDV") and Canada Dry Potomac ("CDP"), and Mike Dooley, CDDV and CDP's Vice President Trade Development.  I informed Messrs. Taglienti and Dooley of Hornell's introduction of the new 20 oz PET product line.  I further informed them that the laid-in cost to CDDV and CDP for each 24 pack case would be $15.00 and that the suggested selling price to the retailer would be $18.99, resulting in a profit to CDDV and CDP of $3.99 per case.  Moreover, I indicated to Messrs. Taglienti and Dooley that they could charge a higher price to less price sensitive retailers, like movie theaters, pizzerias, bakeries, golf courses, restaurants, little league fields, parks and similar locations.  This would, I pointed out, increase Petitioners' blended profit margin on this new product line.

6.     At the February 4, 2008 meeting, Mr. Taglienti informed me that CDDV and CDP were "not interested" in selling another AriZona single serve product at less than a

gross profit margin of 30%. Mr. Taglienti informed me that CDDV and CDP would not agree to sell the new 20 oz PET to any account at less than $21.99 per case -- $3.00 per case higher than Hornell's recommended price. Accordingly, Mr. Taglienti informed me that Petitioners would not accept the 20 oz PET.

7.      By letter dated February 27, 2008, Mr. Taglienti reiterated that "we are not interested in selling another AriZona single serve package for less than our gross margin percentage standards" of 30%. (A copy of Mr. Taglienti's February 27, 2008 letter is annexed hereto as Exhibit "A.") Although he would not agree to Hornell's recommended pricing, Mr. Taglienti informed me in the letter that "[p]rior to introduction, we will forward AriZona a contract amendment, adjusting Schedule A of our CDP and CDDV contracts" to include the 20 oz PET. (Exhibit "A" at p. 2.)

8.      I understand from Hornell's counsel that Mr. Taglienti's letter was written in an effort by him to conform to Paragraph 8 of the Distributor Agreements and Paragraph 7 of a November 14, 2006 Letter Agreement, which provides that if Petitioners want to accept a new product line, it must be added to Schedule A of the parties' Distributor Agreements.

9.      Almost a month later, by letter dated March 25, 2008, Mr. Taglienti informed me that he was not going to send me an amendment adding the 20 oz PET to Schedule A to the Distributor Agreements because he now contended that it was already an exclusive product line under the Agreements. (A copy of Mr. Taglienti's March 25, 2008 letter is annexed hereto as Exhibit "B.") In his letter, Mr. Taglienti informed me for the first time that Petitioners "accept the . . . 20 oz PET packages as exclusive packages under our distributor agreements."

10.      It was not until April 23, 2008, and more than thirty (30) days after introduction of the new 20 oz PET, that CDP placed an order with Hornell for the 20 oz PET.

However, CDP did not place an order for a full trailer load (i.e., 22 pallets/1188 cases of the 12 pack) of each of the six (6) flavors. In fact, CDP did not place an order for a full trailer load of any flavor of the new 20 oz PET. CDP placed no order for the following new 20 oz PET products: Diet Green Tea, Pomegranate and Raspberry.

11.    To the best of my knowledge, CDDV never placed any order for the 20 oz PET, let alone for one trailer load of the new product.

12.    Neither CDP nor CDDV ever committed to offer a 30 day price promotion to the trade for the 20 oz PET so long as a margin of $1 per case was maintained.

13.    On April 24, 2008, I met again with Mike Dooley. He reiterated at this meeting that CDDV and CDP did not intend to follow Hornell's recommended pricing and would not commit to run any price promotions for the 20 oz PET. He further advised me that CDDV and CDP would not accept and distribute the 20 oz PET on a non-exclusive basis, which was consistent with Mr. Taglienti's February 27, 2008 letter.

14.    In light of the above, including Petitioners' statements that they would not accept and distribute the 20 oz PET on a non-exclusive basis, Hornell did not process the insufficient order placed by CDP.

15.    Hornell believes that Petitioners have no intention of aggressively promoting and actively soliciting the sale and distribution of the new 20 oz PET. Rather, Hornell believes that Petitioners' real interest is in preventing Hornell (or anyone else) from distributing the new 20 oz PET in Petitioners' territory in order to protect Petitioners' sales of other products. This belief is consistent with Petitioners' refusal to distribute the new 20 oz PET on a non-exclusive basis.

