```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
CANADA DRY DELAWARE VALLEY              :
BOTTLING COMPANY and CANADA             :     07 Civ. 8037 (SHS)
DRY POTOMAC CORPORATION                 :
                                        :
                    Petitioners,        :
                                        :
          - against -                   :
                                        :
HORNELL BREWING CO., INC. d/b/a         :
FEROLITO, VULTAGGIO & SONS,             :
                                        :
                    Respondent.         :
------------------------------------------------------------ X
```

## DECLARATION OF HOWARD S. WOLFSON IN OPPOSITION TO PETITIONERS' MOTION TO ENFORCE COMPLIANCE AND FOR CONTEMPT

I, Howard S. Wolfson, declare and affirm under the penalties of perjury that:

1. I am a Member of Morrison Cohen LLP, counsel for the Respondent Hornell Brewing Co., Inc. ("Hornell"). I submit this declaration on personal knowledge in opposition to the Petitioners' motion to enforce compliance with this Court's judgment and for contempt.

2. I was lead trial counsel for Hornell in the arbitration before the American Arbitration Association ("AAA") entitled <u>Canada Dry Delaware Valley Bottling Co. and Canada Dry Potomac Corporation v. Hornell Brewing Co., Inc. d/b/a Ferolito, Vultaggio & Sons</u>, AAA Case No. 131810142505 (the "Arbitration"). The description of the Arbitration in Petitioners' moving papers is not accurate. The description is intended to create the misleading picture that the instant motion involves an issue that was decided during the Arbitration, when in fact that is not the case. The instant motion involves a new dispute between the parties and products that were not even in existence at the time of the Arbitration.

#1339094 v1 \016932 \0003

3.      I would point out that the issue of whether Hornell may sell directly to a national chain account, like Exxon/Mobil, because Petitioners refuse to abide by a national price that Hornell has negotiated directly with the account, was neither explicitly raised nor decided in the Arbitration. (Cf., June 24, 2008 Declaration of Dana Klinges ("Klinges Aff.") at ¶ 5.) Nor did Hornell argue in the Arbitration that "exclusivity had been entirely eliminated from the agreements." (Id.) The Arbitration involved certain specific disputes that are described fully below.

4.      The Petitioners' claim on this motion is set forth in Paragraphs 23 through 28 of John Taglienti's Declaration and in the discussion of alleged "Exclusive Products" at page 4 of their Memorandum of Law. Their claim is that the new AriZona 16 oz PET and 20 oz PET product lines are exclusive products under Schedules A-1 and A-2 of Petitioners' Distributor Agreements with Hornell. This claim arises out of the terms of the Distributor Agreements -- not the Consent Award.

5.      Pursuant to Paragraph 20.3(b) of each of the three (3) Distributor Agreements, "[a]ny and all disputes hereunder other than a failure by the Distributor to satisfy its payment obligations to the Manufacturer . . . shall be resolved by arbitration . . . in New York City before three arbitrators." (Copies of the Distributor Agreements between Hornell and Petitioners are annexed to the accompanying Declaration of Don Vultaggio in opposition to Petitioners' motion.) Accordingly, Petitioners' new claim that the 16 oz and 20 oz PET are exclusive under Schedules A-1 and A-2 of each Distributor Agreement raises a dispute that "shall be resolved" by arbitration in accordance with Paragraph 20.3(b) thereof.

6.      Recognizing that this is a new dispute between the parties under their Distributor Agreements, Petitioners have concocted the argument that "[t]he Settlement

#1339094 v1 \016932 \0003

Agreement incorporated the Distribution Agreements." (Klinges Dec. at ¶ 10). By arguing that the Distributor Agreements were incorporated into the Settlement Agreement, Petitioners further posit that the Distributor Agreements "are incorporated into the Consent Award (and therefore the Judgment) by reference." (Petitioners' Memorandum of Law at p. 13). Through this convoluted and misleading argument, Petitioners contend that the Court can decide disputes between the parties under the Distributor Agreements because these Agreements were supposedly incorporated into the Consent Award.

