Exhibit B

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| Canada Dry Delaware Valley Bottling Company, and Canada Dry Potomac Corporation, | : : : : | |
| Claimants, | : : | AMENDED STATEMENT |
| v. | : : | OF CLAIM |
| Hornell Brewing Co., Inc. d/b/a Ferolito, Vultaggio & Sons, | : : : | FOR ARBITRATION |
| Respondent. | : | |

Canada Dry Delaware Valley Bottling Company ("CDDV") and Canada Dry Potomac Corporation ("CDP") bring this Claim against Hornell Brewing Co., Inc. d/b/a Ferolito, Vultaggio & Sons ("Hornell") for multiple, repeated, and continuing breaches of exclusive distribution contracts.

CDDV and CDP are bottlers and distributors of soft drinks in the Delaware Valley and Potomac regions. In 1997 and 1998, CDDV and CDP entered into exclusive distribution contracts ("Distribution Agreements") to distribute AriZona Iced Tea and other AriZona products through their Direct Store Delivery ("DSD") network to stores and other resellers in southern New Jersey, Delaware, southeastern Pennsylvania, Maryland and the District of Columbia. These Distribution Agreements are perpetual and are still in effect.

Pursuant to these contracts, CDDV and CDP are authorized to distribute all non-alcoholic beverages in all product sizes on an exclusive basis (the "Exclusive Products"), subject to a limited number of narrowly-tailored exceptions (the "Non-Exclusive Products"). In blatant violation of these Distribution Agreements, and its express duty to act in good faith, Hornell has been directly and indirectly selling Exclusive Products throughout the territories defined by the contracts (the "Exclusive Territories").

Hornell has recently engaged in an even more egregious course of conduct, purposefully designed to bypass its regional exclusive distributors and sell its AriZona Iced Tea directly into their markets. To this end, AriZona has created new packaging for Exclusive Products and has begun distributing these new packages of the Exclusive Products through other distributors and for its own account. Hornell has refused to offer these packages to CDDV and CDP on an exclusive basis.

Each case of Exclusive Products that Hornell sells in violation of the exclusive Distribution Agreements represents a direct lost profit to CDDV and CDP. These sales, often at prices lower than CDDV and CDP can offer, also have a disastrous effect on customers' confidence in the prices offered by CDDV and CDP and in the exclusivity of their Distribution Agreements with Hornell.

CDDV and CDP seek the following remedies:

1) a declaration that, within the relevant territories, CDDV and CDP are the exclusive distributors of all non-alcoholic Hornell beverage products in all packages and sizes unless specifically excepted in the Distribution Agreements, as specifically detailed below;

2) an Order enjoining Hornell from directly and indirectly distributing Exclusive Products in violation of the Distribution Agreements;

3) a complete and detailed accounting of all non-alcoholic Hornell beverage products sold in the CDDV and CDP territories for 180 days prior to the commencement of this action;

4) damages resulting from Hornell's multiple breaches of the Distribution Agreements; and

PHL:5175058.2/CAN039-151063

    5)        reimbursement for all costs and expenses, including attorneys' fees, incurred by CDDV and CDP in connection with this action.

In support of this action, CDDV and CDP allege the following:

## THE PARTIES

1.    CDDV is a Pennsylvania corporation with its principal place of business located at 8275 U.S. Route 130, Pennsauken, New Jersey 08110.

2.    CDDV is in the business of bottling and distributing beverages in southern New Jersey, Delaware and the Philadelphia metropolitan area.

3.    CDP is a Pennsylvania corporation with its principal place of business located at 3600 Pennsy Drive, Landover, MD 20785.

4.    CDP is in the business of bottling and distributing beverages in Maryland, Virginia, and District of Columbia.

5.    Hornell is a New York corporation with its principal place of business located at 5 Dakota Drive, Lake Success, New York 11042.

6.    Hornell is in the business of producing, marketing and selling AriZona brand beverages and other products in the United States.

## THE CONTRACTS

7.    Hornell executed an exclusive distribution agreement with CDDV on March 17, 1997, granting CDDV distribution rights in Pennsylvania (the "Pennsylvania Agreement"). A true and correct copy of that agreement is attached as Exhibit "A."

8.    The counties covered by the Pennsylvania Agreement include Bucks, Chester, Delaware, Montgomery and Philadelphia. See Ex. A at 39.

