UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
CANADA DRY DELAWARE VALLEY     :
BOTTLING COMPANY and CANADA     :     07 Civ. 8037 (SHS)
DRY POTOMAC CORPORATION     :
    :
           Petitioners,     :
    :
    - against -     :
    :
HORNELL BREWING CO., INC. d/b/a     :
FEROLITO, VULTAGGIO & SONS,     :
    :
           Respondent.     :
-------------------------------------------------------------- X

## DECLARATION OF DON VULTAGGIO IN OPPOSITION TO PETITIONERS' MOTION TO COMPEL COMPLIANCE AND FOR CONTEMPT

I, Don Vultaggio, declare and affirm under the penalties of perjury that:

1.     I am the Chairman of Respondent Hornell Brewing Co., Inc. ("Hornell"), and am authorized to submit this Declaration on personal knowledge on its behalf in opposition to the Petitioners' motion to compel compliance and for contempt.

2.     As discussed below, Hornell has not violated any provision of the Consent Award. By calling this a "contempt" motion, Petitioners hope to prejudice the Court against Hornell and avoid the agreed-upon remedy for disputes under the parties' Distributor Agreements: arbitration in New York City before a panel of three arbitrators.

## A.    Background - The Parties

3.     Hornell is a private, family operated business headquartered in Lake Success, New York. It was founded in the early 1970's in a small warehouse in Brooklyn by me and John Ferolito. Hornell first began manufacturing and marketing its AriZona brand of iced teas in or around 1992. Without the benefit of any television, radio or other advertising, Hornell

has built AriZona iced tea into the industry leader in iced tea sales.  Hornell's recipe for success has been simple: work hard and offer high quality products at a reasonable price.

       4.     The Petitioners, Canada Dry Delaware Valley Bottling Company ("CDDV") and Canada Dry Potomac Corporation ("CDP") (collectively "Petitioners" or "Canada Dry"), are bottlers and distributors of soft drinks and other beverage products in New Jersey, Maryland, Ohio, Delaware, Virginia and the District of Columbia.  They are all part of the so-called "Honickman Group," which includes the behemoth Pepsi Cola Bottling Company of New York, Inc., other Canada Dry bottling companies, including Canada Dry of New York, Inc., and Manhattan Beer Company (one of the largest Coors/Corona distributors in the country). The Honickman Group bottles and distributes Pepsi-Cola and Cadbury Schweppes brand products and according to Beverage World's "Top 25 Bottlers Report 2006," was the 6th largest bottler in the United States based on net sales of over $1 billion.  (See Exhibit "A" annexed hereto.)  The Chairman of the Group, Mr. Harold Honickman, has been featured in Forbes magazine.

       5.     The various Cadbury Schweppes brands that CDDV and CDP distribute include many recognizable brands such as Canada Dry, 7 Up, A&W, Dr. Pepper, Hawaiian Punch, Yoo Hoo and Welch's, among many others.  Petitioners also distribute beverages for a few independent companies, like Hornell.  To the best of my knowledge, sales of Hornell's products account for a small percentage of the Petitioners' (and the Honickman Group's) overall business.  Petitioners distribute multiple Cadbury Schweppes brands that compete directly with Hornell's AriZona Iced Teas, including Snapple Iced Teas, Mistic Iced Teas and Nantucket Nectars.  Petitioners also distribute other iced teas, including Honest Tea, and are one of the largest distributors of Glaceau's 20 oz. Vitamin Water in 20 oz plastic packages.  The

Honickman Group's Pepsi Bottling Companies also distribute brands that compete directly with AriZona Iced Teas, including Lipton Iced Teas and Sobe beverages.

6.    Canada Dry is what is termed a "DSD" distributor -- they deliver products directly to stores in their territory. There are two (2) different distribution systems or ways to distribute beverages: the DSD system and direct delivery to a chain account's warehouse. "DSD" or direct store door distribution means that the product being distributed is delivered to the customer's individual retail stores, whether the store is part of a chain or simply a mom and pop account like a deli. "Direct" delivery means that the product is being delivered to a chain account's warehouse (either by the manufacturer or by its distributor/agent), rather than to the chain's individual retail stores. Many large chains like club stores, mass merchandisers and drug chains maintain their own warehouse distribution systems, through which they receive the manufacturer's products and then distribute the products themselves to their numerous retail store outlets. Chain accounts have increasingly moved to direct delivery and many will not accept DSD delivery to their retail store outlets from a different distributor in each locale where the chain account has a store.

