(i) the persons owning the ownership interests of Distributor on the date hereof would own less than 67% of the aggregate ownership interests of the Distributor, or (ii) following the date hereof there shall have been transfers of ownership interests representing more than 50% of the aggregate ownership interests of Distributor, or (iii) there shall have been a change in Control from that existing on the date hereof. Attached hereto as Schedule F is a list of all of the present owners of ownership interests in Distributor, together with the amount of their respective ownership interests. Without limiting the prohibitions set forth herein, but instead to assure the Distributor's compliance with the provisions hereof, the Distributor shall notify the Manufacturer in writing of any anticipated changes in ownership interests applicable to Distributor (even if not requiring the consent of the Distributor) not less than ten (10) days prior to the effective date thereof. Notwithstanding the foregoing, nothing contained herein shall prohibit or limit transfers to or among existing owners, spouses, lineal descendants or spouses of lineal descendants of any of the present owners or to trusts or other entities where any of the foregoing own the economic benefit thereof and possess all governance rights therein.

19.3  Any purported or attempted transfer, as aforesaid, if undertaken without the consent of the Manufacturer shall constitute a "Transfer" for purposes of Paragraph 6A.1(f) above.

20.  GOVERNING LAW, ENFORCEMENT.

20.1  The grant by the Manufacturer to the Distributor of an exclusive geographic distributorship is made pursuant to the provisions of 15 U.S.C. 3501, cited as "SOFT DRINK INTERBRAND COMPETITION ACT".

20.2  To the extent that the laws governing rights of distributor of soft drink beverages adopted by the state in which Distributor primarily conducts its operations would restrict Manufacturer's ability to exercise any of its rights hereunder, including without limitation its rights to terminate this Agreement, such laws shall govern the exercise of such rights, superseding the applicable provisions of this Agreement. In all respects other than the exercise of rights under such laws, this Agreement is to be governed and construed according to the laws of the State of New York and is to be considered as a New York Contract without regard to New York's conflict of laws principles. The illegality or unenforceability of any provision of this Agreement, in whole or to any extent, shall not operate to impair the legality or enforceability of any other provision of this Agreement or said provision except to such extent.

20.3  (a)  Any action by Manufacturer to obtain collection from Distributor of amounts due hereunder may be brought and pursued by Manufacturer in the Federal District Court for the Eastern or Southern Districts of New York or in the Supreme Court, State of New York, County of Nassau, and for this purpose Distributor hereby expressly and irrevocably consents to the jurisdiction of said courts.

(b)  Any and all disputes hereunder other than a failure by the Distributor to satisfy its payment obligations to the Manufacturer (which shall be resolved pursuant to subparagraph (a) above) shall be resolved by arbitration in

accordance with the following:

(i) Such arbitration shall be conducted in New York City before three arbitrators, one of whom shall be appointed by the Manufacturer, one of whom shall be appointed by the Distributor, and the third of whom shall be appointed by the first two arbitrators.

(ii) Except as otherwise provided herein, such arbitration shall be conducted in accordance with the rules then obtaining of the American Arbitration Association.

(iii) The finding of the arbitrators shall be final and binding upon the parties to any such arbitration.

(iv) The arbitrators shall have the authority to provide that the prevailing party to any such arbitration shall be reimbursed by the other party for all costs and expenses incurred in connection therewith, including reasonable attorneys' fees. Absent any such award, each party shall be responsible for its own costs and expenses, except that each party shall bear the costs of the arbitrator designated by it, and the costs of the third arbitrator shall be borne equally by the Manufacturer and the Distributor.

20.4 Without expanding or increasing specifically limiting provisions hereof to the contrary, any claim by or against the Manufacturer hereunder by or against the Distributor, as the case may be, must be formally asserted pursuant to Paragraph 20.3(b) not later than 180 days following the event or circumstance giving rise to the underlying claim; the failure to abide by such time requirement shall constitute a waiver by the Distributor of any rights in respect of, and shall constitute a bar on, any claims by Distributor on the basis of such event or circumstance.

