Case 1:07-cv-08037-SHS    Document 16-8    Filed 07/24/2008    Page 1 of 12

Exhibit D

November 14, 2006

VIA FAX: 212-735-8708

Mr. Don Vultaggio
Hornell Brewing Co., Inc.
5 Dakota Drive, Suite 205
Lake Success, NY 11042

Dear Don:

I am writing in response to David Menashi's letter to Lewis Gantman, dated November 10, 2006. I am sure we both understand the value of settlement – both in the avoidance of potential liability and in our ability to craft our own resolution. Accordingly, we are not interested in settling this matter by submitting a host of issues for the Panel to decide. If we are going to resolve this case amicably, let us resolve it by our own terms.

We have revised the terms from my November 3, 2006 letter, as follows:

1. Hornell will agree to the deletion of that portion of Paragraph 2.4 of the distribution agreements between the parties (the "Agreements") beginning with the phrase, "provided, however, that if in the Manufacturer's good faith...." and continuing through the remainder of the paragraph. The deleted language will be replaced by language stating that CDDV and/or CDP will give Hornell written notice of transshipment. Upon the receipt of written notice, both parties would have a period of 60 days to determine if they were responsible for the transshipment problem and eliminate it. If after the 60-day cure period the transshipment continues, then CDDV/CDP would give Hornell written notice of the continuation of the transshipment, and both parties would use their "best efforts" to eliminate the transshipment problem.

2. In the absence of a mutually agreeable Business Plan pursuant to Paragraph 10 of the Agreements, Paragraph 2.1 of the Agreements will require CDDV and CDP to diligently and aggressively promote and actively solicit the sale and distribution of Exclusive Products in good faith and in a manner consistent with the terms of the Agreements as amended by the Settlement Agreement, including the distribution goals set forth in paragraphs 6, 7 and 8.

3. Hornell shall be permitted to distribute the following specific packages of hot fill Exclusive Products to the following specific customers within the Territories on a direct basis:

NOV-14-2006 11:23
NOV. 14. 2006 9:33PM
11/14/2006 17:29 FAX 18566614560        Executive Offices                              P.03

a. Drug Stores:

   CVS, Walgreen's and Brook's/Eckerd/Rite Aid
   Full Product Line

b. Club Stores:

   Sam's Club, BJ's and Costco
   16 ounce glass bottles and 15.5 ounce cans

c. Mass Merchandisers:

   K Mart and Target
   16 and 20 ounce glass bottles and 23.5 ounce Big Cans

   Walmart
   16 and 20 ounce glass bottles

d. Aldi's:

   Full Product Line

e. Convenience Stores:

   Sheetz
   16 and 20 ounce glass bottles

   Cumberland Farms and High's
   16 and 20 ounce glass bottles and 23.5 ounce Big Cans

f. Supermarkets:

   Shop Rite, Pathmark, Super Fresh, Stop & Shop, Safeway and Genuardi's
   Products equal or less than 12 ounce and greater than one liter

   For Safeway and Genuardi's only, Hornell shall be permitted to sell the
   Arizona Energy Drink in the Green Tea, Diet Green Tea and Green Tea
   Pomegranate Flavors in 16 ounce cans.

g. Military:

   Full Product Line. There shall be no distribution of Products to any of the
   following customers except to the extent Hornell can demonstrate a
   history of sales: Walter Reed Hospital, Bowling Air Force Base, Quantico
   Marine Base, Fort Meade, Naval Academy, Fort Belvoir, Fort Myer, Fort

McNair and Dover Air Force Base. To the extent CDDV or CDP obtain evidence of improper sales to any of these bases, such evidence will be forwarded to Hornell immediately.

h. Food Service:

Syrup may be sold through a commissary system to any national restaurant chain. In addition, Hornell may sell its full product line to McDonald's, Burger King and Wendy's through a self-distribution commissary system, which must be wholly-owned or controlled by such restaurant customer, must distribute products exclusively to such restaurant customer, and must operate all of its outlets under its trademark.

i. Vending Machine Accounts:

Sales to vending machine accounts will include only packages which are permanently marked "For vending only and not for resale" and will not include a UPC on the package. CDDV/CDP will provide Hornell with written notice of "vending packages" that appeared in the market for resale within 60 days of its becoming aware of the problem. Hornell would have 60 days to cure this problem by eliminating the sales of the "vending packages" to the appropriate customers.

4. The exceptions to exclusivity specified in Paragraph 3 above relating to convenience stores and supermarkets only apply to existing stores of those customers and new stores of those customers. However, the exceptions shall not apply if the new stores were opened pursuant to an acquisition or business combination with an existing store chain that has at least 10 stores.