16.     Although Mr. Taglienti argued in one of his letters that retailers will not agree to carry the same flavor in multiple product lines, that has not been Hornell's experience to date.  For example, AriZona distributors that carry the AriZona Big Can product line have agreed to carry the 20 oz PET in the same flavors and are selling the new 20 oz PET at $18.99 per case, including Canada Dry Asbury Park which services the territory contiguous to Petitioners' territory.  In California, one of Hornell's distributors found that by carrying the 20 oz PET, it actually increased its sales of AriZona 20 ounce glass products.

17.     In 2007, Petitioners' sales of AriZona's Big Cans accounted for over 71.7% of their total sales of all AriZona products.  According to Mr. Taglienti's February 27, 2008 letter (see Exhibit "A" at p. 1), Petitioners' gross profit margin on the sale of AriZona Big Cans is 21.3%.  According to Mr. Taglienti's letter, at the recommended price of $18.99 per case, Petitioners' gross profit margin on the new 20 oz PET would be 23.6% -- substantially higher than their gross profit margin on AriZona Big Cans.

18.     In 2007, sales of AriZona 20 ounce glass bottles accounted for less than 26.1% of Petitioners' total sales of AriZona products.  Approximately 50% of Petitioners' sales of AriZona 20 ounce glass bottles are to a single account, WaWa Convenience Stores.  My understanding is that these sales will not be impacted by the new 20 oz PET because WaWa offers the AriZona 20 ounce glass bottle as a "high-end" product and offers its own private label iced tea as the lower price alternative.

19.     While sales of AriZona products increased by 18% in 2007, they increased by only 4% in Petitioners' territory.

#1336361 v2 \016932 \0003

20. To date, Hornell has not distributed the new 20 oz PET via DSD (i.e., direct store door distribution) in Petitioners' territory nor has Hornell offered this new product line to another DSD distributor in that territory.

21. Hornell has been selling the new 20 oz PET to Exxon/Mobil. However, Petitioners neglect to inform the Court as to the circumstances surrounding this. In 2007, Exxon/Mobil removed AriZona Iced Tea as an approved product throughout its locations countrywide. Thus, in their territory, Petitioners were unable to obtain any orders for AriZona products from Exxon/Mobil. However, to the best of my knowledge, the Petitioners continued to sell competitive Snapple Iced Tea products to Exxon/Mobil. Petitioners will not share any information with Hornell concerning their sale of competitive products, including the quantities they sell or to which accounts they make those sales. Accordingly, I do not know to what extent Petitioners' sale of Snapple products actually increased because of Exxon/Mobil's refusal to carry AriZona products.

22. In 2008, Hornell met directly with Exxon/Mobil and was able to convince this account to once again carry AriZona products by offering the new 20 oz PET. This was a tremendous opportunity for Hornell. In order to secure this deal, Hornell had to agree to supply the 20 oz PET at a price of $18.99 per case to all of Exxon/Mobil's approximate 1,200 locations countrywide.

23. Notwithstanding that Hornell was required to enter into an arrangement with Exxon/Mobil that establishes a national price of $18.99 per case, Mr. Taglienti informed me that the Petitioners would not agree to distribute the new 20 oz PET to the Exxon/Mobil locations in Petitioners' territory at $18.99 per case. There are approximately 37 Exxon/Mobil locations in Petitioners' territory. Petitioners' refusal to sell the 20 oz PET at $18.99 not only

meant that the Exxon/Mobil locations in their territory would not carry the product, it put at risk Hornell's national arrangement under which we were able to place AriZona products back into the 1,200 Exxon/Mobil locations.

24.    As Hornell has previously informed Petitioners, if they will agree to supply Exxon/Mobil on the terms agreed to nationally, Hornell is prepared to allow them to distribute the 20 oz PET to the 37 Exxon/Mobil locations in their territory.

25.    It is my understanding that Exxon/Mobil will not purchase the 20 oz PET at any price other than $18.99 per case.  Accordingly, Petitioners refusal to sell to Exxon/Mobil at this price means that Petitioners will be unable to sell this product line to Exxon/Mobil even if Petitioners distribute it exclusively.  As such, if Hornell is prevented from selling to Exxon/Mobil, Petitioners will obtain no benefit -- except possibly in their sale of competitive Snapple products.  Instead, the 37 Exxon/Mobil locations in Petitioners' territory will not be supplied with the new 20 oz PET and Hornell's relationship with this critical national account will be placed in jeopardy.