7. As explained in detail below, the Distributor Agreements were **not** incorporated into the Settlement Agreement and Consent Award. Just to the contrary, the Arbitration Panel struck from the Settlement Agreement a provision that did incorporate the Distributor Agreements and then denied Petitioners' motion requesting that the Panel reconsider its decision and add such a term. These critical facts and procedural history are studiously omitted from Petitioners' papers.

8. The instant motion attempts to recast a new dispute between the parties into a motion for contempt or enforcement in an effort to avoid arbitration. The motion should be denied.

A.    **The AAA Arbitration**

9. Petitioners commenced the Arbitration before the AAA on or about June 21, 2005. In their detailed Statement of Claim for Arbitration, Petitioners argued that Hornell had breached the Distributor Agreements by refusing to recognize Petitioners' alleged exclusive distribution rights to two (2) then new products: (1) AriZona "Fresh Choice" Iced Tea product that, like milk and other dairy products (and unlike hot-filled iced tea products), requires constant refrigeration during manufacture, delivery, sale and following purchase; and (2) a new line of 1

#1339094 v1 \016932 \0003

liter plastic products. (A copy of Petitioners' June 21, 2005 Statement of Claim for Arbitration, without the voluminous exhibits, is annexed hereto as Exhibit "A.")

        10.    Subsequently, when negotiations failed, Petitioners amended their Statement of Claim for Arbitration to assert that Hornell's direct sales of certain AriZona products to drug stores, club stores and mass merchandisers was in breach of the Distributor Agreements. (Copies of Petitioners' Amended Statement of Claim for Arbitration and Second Amended Statement of Claim for Arbitration, without the voluminous exhibits, are annexed hereto as Exhibits "B" and "C," respectively.) I would point out Exxon/Mobil was not one of the chain accounts specifically at issue in the Arbitration. In many cases, Hornell had been selling AriZona products directly to the chain account for years. Petitioners asserted that they possessed the exclusive distribution rights to the following AriZona product lines in their territory: 16 ounce glass bottles, 23.5 ounce Big Cans, 20 ounce glass bottles and 42 ounce plastic bottles. This was in addition to Petitioners' original claim that the Fresh Choice and 1 liter plastic product lines were also exclusive under their Distributor Agreements with Hornell.

        11.    As Petitioners' own Statement, Amended Statement and Second Amended Statement of Claim for Arbitration plainly illustrate, the 16 oz PET and 20 oz Pet product lines were not raised in the Arbitration because these product lines were not even in existence at the time. There was, accordingly, no dispute between the parties concerning whether these were exclusive product lines under the Distributor Agreements. (Although the Fresh Choice product is sold in a 16 oz plastic bottle, it is a cold-filled dairy product unlike the new 16 oz PET, which is hot-filled. In any event, under the settlement that was eventually negotiated, the Fresh Choice 16 oz plastic product line is not an exclusive product.)

#1339094 v1 \016932 \0003

4

12. The Arbitration was heard by a Panel of three (3) AAA arbitrators, Hon. E. Leo Milonas, Hon. Walter Schackman and Eugene Ginsberg, Esq. Following six (6) hearing days and while Petitioners were presenting their direct case, the parties reached a settlement. The business terms of the settlement were negotiated directly between the principals and officers of the parties and not by outside counsel.

13. The business terms of the settlement were set forth in a letter agreement dated November 14, 2006, that Petitioners' Chairman (Harold Honickman) forwarded to Hornell and in a one (1) page handwritten Rider (written by Mr. Honickman's wife) also dated November 14, 2006 (collectively the "Letter Agreement"). The only terms not set forth in the Letter Agreement were standard, boilerplate legal provisions --i.e., discontinuance of the Arbitration, mutual releases, notices, etc. These legal provisions were set forth in an undated Settlement Agreement and Mutual Release that was drafted by Petitioners' counsel and forwarded to Hornell's counsel on November 17, 2006 (the "Settlement Agreement"). (A copy of the Settlement Agreement forwarded to Hornell's counsel by Petitioners' counsel on November 17, 2006, is annexed hereto as Exhibit "D.")