9.    Hornell executed a similar exclusive distribution agreement with CDDV on March 17, 1997, granting CDDV distribution rights in New Jersey and Delaware (the "New

- 3 -

Jersey/Delaware Agreement"). A true and correct copy of that agreement is attached as Exhibit "B."

10. The counties covered by the New Jersey/Delaware Agreement include Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester and Salem Counties in New Jersey; and Kent, New Castle and Sussex Counties in Delaware.

11. Combined, these counties in Pennsylvania, New Jersey and Delaware (collectively, the "CDDV Territory") comprise the territory for which CDDV is the exclusive distributor of Hornell products defined in Schedule A-1 of the CDDV Pennsylvania and New Jersey/Delaware Agreements as "Exclusive Products."

12. The contract language relevant to this dispute is identical in CDDV's Pennsylvania and New Jersey/Delaware Agreements. Accordingly, references to specific contractual language in both agreements will be cited as the "CDDV Agreements."

13. Hornell executed an exclusive distribution agreement with CDP on December 23, 1998 (the "CDP Agreement"). A true and correct copy of the CDP Agreement is attached as Exhibit "C."

14. The "CDP Territory" as defined in Schedule B to the CDP Agreement includes the District of Columbia and the following counties in Maryland: Anne Arundel, Baltimore, Baltimore City, Carroll, Frederick, Howard, Montgomery, and Prince George's.[1]

## JURISDICTION AND VENUE

15. The American Arbitration Association has jurisdiction over this case under §20.3(b) in each of the Distribution Agreements.

---

[1] Collectively, the CDDV Territory and the CDP Territory will be referred to as the "Exclusive Territories."

16. Arbitration under these agreements is to be held in New York City pursuant to §20.3(b)(i) in the Distribution Agreements. That provision reads, "[s]uch arbitration shall be conducted in New York before three arbitrators, one of whom shall be appointed by [Hornell], one of whom shall be appointed by the Distributor, and the third of whom shall be appointed by the first two arbitrators." See Ex. A, B & C, §20.3(b)(i).

## THE EXCLUSIVE PRODUCTS

### A. Exclusive Products in CDDV's Territory

17. Pursuant to section one of the CDDV and CDP Agreements, CDDV and CDP have been appointed by Hornell as the "sole and exclusive" distributors in their territories of those specific AriZona Beverages and Other Products identified as the "Exclusive Products" on Schedule A-1. See Ex. A, B & C at 1.

18. Schedule A-1 to the CDDV Agreements defines "Exclusive Products" as "[a]ll non-alcoholic beverage products in all product sizes, except those set forth in Schedule A-2." Ex. A at 37.

19. Schedule A-2 to the CDDV Agreements defines the "Non-Exclusive Products" (as to which CDDV is granted a non-exclusive right to distribute) as follows:

> Hornell Brewing Co. Inc. PRODUCT AND PACKAGE SIZES Distributor is authorized to distribute on a non-exclusive basis: All products in 7.7 ounce cans, tetra packs, 64 ounce bottles, 128 ounce bottles and 16 ounce glass bottles; provided that products in 16 ounce glass bottles are non-exclusive only as to sales to so-called non-traditional beverage outlets such as club stores and stores such as K-Mart, Walmart, Target, Caldor and the like; provided that such non-exclusivity shall not apply to any such stores located only in the Philadelphia and New York Metropolitan areas.

Exs. A and B, Schedule A-2.

20. Accordingly, products which meet the broad definition in Schedule A-1, and are not specifically enumerated in Schedule A-2, are Exclusive Products in the CDDV Territory, including:

    a. 16 ounce plastic bottles;

    b. 16 ounce glass bottles (except to non-traditional beverage outlets, as described in Schedule A-2);

    c. 20 ounce glass bottles;

    d. 23.5 ounce big cans;

    e. 1 liter plastic bottles; and

    f. 42 ounce plastic bottles.

**B. Exclusive Products in CDP's Territory**

21. Schedule A-1 to the CDP Agreement defines "Exclusive Products" as all non-alcoholic, non-carbonated Hornell Brewing Co. Inc. products and product sizes, "except those set forth on Schedule A-2." Ex. C, Schedule A-1.