**B.    The Distributor Agreements**

7.    In March of 1997, Hornell entered into two (2) Distributor Agreements with CDDV (the "CDDV Agreements"). (Copies of the CDDV Agreements are annexed hereto as Exhibit "B.") At the time, Hornell believed that with its substantial manpower and resources, the Honickman Group (and CDDV in particular) had the wherewithal to successfully market and distribute Hornell's growing line of products. Under the CDDV Agreements, Hornell appointed CDDV its exclusive distributor with respect to certain products in five (5) counties in Pennsylvania (Bucks, Chester, Delaware, Montgomery and Philadelphia), seven (7) counties in

Southern New Jersey (Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester and Salem), and all three (3) counties of Delaware. However, CDDV's appointment was not exclusive with respect to all existing Hornell products or with respect to new products that might be developed in the future.

8.     With respect to then existing product lines, Schedule A-2 of the CDDV Agreements provides that CDDV's rights with regard to "products" that are sold in 7.7 ounce cans, 64 ounce bottles, 128 ounce bottles and 16 ounce glass bottles are non-exclusive. In the case of 16 ounce glass bottles, Schedule A-2 further provides that sales to non-traditional beverage outlets such as club stores and stores such as K-Mart, Wal-Mart, Target, Caldor and the like are non-exclusive.

9.     On or about December 23, 1998, Hornell entered in a Distributor Agreement with CDP (the "CDP Agreement"). (A copy of the CDP Agreement is annexed hereto as Exhibit "C.") The territory covered by the CDP Agreement is the District of Columbia and seven (7) counties in Maryland (Anne Arundel, Baltimore, Baltimore City, Carroll, Frederik, Howard, Montgomery and Prince George's.) Schedule A-1 of the CDP Agreement provides that Hornell may sell all AriZona "products in all product sizes" (including but not limited to products in 16 ounce glass bottles) directly to six (6) club store chains (BJ's, Costco, WalMart, K-Mart, Caldor, Sam's Club) and pay CDP $1.50 for each case that it sells. Further, Schedule A-2 of the CDP Agreement provides that products larger than 1 liter, 7.7 ounce cans and tetra packs are also non-exclusive.

10.     Unlike Petitioners who distribute a plethora of products, Hornell's success in Canada Dry's territory hinged entirely on Canada Dry's efforts to successfully market Hornell's products. Accordingly, while Canada Dry's failure to successfully market Hornell's

products would have little or no impact on Canada Dry, it would be disastrous for Hornell. Accordingly, in Paragraph 2.1 of the Distributor Agreements, Hornell obtained Canada Dry's promise that they:

> [s]hall at all times diligently and aggressively promote and actively solicit the sale and distribution of Products   . . . within and throughout the Territory.

I understand that Paragraph 2.1 is consistent with New York law that implies an obligation on an exclusive distributor to exploit the exclusive products in good faith and to generate income. In the CDDV and CDP Distributor Agreements, we made this obligation explicit.

11.    For purposes of this motion, the most relevant provision in the parties' Distributor Agreements is Paragraph 20.3(b). That paragraph, which appears in identical form in each Distributor Agreement, makes clear that "[a]ny and all disputes hereunder other than a failure by the Distributor to satisfy its payment obligations to the Manufacturer . . . shall be resolved by arbitration . . . in New York City before three arbitrators." Hence, disputes under the Distributor Agreements, like the one at issue here, must be resolved by arbitration in New York City.

**C.    The Arbitration Before The
American Arbitration Association**

12.    On or about June 21, 2005 and in accordance with Paragraph 20.3(b) of the Distributor Agreements, Petitioners commenced an arbitration proceeding against Hornell before the American Arbitration Association ("AAA") in New York City (hereinafter the "Arbitration.")  The Arbitration is described in the accompanying Declaration of Hornell's outside counsel, Howard S. Wolfson, Esq. of Morrison Cohen LLP.