21. FORCE MAJEURE.

Either party shall be excused from performance (except for payment of money) and liability under this Agreement while and to the extent that such performance is prevented by an Act of God, strike or other labor dispute, war or war condition, riot, civil disorder, embargo, fire, flood, accident, the unavailability of sufficient quantities of Product for sale to Distributor, or any other casualty beyond the reasonable control of such party, provided that the disabled party exercises its good faith reasonable efforts to overcome the circumstances which create the disability.

22. ENTIRE AGREEMENT.

This Agreement together with the Schedules and Rider attached hereto set forth the entire agreement between the parties with respect to the matters provided herein and there are no understandings or other agreements except as expressly herein provided. This Agreement may not be modified or amended except, in writing, by both parties.

23. **FORMALITIES**

23.1   If any of the provisions of this Agreement shall be held unenforceable by a court of competent jurisdiction, such invalidity shall not affect any other provisions which can be given effect without the invalid provisions, and to this end, the provisions of this Agreement are intended to be and shall be deemed severable, all of which shall be liberally construed to effect the provisions of this Agreement.

23.2   The failure of either party, in any one or more instance, to insist upon full performance of any of the terms, covenants or conditions of this Agreement or to exercise any right to terminate this Agreement, shall not be deemed a waiver of such provisions. No waiver by either party at any time or with respect to any right or any condition or requirement contained in this Agreement shall be deemed a waiver at any other time or with respect to any other right or any other condition or requirement or as a waiver of estoppel to exercise any present or future right to terminate this Agreement. Such waiver shall not be valid unless in writing and signed by authorized officers of the Manufacturer and Distributor, and the other party's obligation with respect to future performance of the same and all other terms, covenants and conditions shall continue in full force and effect.

23.3  This Agreement shall be binding upon and inure to the benefit of successor and assigns of the Manufacturer and subject to the provisions of Paragraph 19.1, the permitted successors and assigns of the Distributor.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on the day and year first above written.

HORNELL BREWING CO. INC.

By: _____
Don Vultaggio, Chairman

CANADA DRY POTOMAC CORPORATION

By: _____
Richard E. Wolfe, President

SCHEDULE A-1

Hornell Brewing Co. Inc. PRODUCT AND PACKAGES SIZES Distributor is authorized to distribute on an exclusive basis (herein, the "Exclusive Products"): All non-alcoholic, non-carbonated beverage products in all product sizes, except those set forth on Schedule A-2.

As used in this Agreement, unless explicitly provided otherwise, the term "Case" shall mean a 24-pack equivalent case of AriZona products, Exclusive and Non-Exclusive; the term "Exclusive Case" shall mean a Case of Exclusive Products.

Manufacturer shall have the right to sell the Exclusive Products in the Territory directly (but not indirectly) only to the following six (6) club store chains: BJ's, Costco, WalMart, K-Mart, Caldor and Sam's Club (the "Club Stores"), and Manufacturer shall pay to Distributor, at the end of each quarter, $1.50 for each Exclusive Case sold to the Club Stores during that quarter. Sales by Manufacturer shall be determined by the data of the Club Stores for sales of such Exclusive Products by their stores in the Territory. In the event that additional club stores are opened in the Territory, such stores may be included in those listed in this paragraph upon the mutual agreement of Manufacturer and Distributor.

## SCHEDULE A-2

Hornell Brewing Co., Inc. PRODUCT AND PACKAGES SIZES

Distributor is authorized to distribute on a non-exclusive basis and the following will be deemed to be the "Non-Exclusive Products": all 7.7 ounce cans, tetra packs, and all packages of Products larger than 1-Liter.

In the event that Distributor fails to purchase 11.5 ounce cans within ninety (90) days of the date of this Agreement, 11.5 ounce cans shall become non-exclusive as to Distributor and shall be made part of this Schedule A-2 without any further action by the parties hereto.