5. The 16 ounce "Fresh Choice" product will be a Non-Exclusive Product in the CDDV and CDP territories if Hornell and the product meet and enforce all of the following conditions: 1) the product is produced without preservatives in an ultra-high temperature pasteurization process; 2) the product requires refrigeration at the manufacturer, distributor and retailer levels; 3) Hornell informs its customers that the product must be sold in the dairy refrigerated section of the retail store; and 4) the product is not sold in the CDDV and CDP coolers. ~~Any packages~~ ~~12 oz cans (neither Hornell nor Lifer shall be excluded from~~ *[handwritten annotations]*

6. CDDV and CDP will agree to distribute enough Arizona SKU's to represent at least 80% of the annual DSD sales in the Northeastern part of the United States from Virginia to Maine for each of the following package sizes – 16 ounce bottle, 20 ounce bottle, and 23.5 ounce "Big Can". Hornell will provide an annual report certifying SKU sales in the Northeastern part of the United States from Virginia to Maine to verify the SKU distribution requirements. The SKU's will be selected jointly by CDDV/CDP and Arizona to reflect the most appropriate products for the marketplace.

NOV. 14. 2000   9:09AM
11/14/2006 17:30 FAX 18586614580        Executive Offices                    NO. 720      P.05

7. Introduction of new product lines: If any new product bears the Arizona trademark, or the trade dress of any new product is substantially similar to that of an Exclusive Product, the new product must be offered to CDDV and CDP on an exclusive basis and on the same terms and conditions as other Exclusive Products. If such product is accepted, then the product shall be added to Schedule A-1. If Hornell offers such new product line and CDDV and/or CDP elects not to carry it, then this new product line will be added to Schedule A-2 as a Non-Exclusive Product. This ~~Paragraph shall~~ [handwritten edits]

8. Introduction of new flavors: CDDV and CDP will agree to present any new flavor to at least 40% of its active customers in the "All Other Market" category, as defined by CDDV and CDP, as will be evidenced by a written confirmation signed by a representative of each customer. CDDV and CDP will agree to distribute all new flavors of any existing product line for at least one year, unless CDDV and/or CDP have a contractual prohibition on such offering. CDDV and CDP will also agree to distribute a minimum of 50% of all new SKU's in any line extension (i.e., Rx Black Teas) of any existing product for a period of at least one year. If after one year, CDDV or CDP delete any flavor referred to in this Paragraph, that flavor shall continue to be an Exclusive Product. New flavors will not be considered within the 80% rule stated in Section III.B above for the first year of the new flavor's distribution.

9. With respect to any new flavor, new package or new product line taken on by CDDV or CDP, each entity will purchase one trailer-load of such new flavor, new package or new product line within 30 days of its introduction into the Territories. In addition, each entity will offer a 30-day price promotion to the trade for such new flavor, new package or new product line so long as a margin of $1.00/case is maintained during the promotion.

10. CDDV and CDP will each run two 30-day incentive programs for salesmen each year. Each incentive program will provide up to a maximum incentive of $1.00 per case sold, the cost of which is to be shared equally by Hornell and the distributor. CDDV and CDP will each reach a mutual agreement with Hornell on the particular flavors, package sizes and product lines to be included in the incentive programs.

11. In recognition of the additional exceptions to exclusivity which are being codified in this agreement and the additional competition that has existed and will continue to exist between the parties with respect to retail accounts in the Territories, Paragraph 7.2 of the Agreements will be amended to define "Customer Information" to specifically include gross sales information by package and by channel, but not to include the names or addresses of customers.

12. The Settlement Agreement will contain a mechanism to have the Settlement Agreement approved by the Arbitration Panel and confirmed by the United States District Court for the Southern District of New York. [handwritten additions, largely illegible]

11/14/2008 17:31 FAX 18566614560    Executive Offices

While I am confident that you and I can resolve this matter quickly and permanently, I cannot let these negotiations drag on or risk interfering with our preparation for the upcoming hearing dates. Accordingly, the terms above represent our best and final offer. If we cannot settle this case in this manner at this time, settlement negotiations will have to be put on hold indefinitely.

Sincerely,

*[signature]*

Harold A. Honickman

Agreed *[signature]*  Date NOV 14 2006
Harold A. Honickman

Agreed *[signature]*  Date NOV 14 2006
Don Vultaggio

TOTAL P.05

paragraph 7
This paragraph shall not apply to Soho natural soda and any vitamin enhanced waters presented to CDDV and CPP prior to the date of this letter

paragraph 5
any package greater than 1 liter shall be excluded from the distribution agreement

parag. 13
The settlement agreement shall include a provision permitting either party to cure any default within 60 days of receipt of a written notice of any such default.