**B.    AriZona's New Line Of 16 Ounce Plastic Products**

26.    Petitioners' complaint about the new 16 ounce plastic product line ("16 oz PET") is disingenuous because Petitioners do not actively distribute AriZona's line of 16 ounce glass bottles and they have not done so for many years.  In 2007, in a territory that includes all or part of the states of Maryland, New Jersey, Delaware, Pennsylvania and the District of Columbia and millions of consumers, Petitioners purchased from Hornell for distribution in their territory a grand total of 23,166 cases of AriZona's 16 ounce glass bottle product.  In 2008, through June Petitioners have purchased approximately 9,404 cases.  The 16 ounce glass bottle line accounts for approximately 1% of Petitioners' sales of AriZona products.

27.     Hornell believes that Petitioners' sole concern is with protecting their highly profitable sales of Snapple's flagship product line -- **the 16 ounce bottle**. On information and belief, Petitioners sold millions of cases of Snapple's 16 oz glass bottle line in 2007 at the same time that they purchased the miniscule number of 23,166 cases of AriZona's 16 ounce glass bottle line for distribution. [1]   The numbers speak for themselves and highlight that Petitioners do not aggressively promote the sale of AriZona 16 ounce products for fear that it will impact their sale of Snapple 16 ounce products.

28.     The new 16 oz PET is sold in both a 12 pack and 24 pack case and is primarily targeted for sale in chain accounts, including supermarkets, rather than for DSD distribution.  The 16 oz PET is intended by Hornell to phase out and eventually replace the line of 16 ounce glass bottle products over the next year.

29.     The 16 oz PET is also targeted to compete with the Lipton Iced Tea 16 oz 12 pack that can be found clogging the aisles of every supermarket.  The Lipton product is distributed by Petitioners' Honickman Group affiliate, Pepsi Cola Bottling Co. of New York, in certain parts of Petitioners' territory and sales of this product are likely to be impacted by AriZona's new 16 oz PET.

30.     When I met with Messrs. Taglienti and Dooley on February 4, 2008, Hornell offered Petitioners the exclusive distribution rights to the 16 oz PET in their territory if Petitioners would agree to purchase each case at $5.89 with an off invoice marketing allowance of .14¢, for a net price of $5.75, and then sell to chain accounts/supermarkets at that same price of $5.75.  Hornell would then pay Petitioners $1 for every case that they sold.

---

[1]     Petitioners will not provide Hornell with any information with respect to their sale of Snapple products.

31.     The terms and conditions Hornell offered to Petitioners are the very same terms and conditions under which Petitioners were and have been selling AriZona 16 ounce glass bottles to supermarkets in 2007 and 2008. Accordingly, Hornell was simply asking Petitioners to adhere to the same terms and conditions for the new 16 oz PET that they have been following for the 16 ounce glass bottle product line that it will eventually replace.

32.     At the February 4, 2008 meeting, both Messrs. Taglienti and Dooley stated that Petitioners were not interested in selling the 16 oz PET unless Hornell agreed to pay Petitioners at least $1.25 for every case sold. As such, Petitioners were not willing to agree to distribute the new 16 oz PET on the same terms and conditions as they are distributing AriZona's line of 16 ounce glass bottles. I agreed to communicate their position to my superior, Rob Marciano, and to get back in touch with them.

33.     Following a discussion with Mr. Marciano, I informed Messrs. Taglienti and Dooley that Hornell would not agree to pay Petitioners more than $1 per case sold. They informed me that Petitioners would, therefore, not agree to distribute the new 16 oz PET.

34.     By letter dated February 27, 2008 (see Exhibit "A"), Mr. Taglienti reiterated that Petitioners would not agree to sell the 16 oz PET on the same terms and conditions under which they have been selling AriZona's line of 16 ounce glass bottles. In his letter, Mr. Taglienti informed me that Petitioners could not accept these terms "for all of our customers and channels on a everyday basis." Mr. Taglienti's reference to "all" customers and "channels" was meaningless because Petitioners' miniscule sales of AriZona' s 16 ounce glass bottles in 2007 and 2008 were made, to the best of my knowledge, almost exclusively to supermarkets. Petitioners do not sell AriZona 16 ounce products to "all of their customers and channels" -- they sell it to a tiny percentage of their active accounts and almost exclusively through the

supermarket channel. Based upon his letter, I concluded that Mr. Taglienti's reasoning was contrived.

35.     As with the new 20 oz PET, in his February 27, 2008 letter, Mr. Taglienti stated that an amendment was necessary in order to add the new 16 oz PET as an exclusive product under Schedule A of the parties' Distributor Agreements and that he would forward such an amendment to me. He never did so.