14. Subsequent to executing the Letter Agreement, Petitioners sought to disaffirm the settlement and argued that the Letter Agreement was a non-binding "term sheet." The parties thereafter agreed that the Arbitration Panel would decide whether the parties were bound by the settlement.

15. In their January 5, 2007 Brief in Opposition to Respondent's Motion to Enforce Settlement Agreement, Petitioners argued, among other things, that the Letter Agreement was "sloppy, incomplete and, in some places, incoherent" and "was always intended

#1339094 v1 \016932 \0003

merely as a summary of the parties' deal." (Brief at p. 1.)[1] One of the provisions that Petitioners argued was ambiguous was Paragraph 3 of the Letter Agreement, which authorizes Hornell to sell certain exclusive products to certain chain accounts in Canada Dry's territory "on a direct basis." "Direct" means that the product is being delivered directly to a chain account's warehouse rather than to the chain's individual stores. "Direct" delivery is a method of distribution and does not mean that Hornell cannot use another party to actually make the warehouse delivery. Petitioners argued that "direct" meant that nobody except Hornell could physically deliver the products to the chain account's warehouse.

      16.    In their January 5, 2007 Brief in Opposition to Respondent's Motion to Enforce Settlement Agreement, Petitioners further argued that the handwritten language in the Rider that forms part of the Letter Agreement and states that "any package greater than 1 liter shall be excluded from the distribution agreements," really meant that packages greater than 1 liter were "non-exclusive" under the Agreement – rather than "excluded" therefrom. On this motion, the Petitioners argue in passing in their memorandum of law it means that any new product smaller than 1 liter is exclusive. (Petitioners' Memorandum of Law at p. 8 & fn. 5.) There is not a word in the Letter Agreement, including the Rider, concerning whether new products smaller than 1 liter are exclusive or non-exclusive.

      17.    In its January 12, 2007 Reply Memorandum in the Arbitration, Hornell argued as follows:

> Once the Panel determines that the Letter Agreement and accompanying Settlement Agreement set forth the terms of the parties' settlement and that no material terms were left open for future negotiation or drafting, the only appropriate relief is the entry of a Consent Award adopting these

---

[1] At the Court's request, Hornell will submit a copy of Petitioners' January 5, 2007 Brief.

#1339094 v1 \016932 \0003

6

> agreements. That will conclude this arbitration. Thereafter, if Claimants genuinely believe that the Letter Agreement is ambiguous and that their nonsensical interpretation of certain of its terms has merit, they may commence a new arbitration if Hornell allegedly breaches the amended Distributor Agreements. By the parties' agreement, however, the only issue that is before the Panel on this motion is whether a settlement was reached -- not whether the parties' conduct in the future may or may not violate the terms of their amended Distributor Agreements.

(Hornell Reply Memorandum at p. 2; this page is annexed hereto as Exhibit "E.") (At the Court's request, Hornell will submit its entire Reply Memorandum from the Arbitration.)

18. Following an evidentiary hearing on January 18, 2007, on February 8, 2007, the Arbitration Panel rejected Petitioners' arguments and ruled that the parties were bound by the Letter Agreement and the Settlement Agreement -- but with a critical exception: Paragraph 1 of the Settlement Agreement (and certain language in the sixth line of Paragraph 8) was stricken. (A copy of the Arbitration Panel's decision dated February 8, 2007 is annexed hereto as Exhibit "F.")