22. Schedule A-1 to the CDP Agreement permits Hornell to sell Exclusive Products to six specifically enumerated club store chains in exchange for a fee of $1.50 for each case of Exclusive Products (which fee Hornell has not been paying). Id.

23. Schedule A-2 to the CDP Agreement defines the following Hornell Brewing Co. Inc. product and package sizes as non-exclusive: "all 7.7 ounce cans, tetra packs, and all packages of Products larger than 1-Liter." Ex. C, Schedule A-2.

24. Accordingly, products which meet the broad definition in Schedule A-1, and are not specifically enumerated in Schedule A-2, are Exclusive Products in the CDP Territory, including:

    a. 16 ounce plastic bottles;

    b. 16 ounce glass bottles;

      c.      20 ounce glass bottles;

      d.      23.5 ounce big cans; and

      e.      1 liter plastic bottles.

**C.    Hornell's Duty to Protect Exclusivity**

25. As made clear in the very first section of each of the distribution agreements, the primary purpose of the contracts is Hornell's grant of perpetual exclusivity to CDDV and CDP. Exs. A, B & C, §1.1.

26. In each of the Distribution Agreements, Hornell promised to "use its good faith efforts to protect the territorial exclusivity granted to Distributor hereunder in respect of the Exclusive Products." Exs. A, B & C, §2.4.

27. Hornell has a limited right to sell Exclusive Products within the Territory where a customer in the territory is not being properly serviced, but this exception does not apply if CDDV or CDP has elected not to sell to a particular customer for good business reasons "in the exercise of its reasonable good faith discretion." Id.

## HORNELL'S BREACHES

**A.    Hornell's Refusal to Honor its Contracts**

28. On various occasions Hornell has declined to live up to its contractual obligation to protect the territorial exclusivity granted to CDDV and CDP.

29. Examples of such breaches include direct sales of exclusive products to drug store chains, supermarkets, wholesalers, club stores and convenience stores.

30. In many instances, Hornell has decided to sell products directly to national chain stores with locations within the Territories, irrespective of the territorial exclusivity granted to CDDV and CDP and the effect of these sales on its regional distributors.

31. Whenever instances of direct or indirect transshipment were discovered by CDDV and CDP, Hornell was put on notice and a cease and desist demand was made.

32. Hornell responded in various ways, either by promising to cease the transshipment, by refusing to provide information about transshipment, or by simply declaring that various flavors and package sizes had been rendered non-exclusive.

33. There are no triggers, targets, goals or sales requirements in any of the distribution agreements by which Hornell is permitted to declare unilaterally that an Exclusive Product has become Non-Exclusive.

34. Recently, Hornell has come up with more creative ways to avoid honoring the territorial exclusivity it promised to CDDV and CDP -- packaging its top selling Iced Tea products in new sizes and claiming that they are new products.

**B.    One Liter Plastic Bottles**

35. An industry trade journal recently reported that Hornell is "debuting a 1-liter plastic bottle for some of its core items in its 20 ounce glass-bottle line such as green tea" and that it "will go through both DSD, where it will make it on shelves just below $2, and direct, at a $1.49-1.59 retail price." Brooklyn Boys in the Hood: AriZona Enters Dairy Channel, Beverage Business Insights, Vol. 2, No. 29, April 12, 2005, a true and correct copy of which is attached as Exhibit "D."

36. Hornell is currently selling AriZona Lemon Tea and AriZona Green Tea in this new 1-liter package directly into the Exclusive Territories. A picture of these two packages is attached as Exhibit "E."

37. This package size is not listed on Schedule A-2 of the CDDV or CDP agreements as a non-exclusive package size.

PHL:5175058.2/CAN039-151063

38.    Despite the clear and unambiguous exclusivity which Hornell has granted CDDV and CDP to distribute this package under the distribution agreements, Hornell has unilaterally decided to offer this package to CDDV and CDP on a non-exclusive basis. On June 16, 2005, Hornell agreed to "consider" CDDV and CDP the exclusive distributor of the 1-liter package, but only if CDDV and CDP agree to additional restrictive terms in the exclusive Distribution Agreements currently in effect (Exhibit "F").