13.     The Arbitration arose out of Hornell's introduction of two (2) new product lines in 2005:  (1) "Fresh Choice" AriZona Iced Tea products in 16 ounce plastic bottles that, like milk and other dairy products (and unlike shelf-stable iced tea products), require constant refrigeration during manufacture, delivery, sale and following purchase; and (2) a new product line of 1 liter plastic bottles.  Canada Dry argued that under their Distributor Agreements with Hornell, they had the exclusive distribution rights to these new products in their territory.  To highlight just how unreasonable Canada Dry's claim was in the Arbitration, products like Fresh Choice require special refrigerated delivery trucks that Canada Dry did not own or make use of since they did not distribute dairy or refrigerated products for any manufacturer.  The Fresh Choice products were to be manufactured, packaged, marketed and distributed by H.P. Hood, LLC, a dairy manufacturer, under license from Hornell.

14.     Canada Dry's real goal in filing the Arbitration was not to obtain the exclusive rights to the Fresh Choice product line so that they could distribute this product for Hornell, but instead to prevent Hornell from distributing this new product in Canada Dry's territory because it competed with the Snapple, Mistic and other product lines that Canada Dry was distributing.  Canada Dry had no real interest in aggressively distributing or promoting this new AriZona product line, they just wanted to tie up the product and make sure that nobody else could successfully distribute it in their territory.

15.     Canada Dry is one of the largest distributors of Snapple and Mistic Iced Tea products.  The Snapple and Mistic Iced Tea products they distribute compete directly with many of Hornell's AriZona products.  Canada Dry makes no effort to aggressively distribute certain of the AriZona products for which they claim nonetheless to have the exclusive distribution rights in their territory.  Instead, whether they aggressively market and distribute a

certain AriZona product often depends upon whether that product competes head-to-head with a Snapple or Mistic Iced Tea product or whether Snapple or Mistic offer a directly competitive product. During the Arbitration, Canada Dry took the unreasonable position that they could prevent Hornell from distributing an allegedly exclusive AriZona product in their territory even if Canada Dry had no intention of aggressively distributing that same AriZona product themselves.

16.     Hornell argued in the Arbitration that Canada Dry's position that an exclusive distributor has no obligation to actually distribute exclusive products is contrary to New York law and highlighted that their real reason for commencing the Arbitration was to stop Hornell from distributing AriZona products that Petitioners were not aggressively distributing in order to avoid competition with the Snapple and Mistic products that they do distribute.

17.     Notwithstanding Petitioners' statements concerning how "vital" it is that they maintain "exclusivity" with brands like Arizona, the absence of exclusivity is often meaningless from an economic standpoint. In fact, since 1999, Hornell has entered into two (2) additional Distributor Agreements with CDP for Northern Virginia and the Richmond, Virginia areas granting CDP the non-exclusive rights to distribute Arizona products in that territory. CDP's sales, especially of the Big Can, have grown substantially in these areas where it distributes AriZona products on a non-exclusive basis. CDP has also serviced Cecil and Harford counties in Maryland on a non-exclusive, at-will basis. Hornell has also entered into non-exclusive agreements with other Honickman Group affiliates. The economic success of a distributor is not dependent on whether it sells products on an exclusive or non-exclusive basis, but instead on whether it is aggressively promotes and actively solicits the sale of the products it distributes.

18.    Before the hearings began and when Hornell refused to buckle under to Canada Dry's demands, Canada Dry amended their Statement of Claim to include additional claims challenging Hornell's right to continue to make direct sales of various AriZona products to club stores, drug stores and mass merchandisers with retail store outlets in Canada Dry's territory.  In many cases, Hornell had been selling AriZona products on a direct basis to these chain accounts on a national or regional basis for years.  As discussed above, because many of these chain accounts will not accept DSD delivery through distributors, Canada Dry is unable to service some of these chain accounts in their territory and their request for injunctive relief was intended to remove the AriZona products from the chain accounts' stores in their territory -- as opposed to allowing Canada Dry the opportunity to distribute the AriZona products to these accounts themselves.