SCHEDULE B

I.    Channels of Distribution through which Distributor is authorized to distribute the Product:

| Yes | No | |
|---|---|---|
| X | | On-premise licensed accounts |
| X | | Off-premise licensed accounts |
| X | | On-premise non-licensed accounts |
| X | | Off-premise non-licensed accounts |
| X | | Vending machine accounts (non-exclusive) |
| | | Other (describe) |

II.    Distributor's Territory (be specific):

The following counties:

Anne Arundel
Baltimore
Baltimore City
Carroll
Frederick
Howard
Montgomery and
Price George's Counties Maryland

and the District of Columbia

SCHEDULE C

Exempted Beverages

| | |
|---|---|
| A&W | Royal Crown |
| Canada Dry | San Pellegrino |
| Coffee House | Seven-Up |
| Country Time | Snapple |
| Crystal Light | So Be |
| Diet Rite | Squirt |
| Evian | Stewarts |
| Hawaiian Punch | Sunkist |
| Mistic | Sunny Delight |
| Nantucket Nectars | Tahitian Treat |
| Nehi | T-Time |
| Orangina | Vintage Water |
| Pennsylvania Dutch | Volvic |
| Perrier | Yoo Hoo |
| Poland Spring | Welch's |
| Rock Creek | Wink |

SCHEDULE D

AriZona Sales Development Budget;
AriZona Sales Goals

To be completed mutually
by the parties

## SCHEDULE E

### Overage Product Policy

The following shelf life standards, measured in days from the date of production, apply to AriZona Products:

|  | Diet Products | Iced Teas/Juice Drinks | Pina Colada; Chocolate Fudge; Chocolate Drink | Tetra Packs |
|---|---|---|---|---|
| Production Inventory | 60 Days | 60 Days | 60 Days | 60 Days |
| Distribution Inventory | 120 Days | 120 Days | 120 Days | 120 Days |
| Retail Inventory | 150 Days | 180 Days | 180 Days | 180 Days |

"Production Inventory" means the number of days following production within which the indicated Products must be delivered to Distributor.

"Distribution Inventory" means the number of days following production within which the indicated Products must be delivered by the Distributor to retailers.

"Retail Inventory" means the number of days following production within which the indicated Products must be sold by the retailers.

## SCHEDULE F

Ownership of Distributor

All stock in the Distributor is owned legally by Harold Honickman and Richard E. Wolfe, individually, and by Mr. Honickman pursuant to a voting trust agreement. Mr. Honickman and various other persons are beneficial owners of equity interests in the Distributor.

RIDER TO

HORNELL BREWING CO., INC.
DISTRIBUTOR AGREEMENT

This Rider, made and agreed as of December ___, 1998, is made part of the attached Hornell Brewing Co., Inc. Distributor Agreement with Canada Dry Potomac Corporation (the "Agreement"). All defined terms in the Agreement shall have their same meanings in this Rider.

Notwithstanding any provision of the Agreement to the contrary, the following provisions shall govern the rights of the parties with respect to the following provisions:

Manufacturer shall have the right to terminate the Agreement (by notice to Distributor not later than thirty (30) days after receipt from the Distributor of the sales report for 1999) on the grounds of decreased 1999 Case sales of AriZona products in the Territory by Distributor only as follows:

i) If Distributor's Case sales in the Territory during calendar year 1999 decrease *more* than five percent (5%) (to less than 147,250 cases), but the decrease is *less* than fifteen percent (15%) (*not* less than 131,750 cases), Manufacturer may take back the distribution rights by paying Distributor the amount it paid Atlantic Premium Brands, Ltd. ("Atlantic") for Atlantic's sale of Cases in the Territory. That amount will be calculated by multiplying Atlantic's Case sales in the Territory during the twelve months ended December 31, 1998, that is, 155,000 cases, by $2.50 per case, or $387,500.00.

ii) If Distributor's sales of Cases in the Territory during calendar year 1999 decrease *more* than fifteen percent (15%) (to *less* than 131,750 cases), Manufacturer may take back the distribution rights by paying Distributor for the Cases sold during 1999 by Distributor in its Territory, multiplied by $2.50.

iii) If Distributor sells 147,250 or more Cases in the Territory during calendar year 1999, the term of the Agreement shall be perpetual, subject to the other provisions of the Agreement.

IN WITNESS WHEREOF, the parties have caused this Rider to be duly executed on the day and year first above written.

HORNELL BREWING CO. INC.

By: _____
Don Vultaggio, Chairman

CANADA DRY POTOMAC CORPORATION

By: _____
Richard E. Wolfe, President