agreed    Harold H. _____    NOV 14 2006

agreed    Don V_____    Nov 14 2006

Case 1:07-cv-08037-SHS     Document 16-8     Filed 07/24/2008     Page 8 of 12

Exhibit E



CANADA DRY DELAWARE VALLEY BOTTLING COMPANY
CANADA DRY POTOMAC CORPORATION
8275 U.S. Route 130, Pennsauken, NJ 08110

856-662-6767
FAX 856-663-6746

John Taglienti
Executive Vice President
Sales and Marketing

February 27, 2008

Arizona Beverages
ATTN: John Welsh
5 Dakota Drive
Lake Success, NY 11042

Dear John,

I appreciate your recap of our meeting held in Glen Burnie on Monday, February 4th. Both Mike and I are looking forward to working with you in our efforts to build our mutual businesses. Although Mike may have responded to a number of the points detailed in your memo, he may not have covered all of the issues. As a result, I would like to take this opportunity to clearly provide our position on each of the topics detailed in your recent correspondence. The position we presented at the meeting on each topic and our "go forward" strategy is as follows:

### 24 pack / 20 oz.

While we agree that the 24 pack/20 oz. Pet represents a package with retailer and consumer benefits, we do not agree with the pricing strategy recommended by Arizona. The recommended pricing of $18.99 per case to our customers will result in lower customer retail pricing; but the margin return of 23.6% to our CDP and CDDV sales operations is significantly below our target for our Premium New Age single serve packages of 30% gross margin. As you know, we currently accept a much lower gross margin percentage than our standard on your Arizona Big Cans (21.3% gm), and we are not interested in selling another Arizona single serve package for less than our gross margin percentage standards.

Additionally, as we discussed, our proposed average net pricing of $21.99 on the new 20 oz. Pet package represents a per case margin reduction versus our current 12 pack/20 oz. glass package of $1.00 per equivalent case. This proposed gross margin reduction takes into consideration the cost efficiencies that the 24 pack Pet package has versus the current 12 pack/20 oz. glass package. We understand your concerns with potential consumer "sticker shock" moving from one Arizona package size to another, but for the last 10 years this retail price gap that has existed between the 24 pack/23.5 oz. Big Cans and the 12 pack/20 oz. glass bottles did not adversely impact our overall sales performance. The actual average net pricing we recommended for the Pet package of $21.99 per case will still reduce the "sticker shock" in the marketplace that currently exists between Big Cans and 20 oz. glass.


The proposed pricing strategy recommended by Arizona also assumes that our retail customers would be willing to carry 3-4 Arizona single serve packages of the exact same flavors. We strongly believe that a number of retail customers in our markets will not agree to this product duplication. In the event that a retailer does choose not to carry both Arizona 20 oz. plastic and glass, with our proposed average pricing of $21.99 on 20 oz. plastic we will not be put in a position of margining down in that account.

As we discussed, we would be willing to work with Arizona to eliminate this price gap, but it would require a significant cost reduction to our operations by Arizona for purchasing the 20 oz. Pet package or 20 oz. glass package. As you know, in 2008, Arizona raised pricing on both Big Cans (+.20¢ per case) and 20 oz. glass bottles (+.50¢ per case). We understand that the rising costs of raw materials led to your increases and respect your decision to manage your internal margins. However, we would expect that Arizona would also recognize our goal of maintaining our profitability in the market. As you know, we have consistently priced our Premium New Age brands to deliver a 30% gross margin return and although you consistently recommend lower pricing for your brands, we have continued to grow the Arizona portfolio of packages with our pricing strategy.

In summary, the pricing strategy detailed by us during our meeting will put us in the best position to avoid margining down on Arizona and enable us to grow our mutual businesses. I understand that Mike reinforced to you, our position during your recent meeting. Prior to our introduction, we will forward Arizona a contract amendment, adjusting Schedule A of our CDP and CDDV contracts. We will then use our recent settlement agreement guidelines and your team's input to develop our introductory plans.

## 12 pack / 16 oz. Pet

I appreciate your efforts to attempt to make the 12 pack/16 oz. Pet exclusive package work for our operations. However, your strategy of a fixed price in the supermarket channel with no limits on the frequency of "Hot" chain feature advertising activity will not work for our operations. Our strategy will be to purchase this exclusive package from Arizona at your confirmed transfer cost of $5.75 per case and develop a pricing strategy for the targeted channels that will work best in our markets. As we discussed, we can accept a $1.00 per case margin for "Hot" activity, but we cannot accept this aggressive pricing and low margins for all of our customers and channels on an every day basis. We will look to develop a competitive value strategy for this exclusive package in all of our markets. This strategy will support both volume growth for Arizona and profit and volume growth for our business. Prior to our introduction, we will need Arizona's position on the 12 pack/16 oz. glass package currently being sold in these channels. Will Arizona continue with this package? We need more information from Arizona before we finalize the rollout of this new package in the market.