36.     The 16 oz PET comes in four flavors, Green Tea, Lemon Tea, Diet Green Tea and Pomegranate. It was not until April 23, 2008, and more than thirty (30) days after Hornell's introduction of the new 16 oz PET product line, that CDP placed an order for 11 pallets (594 cases) of Green Tea and 11 pallets (594 cases) of Lemon Tea. CDP placed no order for Diet Green Tea or Pomegranate. A full trailer load of the new 16 oz PET is 25 pallets (at 120 cases per pallet) or 3,000 cases. Accordingly, CDP did not order a full trailer load of the new 16 oz PET or of any flavor thereof.

37.     To the best of my knowledge, CDDV never placed any order for the new 16 oz PET, let alone for a full trailer load of the new product.

38.     Neither CDP nor CDDV ever committed to offer a 30-day price promotion to the trade for the 16 oz PET so long as a margin of $1 per case was maintained. To the contrary, they specifically refused to sell the 16 oz PET with a gross margin of $1.14 per case.

39.     In light of the above, including Petitioners' statements that they would not agree to accept and distribute the 16 oz PET on a non-exclusive basis, Hornell did not process the insufficient order placed by CDP.

40.    Hornell is not selling the 16 oz PET through any DSD distributors in Petitioners' territory.  Consumers looking for the new 16 oz PET in neighborhood stores, delis and similar locations will not find it available for purchase.

41.    Hornell's sales of the new 16 oz PET in the territory covered by Petitioners has been limited to a handful of chain accounts.  My understanding is that under a settlement that was previously reached with Petitioners in 2006, Hornell is permitted to sell AriZona's line of 16 ounce glass bottles directly to most chain accounts, including Sam's Club and BJ's.  As noted above, the 16 oz PET is replacing the line of 16 ounce glass bottles that Hornell is already selling directly to these chain accounts.

42.    The Petitioners should have no legitimate reason for objecting to Hornell's sale of the new 16 oz PET to chain accounts to which Hornell has been direct selling 16 ounce glass bottles for years.  These sales will have no impact on Petitioners' AriZona business. Hornell's belief is that Petitioners' sole reason for objecting is so that they can try and stop the chain accounts from selling the new 16 oz PET in Petitioners' territory in order to increase and protect Petitioners' sales of Snapple Iced Tea 16 ounce products and the Honickman Group's sale of Lipton Iced Tea 16 oz products.

43.    Although the 16 oz PET has been available to Petitioners if they will agree to accept and distribute it on a non-exclusive basis, they have not agreed to do so or placed any orders on that basis.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:        July 23, 2008

_John Welsh_
JOHN WELSH

Exhibit A



**CANADA DRY DELAWARE VALLEY BOTTLING COMPANY**
**CANADA DRY POTOMAC CORPORATION**
8275 U.S. Route 130, Pennsauken, NJ 08110

856-662-6767
FAX 856-663-6746

John Taglienti
Executive Vice President
Sales and Marketing

February 27, 2008

Arizona Beverages
ATTN: John Welsh
5 Dakota Drive
Lake Success, NY 11042

Dear John,

I appreciate your recap of our meeting held in Glen Burnie on Monday, February 4th. Both Mike and I are looking forward to working with you in our efforts to build our mutual businesses. Although Mike may have responded to a number of the points detailed in your memo, he may not have covered all of the issues. As a result, I would like to take this opportunity to clearly provide our position on each of the topics detailed in your recent correspondence. The position we presented at the meeting on each topic and our "go forward" strategy is as follows:

<u>**24 pack / 20 oz.**</u>

While we agree that the 24 pack/20 oz. Pet represents a package with retailer and consumer benefits, we do not agree with the pricing strategy recommended by Arizona. The recommended pricing of $18.99 per case to our customers will result in lower customer retail pricing; but the margin return of 23.6% to our CDP and CDDV sales operations is significantly below our target for our Premium New Age single serve packages of 30% gross margin. As you know, we currently accept a much lower gross margin percentage than our standard on your Arizona Big Cans (21.3% gm), and we are not interested in selling another Arizona single serve package for less than our gross margin percentage standards.