**B. Petitioners' Unsuccessful Attempt To Amend The Arbitration Panel's February 8, 2007 Decision To Incorporate The Distributor Agreements Into The Settlement Agreement And Consent Award**

19. In the Arbitration Panel's February 8, 2007 decision, the Panel ruled that the parties were <u>not</u> bound by Paragraph 1 of the Settlement Agreement, which provided as follows (emphasis added):

> 1. **Amendments to the Distribution Agreements:** The CDDV Agreements and the CDP Agreement are modified by the amendments set forth in Exhibit A and B (the "Amendments"), which will be executed simultaneously with the execution of this Agreement. *The Amendments, along with the CDDV Agreements and the CDP Agreement which are amended thereby, are incorporated into and made part of this Agreement.*

#1339094 v1 \016932 \0003

7

20.     Subsequent to the Arbitration Panel's February 8, 2007 decision, by letter dated June 8, 2007, Petitioners' counsel requested that the Panel amend their decision to, among other things, add a provision providing that the parties' Distributor Agreements "are incorporated into and made part of" the Settlement Agreement. (A copy of Petitioners' counsel's June 8, 2007 letter to the Arbitration Panel is annexed hereto as Exhibit "G.") By letter dated June 18, 2007, Hornell's counsel opposed Petitioners' motion to the extent that it sought to incorporate the parties' Distributor Agreements into the Settlement Agreement or Consent Award. (A copy of Hornell's counsel's June 18, 2007 letter is annexed hereto as Exhibit "H.") By letter to the Arbitration Panel dated July 9, 2007, Hornell's counsel reiterated that:

> the November 14 [, 2006] Letter Agreement and handwritten Rider can be searched in vain for any provision in which the parties agreed that the CDP and CDDV Distributor Agreements would be incorporated into the Settlement Agreement. Incorporating the entire CDP and CDDV Distributor Agreements into the Settlement Agreement has nothing whatsoever to do with enforcing the settlement. Moreover, rather than correcting the Panel's Order, it instead attempts to add a settlement term that the parties did **not** agree to.

(Emphasis in original; a copy of Hornell's counsel's July 9, 2007 letter is annexed hereto as Exhibit "I.")

21.     By Order dated July 12, 2007, the Arbitration Panel corrected its February 8, 2007 Order by adding that the parties were not bound by the language "and the Amendments" in the first line of Paragraph 8 of the Settlement Agreement. Most importantly, the Panel denied Petitioners' motion to amend the February 8, 2007 decision, including specifically Petitioners' request to add a provision incorporating the Distributor Agreements into the Settlement

Agreement. (A copy of the Arbitration Panel's decision dated July 12, 2007 is annexed hereto as Exhibit "J.")

22. In Petitioners' counsel's declaration in support of the instant motion (and in their Memorandum of Law), Petitioners mistakenly represent that "[t]he Settlement Agreement incorporated the Distribution Agreements." (Klinges' Declaration at ¶ 10.) This contention is plain wrong and misrepresents the Arbitration Panel's rulings. The Settlement Agreement did **not** incorporate the Distributor Agreements and the Arbitration Panel explicitly denied Petitioners' motion to add a provision into the Settlement Agreement and Consent Award incorporating the Distributor Agreements.

C.     **The Consent Award**

23. On or about August 29, 2007, the Panel entered a "Consent Award of Arbitrators." The Consent Award consists simply "of the terms set forth" in the Letter Agreement and Settlement Agreement, which were attached to and comprise the Consent Award along with the Arbitration Panel's July 12, 2007 decision. (A copy of the Consent Award is annexed hereto as Exhibit "K").

24. Consistent with the Panel's February 8, 2007 and July 12, 2007 decisions, Paragraph 1 of the Settlement Agreement was stricken and this provision does not appear in the copy of the Settlement Agreement that is annexed to and forms part of the Consent Award. (See Exhibit "'K.") *Accordingly, the parties' Distributor Agreements were explicitly **not** incorporated into the terms of the Settlement Agreement or Consent Award*.