39.    Recently, CDDV discovered the sale of cases of AriZona Lemon Tea and AriZona Green Tea in 1-liter bottles to Pantry Food Mart in Bensalem, PA (within the CDDV Territory) through a distributor or system owned and/or controlled by Hornell. A true and correct copy of a May 25, 2005 invoice from F&V Distribution Company is attached as Exhibit "G."

40.    Each case of AriZona Tea in 1-liter bottles which is sold directly or indirectly by Hornell to a reseller in the Exclusive Territories makes CDDV and CDP have to compete with Hornell, instead of being Hornell's exclusive distributors of these products.

C.    **16 ounce Plastic Bottles**

41.    This year, AriZona also began production of a new 16 ounce plastic bottle for AriZona Lemon Tea, AriZona Green Tea and AriZona Diet Green Tea.

42.    This 16 ounce plastic bottle is identical in trade dress to the 20 ounce glass and 23.5 ounce "Big Cans" distributed by CDDV and CDP on an exclusive basis, except for the addition of the words "Fresh Choice" and a warning to keep the product refrigerated.

43.    A recent trade publication has reported that Hornell has contracted with HP Hood to produce and distribute this package in order to "enable it to bypass the expensive DSD channel for some packaging configurations and retailers while getting its brand into other parts of the store." Ex. D at 3.

- 9 -

44. This package size is not listed on Schedule A-2 of the CDDV or CDP agreements as a non-exclusive package size.

45. Despite the clear and unambiguous exclusivity which Hornell has granted to CDDV and CDP to distribute this package under the exclusive distribution agreements, Hornell never offered CDDV and CDP the opportunity to distribute this package.

46. In a letter from Don Vultaggio dated May 10, 2005, Hornell represented that there is an exception in the agreements for refrigerated packages, that the 16 ounce plastic bottles require refrigeration, and that HP Hood has committed to sell the product into the dairy section of accounts. A copy of Mr. Vultaggio's letter is attached as Exhibit "H." Not one of these excuses has validity.

47. First, it is clear from the labeling of the of the 16-ounce plastic package that the contents are AriZona Lemon Tea and Green Tea, which are Exclusive Products. CDDV and CDP have been distributing these Exclusive Products for years. Pictures showing the new 16 ounce plastic packages between the top-selling 20 ounce glass bottle and 23.5 ounce "Big Can" packages in the same flavors are attached as Exhibit "I," collectively.

48. Second, the refrigeration exception referred to by Mr. Vultaggio is entirely inapplicable here. That exception, under the heading "MARKETING OF OTHER PRODUCTS," applies only to new product lines which Hornell might offer, such as a line of coffee drinks or dairy products, not AriZona Iced Tea products bearing the AriZona trademark and trade dress. Exs. A, B & C at 1 and § 8.

49. Core, top-selling AriZona Iced Tea products such as AriZona Lemon Tea and Arizona Green Tea which CDDV and CDP have distributed exclusively for years simply cannot be converted into "Other Products" by making minor, cosmetic changes which do not distinguish

them in any meaningful way from the products which CDDV and CDP distribute on an exclusive basis.

50. Finally, Hornell's claim that the "Fresh Choice" line will be sold in a different part of the stores is not true.

51. A diagram from the FasMart/Shore Stop chain for its store in Eden, Maryland, indicates that the new AriZona-Hood package will be sold in the "Tea Door" right next to 20 ounce bottles of AriZona Lemon Tea, AriZona Green Tea, and AriZona Diet Green Tea and other AriZona products distributed by CDP, and not in the Dairy Door. A true and correct copy of a shelving diagram from Shore Stop is attached as Exhibit "J."

52. In addition, the new 16 ounce plastic package is currently on sale at 7-11 stores in the CDDV Territory, where the new 16 ounce plastic bottles of AriZona Lemon Tea and AriZona Diet Green Tea are being sold on the same shelf as 20 ounce glass bottles of AriZona Green Tea and AriZona Iced Tea with Ginseng, which were distributed by CDDV. A true and correct print of a picture of a refrigerator case at a 7-11 on Frankfort Avenue in Philadelphia, PA, is attached as Exhibit "K."

53. The use of "Fresh Choice" on the new 16 ounce plastic package appears to be nothing more than an attempted "end-around" -- to avoid honoring rights granted to CDDV and CDP in the Distribution Agreements, and to permit Hornell to distribute its top-selling Iced Tea flavors within the territories for which CDDV and CDP have been granted exclusive distribution rights.