**D.    The Settlement Of The Arbitration**

19.    Hearings were held before the AAA on six (6) days between September 6, 2006 and October 4, 2006.  On November 14, 2006, the parties reached a settlement, the business terms of which were set forth in a letter agreement dated November 14, 2006.  Under the settlement, Canada Dry agreed that Hornell could distribute certain AriZona products on a direct basis to various chain accounts with stores in Canada Dry's territory.  The parties further agreed, among other things, that the Fresh Choice product line was non-exclusive under the Distributor Agreements.  (A copy of the November 14, 2006 letter agreement (the "Letter Agreement") is annexed hereto as Exhibit "D.")

20.    As discussed in Mr. Wolfson's accompanying Declaration, following the parties' execution of the Letter Agreement, Canada Dry sought to back-out of the settlement. The parties thereafter agreed that the arbitrators would decide whether the settlement was

binding. Following an evidentiary hearing, the arbitrators rejected Canada Dry's arguments and ruled that the parties were bound by the settlement.

21.    The new 16 oz PET and 20 oz PET product lines that are at issue on this motion were not in existence at the time of the Arbitration. Accordingly, no claims were asserted by Canada Dry in the Arbitration with respect to these product lines.

**E.    The Settlement Of The Arbitration
Did Not Eliminate The Arbitration
Provision In The Distributor Agreements**

22.    I was personally involved in the negotiation of the settlement that resulted in the Letter Agreement. The Letter Agreement was drafted by Canada Dry and sent to me by Harold Honickman. I would point out that neither John Taglienti nor Canada Dry's counsel, Dana Klinges, participated in the negotiation of the settlement or the drafting of the Letter Agreement.

23.    The settlement did not include any provision altering or eliminating Paragraph 20.3(b) of the Distributor Agreements, requiring arbitration of "[a]ny and all disputes" under the Distributor Agreements. In negotiating the settlement, the parties never discussed, let alone agreed to alter or eliminate the arbitration provision in the Distributor Agreements.

24.    Canada Dry does not point to any provision in the Letter Agreement (or in the Consent Award) that Hornell allegedly has violated because the Consent Award has not been violated. What Canada Dry is claiming is that the 16 oz PET and 20 oz PET product lines are exclusive products under Schedules A-1 and A-2 of the Distributor Agreements. Leaving aside that this claim is without merit, it allegedly arises out of the terms of the Distributor Agreements -- not the Consent Award. As such, Canada Dry's remedy under the Distributor Agreements is to commence an arbitration.

**F.    To The Extent The Letter Agreement Is Relevant,
It Does Not Give Rise To Any Claim By Canada
Dry But It Does Support Hornell's Position**

25.    One of Hornell's goals in entering into the settlement was elimination of the past situations in which Canada Dry had failed to aggressively market and distribute new AriZona products, while at the same time arguing that nobody else, including Hornell, could market those new product lines in Canada Dry's territory.

26.    Under Paragraphs 7 and 9 of the Letter Agreement, Hornell agreed to offer new products to Petitioners on an exclusive basis -- but with two (2) conditions: First, the new products would be offered on an exclusive basis and could be accepted by Canada Dry, but "on the same terms and conditions as other Exclusive Products."(See Letter Agreement at ¶ 7; Exhibit "D" annexed hereto)  Second, if Canada Dry agreed to take on a new product on an exclusive basis, they were required to purchase a full trailer load of each new product (including each new flavor in the product line) within thirty (30) days of Hornell's introduction of the new product line and to also "offer a 30-day price promotion to the trade . . . so long as a margin of $1.00 case is maintained during the promotion."  (See Letter Agreement at ¶ 9; Exhibit "D" annexed hereto).

27.    The 16 oz PET and 20 oz PET are "product" lines under the Distributor Agreements and, therefore, new product lines under Paragraph 7 of the Letter Agreement. Indeed, Schedule A-1 of both the CDP Distributor Agreement and the CDDV Distributor Agreements, when describing what is exclusive, refer to "products in all product sizes." There is nothing in the Distributor Agreements that differentiates between products in "new packages"

and "new products," as Petitioners contend.  A product in a new package is a new "product" under the Distributor Agreements and Paragraph 7 of the Letter Agreement.