## Other Topics

### 34 oz. "Special Project"

I do not think you clearly understood our position on Arizona's efforts to sell the 34 oz. Pet non-exclusive package in our markets. I did not state that the Arizona representatives who sell the 34 oz. package in our territories in direct competition with our sales efforts on Arizona exclusive packages, would be excluded from our property.

To be clear, we would prefer that the same Arizona field sales representatives selling 34 oz. Pet in our markets not work directly with our retail salesmen selling in the same markets to the same accounts. I understand that Mike explained the issues that this type of situation can create. Your sales representatives are always welcome to work with our sales managers to develop Arizona programs and to identify business-building opportunities. It is our belief that utilizing the same Arizona field representatives to work with our retail salesmen in the market one day and then to compete with them the next day in the same market is confusing to both our retail salesmen and our customers. Additionally, your representatives are not just taking Snapple space; they are also taking space from the exclusive Arizona products (i.e. Big Cans and 20 oz. bottles) that we sell in our markets. None of our other parent companies that sell brands in a multiple distribution system have the same sales representatives call on our facilities (i.e. Cadbury, Coke, etc.). We would request that Arizona give us the same consideration.

### Mis-Labeled 23 oz. Cans

We have notified your company on multiple occasions regarding this issue. The mis-labeling of products and packages sold to our customers is misleading. It may also be a problem to simply change the actual selling size of the product without changing the UPC code. I am hopeful that this issue was addressed prior to making the change to 23 oz. versus 23.5 oz. Until such time that these issues are resolved, we will continue (at our expense) to do our best to fix the mis-labeled packages at our warehouses before they are sold to our customers.

### Program Requirements

Again, I believe you may have misunderstood our comments on program requirements. Specifically, to qualify for promotional support on any package, we want to clearly understand what we need to do in the market with that package. A clear understanding of your requirements will help to eliminate any potential issues that could arise relative to program reimbursements. Additionally, requirements on non-exclusive packages (i.e. distribution levels) would need to be included in any presentation before we could consider distributing these items (i.e. 34 oz. Pet). As you know, we have a Settlement Agreement with Arizona that clearly states our obligations on both new and existing exclusive items. We will continue to perform to our contractual selling obligations and would expect that Arizona would do the same.

### SKU Deletions

I understand your frustration regarding the communication of the SKU deletion letter. In the future I will copy you on our decisions to delete any Arizona items. I want to be clear that these brands were NOT discontinued because we had not received the requested sales information. Further, they were deleted because they did not meet our SKU performance standards. In fact, we delayed deleting these items so that we could cross reference our local sales results on the deleted items to the broader sales list of items sold by Arizona. We have requested from Arizona the required Arizona Sales Ranking Reports detailing this sales information many times. I believe Mike gave you copies of a signed confidentiality document sent to Martin Cunningham pertaining to this specific information back on August 8, 2007 (*attachment 1*). A follow-up letter was also sent to your attorney on November 20, 2007 (*attachment 2*), to again request this information. Unfortunately, we still have never received the required information and we could no longer

wait on deleting under-performing SKU's. We are still looking for this sales information as detailed in our Settlement Agreement. Any help you can provide in getting us this required data would be greatly appreciated.

*Communication*

Communication continues to be a major issue and source of frustration to us as well. It is disturbing to find out from our leading customer, Acme, that Arizona representatives presented an exclusive 12 pack/16 oz. package the day after you had finally formally presented us the details of this package. It is even more concerning that Arizona has sold an exclusive 24 pack/20 oz. Pet package and committed pricing to one of our customers (Mobil/Exxon) without our prior knowledge or consent. We look forward to your thoughts on how we can best resolve this issue before it becomes a problem with our mutual customer. We would have expected Arizona to inform us that they would be running a "Special Project" in our markets. Communication from Arizona in any of these specific examples would have eliminated a number of problems that we now have to deal with in our markets. We are hopeful that with your increased involvement in our business, that communication from your company will improve. We will also commit to keeping you better informed on issues that we have that may have an impact on your business.

I hope this memo and your follow-up meeting with Mike, provides you with a better understanding of our position relative to the issues detailed in your recap. I know Mike provided you with a complete copy of the Settlement Agreement reached between our two companies. It is my hope that your familiarity with this Agreement will allow you to better assist us in our efforts to build our business. It is our intent to introduce both the 24 pack/20 oz. and 12 pack/16 oz. packages under the terms of our Settlement Agreement. As previously noted, we will be forwarding to your company, amendments confirming our plans to include these two packages to Schedule A-1 of our existing contracts. Please contact me directly with any questions regarding this memo. I would recommend as a next step, that we meet in the next couple of weeks to resolve any open issues and finalize our introductory plans on the new packages.

I will contact you to coordinate our calendars.

Sincerely,

*[signature]*

John Taglienti
Executive Vice President
Sales and Marketing

cc:   M. Dooley
      B. Brockway
      L. Gantman


Attachments