Additionally, as we discussed, our proposed average net pricing of $21.99 on the new 20 oz. Pet package represents a per case margin reduction versus our current 12 pack/20 oz. glass package of $1.00 per equivalent case. This proposed gross margin reduction takes into consideration the cost efficiencies that the 24 pack Pet package has versus the current 12 pack/20 oz. glass package. We understand your concerns with potential consumer "sticker shock" moving from one Arizona package size to another, but for the last 10 years this retail price gap that has existed between the 24 pack/23.5 oz. Big Cans and the 12 pack/20 oz. glass bottles did not adversely impact our overall sales performance. The actual average net pricing we recommended for the Pet package of $21.99 per case will still reduce the "sticker shock" in the marketplace that currently exists between Big Cans and 20 oz. glass.

The proposed pricing strategy recommended by Arizona also assumes that our retail customers would be willing to carry 3-4 Arizona single serve packages of the exact same flavors. We strongly believe that a number of retail customers in our markets will not agree to this product duplication. In the event that a retailer does choose not to carry both Arizona 20 oz. plastic and glass, with our proposed average pricing of $21.99 on 20 oz. plastic we will not be put in a position of margining down in that account.

As we discussed, we would be willing to work with Arizona to eliminate this price gap, but it would require a significant cost reduction to our operations by Arizona for purchasing the 20 oz. Pet package or 20 oz. glass package. As you know, in 2008, Arizona raised pricing on both Big Cans (+.20¢ per case) and 20 oz. glass bottles (+.50¢ per case). We understand that the rising costs of raw materials led to your increases and respect your decision to manage your internal margins. However, we would expect that Arizona would also recognize our goal of maintaining our profitability in the market. As you know, we have consistently priced our Premium New Age brands to deliver a 30% gross margin return and although you consistently recommend lower pricing for your brands, we have continued to grow the Arizona portfolio of packages with our pricing strategy.

In summary, the pricing strategy detailed by us during our meeting will put us in the best position to avoid margining down on Arizona and enable us to grow our mutual businesses. I understand that Mike reinforced to you, our position during your recent meeting. Prior to our introduction, we will forward Arizona a contract amendment, adjusting Schedule A of our CDP and CDDV contracts. We will then use our recent settlement agreement guidelines and your team's input to develop our introductory plans.

## 12 pack / 16 oz. Pet

I appreciate your efforts to attempt to make the 12 pack/16 oz. Pet exclusive package work for our operations. However, your strategy of a fixed price in the supermarket channel with no limits on the frequency of "Hot" chain feature advertising activity will not work for our operations. Our strategy will be to purchase this exclusive package from Arizona at your confirmed transfer cost of $5.75 per case and develop a pricing strategy for the targeted channels that will work best in our markets. As we discussed, we can accept a $1.00 per case margin for "Hot" activity, but we cannot accept this aggressive pricing and low margins for all of our customers and channels on an every day basis. We will look to develop a competitive value strategy for this exclusive package in all of our markets. This strategy will support both volume growth for Arizona and profit and volume growth for our business. Prior to our introduction, we will need Arizona's position on the 12 pack/16 oz. glass package currently being sold in these channels. Will Arizona continue with this package? We need more information from Arizona before we finalize the rollout of this new package in the market.

## Other Topics

### 34 oz. "Special Project"

I do not think you clearly understood our position on Arizona's efforts to sell the 34 oz. Pet non-exclusive package in our markets. I did not state that the Arizona representatives who sell the 34 oz. package in our territories in direct competition with our sales efforts on Arizona exclusive packages, would be excluded from our property.

To be clear, we would prefer that the same Arizona field sales representatives selling 34 oz. Pet in our markets not work directly with our retail salesmen selling in the same markets to the same accounts. I understand that Mike explained the issues that this type of situation can create. Your sales representatives are always welcome to work with our sales managers to develop Arizona programs and to identify business-building opportunities. It is our belief that utilizing the same Arizona field representatives to work with our retail salesmen in the market one day and then to compete with them the next day in the same market is confusing to both our retail salesmen and our customers. Additionally, your representatives are not just taking Snapple space; they are also taking space from the exclusive Arizona products (i.e. Big Cans and 20 oz. bottles) that we sell in our markets. None of our other parent companies that sell brands in a multiple distribution system have the same sales representatives call on our facilities (i.e. Cadbury, Coke, etc.). We would request that Arizona give us the same consideration.

## Mis-Labeled 23 oz. Cans

We have notified your company on multiple occasions regarding this issue. The mis-labeling of products and packages sold to our customers is misleading. It may also be a problem to simply change the actual selling size of the product without changing the UPC code. I am hopeful that this issue was addressed prior to making the change to 23 oz. versus 23.5 oz. Until such time that these issues are resolved, we will continue (at our expense) to do our best to fix the mis-labeled packages at our warehouses before they are sold to our customers.