25. Pursuant to the terms of the Settlement Agreement, a petition to confirm the Consent Award was filed by the Petitioners and granted without opposition from Hornell by

#1339094 v1 \016932 \0003

Order dated September 28, 2007. Judgment confirming the Consent Award was entered on October 1, 2007.

### D. Petitioners' Claims Arise Under The Terms Of The Parties' Distributor Agreements And Must Be Raised Via Arbitration

26. In short, the Distributor Agreements are not incorporated into the Letter Agreement, Settlement Agreement or the Consent Award. Further, the Letter Agreement, Settlement Agreement and Consent Award do not contain any provision eliminating Paragraph 20.3(b) of the Distributor Agreements, which requires arbitration of any dispute arising under the Agreements.

27. Although they label this a "contempt" motion, Petitioners do not argue that Hornell has violated any specific provision in the Consent Award. That is because the Petitioners cannot point to any provision in the Consent Award providing that the 16 oz PET or 20 oz Pet are exclusive products under the Distributor Agreements. Petitioners' argument is based upon and arises under Schedules A-1 and A-2 of the Distributor Agreements -- not the Consent Award. Regardless of which party is correct concerning the alleged exclusivity of the 16 oz PET and 20 oz PET, Hornell has not violated any provision in the Consent Award.

28. The instant motion raises a new dispute between the parties under the Distributor Agreements that must be resolved, under Paragraph 20.3(b), via arbitration in New York City.

29. In Paragraph 13 of the Settlement Agreement, the parties did agree that "[n]otwithstanding the arbitration provisions in the CDDV Agreements and the CDP Agreement, the venue for any action arising out of the interpretation, enforcement or a breach of this Agreement or the Consent Award" shall be the United States District Court for the Southern

#1339094 v1 \016932 \0003

10

District of New York. Notably, Petitioners do not rely on this provision in their moving papers. That is because it is inapplicable. First, this is not an "action." Second, the parties did not agree in Paragraph 13 that disputes "arising out of the interpretation, enforcement or a breach of the *Distributor Agreements*" would be venued in the Southern District of New York or that such disputes would no longer be subject to arbitration under Paragraph 20.3(b). Third, based upon Petitioners' own allegations, their claim arises out of the Distributor Agreements.

30. In what were characterized as "default notices" dated April 1, 2008 and April 25, 2008, Petitioners' counsel claimed in letters to Hornell's counsel that Hornell's sale of the 16 oz and 20 oz PET allegedly violated Paragraphs 1 and 3 of the Letter Agreement. This argument is not made in Petitioners' moving papers in this Court. Nonetheless, I will address it.

31. Paragraph 1 of the Letter Agreement addresses the issue of "transshipment" -- i.e., the situation where an exclusive product is properly being sold by Hornell to a distributor outside Petitioners' territory who then "transships" the product into the Petitioners' territory for resale. The claims at issue here have nothing to do with alleged transshipping. In fact, in her April 25, 2008 "default notice," Petitioners' counsel did not cite to Paragraph 1 because it has no applicability here.

32. Paragraph 3 of the Letter Agreement -- a paragraph that Petitioners argued in the Arbitration was "sloppy," "incomplete" and "incoherent" -- sets forth a list of certain chain accounts to which Hornell is permitted to sell certain exclusive products on a direct basis. It creates exceptions to exclusivity **in addition** to those set forth in the Distributor Agreements. There is, however, no provision in Paragraph 3 that Hornell allegedly is violating.

33. Petitioners' contention that the 16 oz and 20 oz PET are exclusive products raises a new dispute that arises under the Distributor Agreements and that is subject to

arbitration under Paragraph 20.3(b) thereof.  Petitioners may not avoid arbitration and manufacture jurisdiction in this Court by falsely arguing that the Distributor Agreements were "incorporated" into the Consent Award.

    34.    Petitioners' motion should be denied.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:   July 23, 2008

                                                            HOWARD S. WOLFSON

Exhibit A