## BREACH OF CONTRACT

54. CDDV and CDP hereby repeat and reallege the factual assertions set forth in paragraphs 1 through 53 as if fully set forth herein.

62.  Hornell is required to use "its good faith efforts to protect the territorial exclusivity granted to [CDDV and CDP] hereunder in respect of the Exclusive Products." Exs. A, B & C, §2.4.

63.  Hornell has been directly and indirectly distributing Exclusive Products into the Exclusive Territories defined in Schedule B of the CDDV and CDP Agreements, and failing to pay fees where required.

64.  All of the improper direct and indirect sales of Exclusive Products by Hornell discussed in paragraphs 28 through 53, above, represent material breaches of sections 1.1 and 2.4 of the Distribution Agreements.

65.  All of these breaches have caused damages to CDDV and CDP and will cause further damages if permitted to continue.

66.  In addition, Hornell has breached its duty of good faith and fair dealing which is implied in every contract.

## PRAYER FOR RELIEF

WHEREFORE, Canada Dry Delaware Valley Bottling Company and Canada Dry Potomac Corporation respectfully request that the arbitration panel provide the following relief:

1)  a declaration that:

   a.  CDDV and CDP are the exclusive distributors of all Hornell beverage products in all packages and sizes unless specifically excepted in their Distribution Agreements;

   b.  Non-alcoholic Hornell beverage products are Exclusive Products under the CDDV and CDP Agreements in 1-liter and 16-ounce plastic packages, and any other package which is not specifically enumerated as a Non-

55. CDDV and CDP have valid and enforceable Distribution Agreements with Hornell which are supported by valuable consideration. See Exs. A, B & C at 1.

56. By the terms of these agreements, CDDV and CDP are the exclusive distributors of every Hornell beverage product in every package except those specifically identified on Schedule A-2 of their contracts. See Exs. A, B & C, §1.1.

57. Nothing in the distribution agreements permits Hornell to cancel the exclusivity of Iced Tea products in 16 ounce glass bottles, 20 ounce glass bottles or 23.5 ounce cans, and the exclusivity of these Exclusive Products cannot be waived.

58. Even though CDDV and CDP did not file an arbitration demand each time Hornell sold a case of Exclusive Products to a store in their Territories, such a failure to insist upon full performance of any of the terms, covenants or conditions, "shall not be deemed a waiver of such provisions." See Exs. A, B & C, §23.2 (emphasis added).

59. Accordingly, Hornell's sales of 16 ounce glass bottles, 20 ounce glass bottles, 23.5 ounce glass bottles and 42 ounce bottles in violation of the agreements constitute breaches of the exclusivity provisions in the agreements, and CDDV and CDP are entitled to damages for all instances within 180 days of the commencement of this arbitration.

60. Further, AriZona Lemon Tea and AriZona Green Tea are Exclusive Products in 1-liter plastic bottles.

61. Similarly, AriZona Lemon Tea, AriZona Green Tea and AriZona Diet Green Tea are Exclusive Products in 16 ounce plastic bottles despite minor cosmetic changes, the addition of the words "Fresh Choice," and the purported requirement that the packages be kept refrigerated (which even if required would still be irrelevant here).

PHL:5175058.2/CAN039-151063

    Exclusive Product under the CDDV and CDP Agreements is an Exclusive Product;

2)  an Order enjoining Hornell from directly and indirectly distributing Exclusive Products in violation of the Distribution Agreement;

3)  a complete and detailed accounting of all non-alcoholic, Hornell beverage products sold in the CDDV and CDP territories for 180 days prior to the commencement of this action;

4)  damages resulting from Hornell's multiple breaches of the Distribution Agreements; and

5)  reimbursement for all costs and expenses, including attorneys' fees, incurred by CDDV and CDP in connection with this action, pursuant to section 20.3(iv) of the CDDV and CDP Agreements.

            */s/ Dana B. Klinges*
            Dana B. Klinges
            Zachary C. Glaser
            WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
            1650 Arch Street – 22nd Floor
            Philadelphia, PA 19103-2097
            (215) 977-2000

            *Attorneys for Canada Dry Delaware Valley Bottling Company and Canada Dry Potomac Corporation*

Dated: December 2, 2005