28.    As described in the accompanying Declaration of John Welsh, when offered to them, Canada Dry refused to distribute the new 16 oz and 20 oz PET product lines on the same terms and conditions as they distribute other exclusive AriZona products.

29.    For example, Canada Dry has refused to adhere to Hornell's recommended pricing because, they contend, it will result in their achieving less than a 30% gross profit margin, which they claim is their required profit margin on the sale of what they term all "premium new age single serve products."  However, over 71% of Petitioners' sales of AriZona products consist of their sale of 23 oz Big Cans, AriZona's most successful product. Petitioners sell the Big Can at Hornell's recommended retail price of 99¢ and, according to John Taglienti, at a gross profit margin of 21.3%.  (See John Taglienti's February 27, 2008 letter to John Welsh; copy annexed hereto as Exhibit "E.")  According to Mr. Taglienti, Canada Dry's gross profit margin on the sale of the 20 oz PET would, at Hornell's recommended price, actually be 23.6% -- significantly higher than its profit margin on the sale of Big Cans.  As such, Canada Dry's refusal to distribute the 16 oz PET and 20 oz PET at less than a gross profit margin of 30% is a refusal to distribute these new products on the same terms and conditions as they distribute other exclusive products, including the Big Cans that account for most of their AriZona business.

30.    Moreover, throughout 2007 and 2008 and to the very limited extent that they bothered to distribute AriZona's 16 ounce glass bottle product, Canada Dry sold this product almost exclusively to supermarkets at a price of $5.75 per case.  This was pursuant to my discussions with Canada Dry's Chairman, Harold Honickman, who specifically agreed to this

pricing. The terms on which Hornell offered the new 16 oz PET product to Canada Dry on an exclusive basis are the very same terms under which Canada Dry has been selling AriZona's 16 ounce glass bottle product.

31.    I would point out that we understand that Petitioners' affiliate, Canada Dry Bottling Company of New York, Inc., also sells Arizona products at a gross profit margin substantially below 30% and below the gross profit margins that Mr. Taglienti claims are Petitioners' required margins on Arizona products. Hornell believes that with respect to the great majority of the beverage products that Petitioners distribute, their gross profit margin is below the margin they earn on the sale of Arizona products.

32.    In short, Canada Dry distributes the great majority of the AriZona products to which they claim to have the exclusive rights at a gross profit margin of significantly less than their purported required margin of 30%.

33.    Further, Canada Dry did not comply with the conditions in Paragraph 9 of the Letter Agreement in several respects. First, they did not place an order for one full trailer load of the 16 oz PET and the 20 oz PET (and of each flavor thereof) within thirty (30) days of Hornell's introduction of the products. This is discussed in Mr. Welsh's accompanying declaration. Second, they failed to offer a price promotion for the trade, which they were required to do so long as a margin of $1.00 per case was maintained during the promotion. As discussed in Mr. Welsh's declaration, Canada Dry expressly refused to distribute the 16 oz PET and 20 oz PET unless they could maintain a profit margin of at least $1.25 a case on 16 oz PET and $6.99 a case on the 20 oz PET.

34.    Hornell has not treated Canada Dry differently than it has treated its other DSD distributors, who have been offered the new product lines on the same terms as Hornell has offered them to Canada Dry.

35.    Hornell has offered to sell the 16 oz PET and 20 oz PET to Canada Dry on a non-exclusive basis.  This offer was reiterated in our counsel's, Howard S. Wolfson, Esq., June 4, 2008 letter to Canada Dry's counsel, Dana Klinges, Esq.  Canada Dry has refused to accept and order the products on this basis, because it claims that the products are exclusive under the Distributor Agreements and Schedules A thereto.  Hornell disagrees.  This dispute must be resolved in accordance with the parties' Distributor Agreements, which provide for arbitration.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:    July 23, 2008

DON VULTAGGIO

#1335440 v2 \016932 \0003