## Program Requirements

Again, I believe you may have misunderstood our comments on program requirements. Specifically, to qualify for promotional support on any package, we want to clearly understand what we need to do in the market with that package. A clear understanding of your requirements will help to eliminate any potential issues that could arise relative to program reimbursements. Additionally, requirements on non-exclusive packages (i.e. distribution levels) would need to be included in any presentation before we could consider distributing these items (i.e. 34 oz. Pet). As you know, we have a Settlement Agreement with Arizona that clearly states our obligations on both new and existing exclusive items. We will continue to perform to our contractual selling obligations and would expect that Arizona would do the same.

## SKU Deletions

I understand your frustration regarding the communication of the SKU deletion letter. In the future I will copy you on our decisions to delete any Arizona items. I want to be clear that these brands were NOT discontinued because we had not received the requested sales information. Further, they were deleted because they did not meet our SKU performance standards. In fact, we delayed deleting these items so that we could cross reference our local sales results on the deleted items to the broader sales list of items sold by Arizona. We have requested from Arizona the required Arizona Sales Ranking Reports detailing this sales information many times. I believe Mike gave you copies of a signed confidentiality document sent to Martin Cunningham pertaining to this specific information back on August 8, 2007 (attachment 1). A follow-up letter was also sent to your attorney on November 20, 2007 (attachment 2), to again request this information. Unfortunately, we still have never received the required information and we could no longer

wait on deleting under-performing SKU's. We are still looking for this sales information as detailed in our Settlement Agreement. Any help you can provide in getting us this required data would be greatly appreciated.

## _Communication_

Communication continues to be a major issue and source of frustration to us as well. It is disturbing to find out from our leading customer, Acme, that Arizona representatives presented an exclusive 12 pack/16 oz. package the day after you had finally formally presented us the details of this package. It is even more concerning that Arizona has sold an exclusive 24 pack/20 oz. Pet package and committed pricing to one of our customers (Mobil/Exxon) without our prior knowledge or consent. We look forward to your thoughts on how we can best resolve this issue before it becomes a problem with our mutual customer. We would have expected Arizona to inform us that they would be running a "Special Project" in our markets. Communication from Arizona in any of these specific examples would have eliminated a number of problems that we now have to deal with in our markets. We are hopeful that with your increased involvement in our business, that communication from your company will improve. We will also commit to keeping you better informed on issues that we have that may have an impact on your business.

I hope this memo and your follow-up meeting with Mike, provides you with a better understanding of our position relative to the issues detailed in your recap. I know Mike provided you with a complete copy of the Settlement Agreement reached between our two companies. It is my hope that your familiarity with this Agreement will allow you to better assist us in our efforts to build our business. It is our intent to introduce both the 24 pack/20 oz. and 12 pack/16 oz. packages under the terms of our Settlement Agreement. As previously noted, we will be forwarding to your company, amendments confirming our plans to include these two packages to Schedule A-1 of our existing contracts. Please contact me directly with any questions regarding this memo. I would recommend as a next step, that we meet in the next couple of weeks to resolve any open issues and finalize our introductory plans on the new packages.

I will contact you to coordinate our calendars.

Sincerely,

John Taglienti
Executive Vice President
Sales and Marketing

cc:   M. Dooley
      B. Brockway
      L. Gantman

Attachments

Exhibit B

 **CANADA DRY DELAWARE VALLEY BOTTLING COMPANY**
**CANADA DRY POTOMAC CORPORATION**
8275 U.S. Route 130, Pennsauken, NJ 08110

856-662-6767
FAX 856-663-6746

John Taglienti
Executive Vice President
Sales and Marketing

March 25, 2008

Arizona Beverages
ATTN: Mr. John Welsh
Mid Atlantic Regional Manager
5 Dakota Drive
Lake Success, NY 11042

Dear John,

Although we have recently exchanged detailed letters about many aspects of our companies' relationship, I am sending this letter to clearly go on record that we do accept the 16 oz. and 20 oz. Pet packages as exclusive packages under our distribution agreements, and we look forward to our mutual success in distributing these packages.

While in my letter of February 27th I stated that we would be sending an amendment to reflect our acceptance of the packages, on further review of the contracts, I have concluded that this is not necessary because these package sizes are already included in the definition of Exclusive Products.

Sincerely,

John Taglienti
Executive Vice President
Sales and Marketing