**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- x
CANADA DRY DELAWARE VALLEY :
BOTTLING COMPANY and CANADA :
DRY POTOMAC CORPORATION, :   07 Civ. 8037 (SHS)
:
: **REPLY MEMORANDUM OF**
Petitioners, : **LAW IN SUPPORT OF**
: **MOTION TO COMPEL**
-against- : **COMPLIANCE AND FOR**
: **CONTEMPT**
HORNELL BREWING CO., INC., D/B/A :
FEROLITO, VULTAGGIO & SONS, :
:
Respondent. :
------------------------------------------------------- x

Hornell[1] responds to Petitioners' Motion to Compel Compliance and for Contempt ("Motion for Compliance") with a three-pronged attack, raising procedural issues, substantive issues and a ploy for sympathy. It is a close call to decide which of the three responses is the weakest.

**I.   HORNELL'S PROCEDURAL ARGUMENTS FAIL BECAUSE THIS COURT IS THE PARTIES' CHOSEN VENUE**

   **A.   This Court Has Power to Interpret and Enforce the Consent Award**

Lacking a substantive justification for selling its products to any willing buyer regardless of its obligations to its distributors, Hornell focuses most of its efforts on forum shopping. Contrary to Hornell's assertions, this is precisely the type of action that the parties agreed would be decided in this Court. The terms of the confirmed Consent Award could not be more explicit:

> Notwithstanding the arbitration provisions in the CDDV Agreements and the CDP Agreement, the venue for any action arising out of the **interpretation, enforcement or breach** of this

---

[1] Unless otherwise stated, defined terms are as set forth in Petitioners' Memorandum of Law in Support of their Motion for Compliance ("Petitioners' Memorandum").

>Agreement or the Consent Award as confirmed shall be the United
>States District Court for the Southern District of New York . . . .

Declaration of Dana Klinges in support of Petitioners' Reply in support of their Motion for Compliance ("Klinges II"), Ex. 2 at ¶ 13 (emphasis added).

The Motion for Compliance is an action arising out of the interpretation, enforcement <u>and</u> breach of the Consent Award. This is obvious from the face of the motion, in which Petitioners have asserted, for example, that Paragraph 3(b) of the Letter Agreement permits Hornell to sell 16 ounce glass bottles and 15.5 ounce cans directly to BJ's Wholesale Club and Sam's Club — but not the 16 and 20 ounce plastic packages being sold directly by Hornell to those customers. Petitioners' Mem. at 8, 10, 13-15. CDDV and CDP contend that these new plastic bottles are "new packages" of an existing product line, as discussed in Paragraph 9 of the Letter Agreement, as opposed to "new product lines," as discussed in Paragraph 7 and 9. *Id.* at 14-15.

Hornell's defenses confirm that venue is proper here. Nowhere in its response ("Hornell's Memorandum") or in its June 4, 2008 letter does Hornell attempt to claim that its actions are permitted by the original Distribution Agreements.[2] Instead, Hornell's defenses are exclusively dependent on misguided interpretations of the Consent Award. Hornell asserts that the new 16 and 20 ounce plastic packages should be deemed new "product lines" under the terms of Paragraph 7 and 9 of the Consent Award. Hornell's Mem. at 22-23. And, Hornell asserts, as new "product lines" they have become non-exclusive because they were not properly "accepted"

---

[2] Petitioners served notices of default relating to these issues on three occasions prior to filing the present motion, each time specifically referring to provisions of the Consent Award. Klinges II at ¶ 17. Not once did Hornell claim that the notices were improper because the Consent Award was not at issue. *Id.* at ¶ 18. Instead, Hornell responded to all of the notices in a single letter on June 4, 2008, asserting that its actions were justified under the Consent Award. *Id.* at ¶ 19. The concept of this dispute being outside the scope of the Consent Award was concocted later.

by Petitioners, as discussed in Paragraph 7. *Id.* Hornell even asserts that CDDV and CDP have violated the Consent Award by failing to order a trailer load of each new package within 30 days as required in Paragraph 9 of the Consent Award.[3] *Id.* at 23-24.

Rather than submit this matter for interpretation and enforcement by this Court — as required by the Consent Award — Hornell seeks a "fresh arbitration." *Id.* at 18. To be clear, Hornell is not suggesting remand to the original arbitration panel for consideration. Such a remedy is not even available; as "'a general rule, once an arbitration panel decides the submitted issues, it becomes *functus officio* and lacks any further power to act.'" *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987) (citation omitted). An arbitration panel may not monitor compliance with its award where the parties did not intend it to do so. *Id.* As the Court of Appeals for the Second Circuit has noted, "[t]he scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." *Id.*

Even assuming, *arguendo,* that the arbitration provision in the Distribution Agreements could be extended to cover disputes arising under a separate agreement that neither incorporates nor is incorporated into the Distribution Agreements,[4] the relief sought by Hornell would be

---

[3]    Contrary to Hornell's assertion, CDDV and CDP did order these new packages in the time-frame agreed to by the parties. Declaration of John Taglienti in support of Petitioners' Reply in support of their Motion for Compliance ("Taglienti II") at ¶¶ 4-9. This issue is irrelevant, however, because exclusivity is not conditioned on compliance with this provision and unripe because Hornell has never served a notice of default or given Petitioners an opportunity to cure. Klinges II at ¶¶ 20-21, Ex. 2 at ¶¶ 10-11.

[4]    Hornell correctly notes that the Consent Award did not incorporate the Distribution Agreements and that Petitioners misspoke on this point in their opening Memorandum. Hornell's Mem. at 11; Klinges II at ¶ 7. It is also true, however, that the Consent Award is not incorporated into the Distribution Agreements. Disputes relating to the parties' new business terms are to be brought in this Court, while disputes relating to the provisions of the Distribution Agreements which were not "modified or amended" by the

wasteful and inconsistent with the parties' agreement and this Court's Judgment. The parties intended a swift and efficient enforcement procedure, in contrast to the original arbitration in which it took more than four months just to empanel the arbitrators.[5] Klinges II at ¶ 9. A "fresh arbitration" would require the parties to empanel three new arbitrators, educate them about this matter and ask them to perform the job that Hornell apparently does not trust this Court to perform — interpreting and enforcing the disputed terms of the confirmed Consent Award.

### B. Hornell's "New Dispute" Argument Misses the Mark

Hornell's Memorandum cites a number of cases for the limited and inapplicable proposition that enforcement cases should be remanded to arbitration where the facts of the enforcement case are beyond the scope of the arbitration award or where the award is not clearly intended to have a "prospective effect." Hornell's Mem. at 17-18. By contrast, the Consent Award at issue here was certainly intended to cover issues beyond those at issue in the prior arbitration and to have a prospective effect. There is no dispute that the parties intended the new business terms to govern the parties' business relationship going forward. Further, there is nothing "new" about this dispute.

#### 1. The Consent Award Far Exceeds the Scope of the Arbitration and Was Intended to Govern the Parties' Future Business Relationship

The Consent Award contains multiple provisions relating to business issues outside the scope of the prior arbitration. For instance, the Consent Award governs distribution to military

---

[5] terms of the parties' Settlement Agreement are governed by the original arbitration provision. *See id.*, Ex. 2 at ¶¶ 8, 13. Examples of disputes that would require arbitration include termination; underperformance; recalls and damaged products; and intellectual property. *See* Vultaggio Decl., Exs. B and C at §§ 5, 6A, 6B, 6C, 13, 14 and 15.

In the arbitration, Hornell asserted that it could not unravel many of the direct distribution arrangements it had made with various chain accounts over a period of time. Klinges II at ¶ 14. A quick resolution of this dispute will prevent this situation from arising again.

bases, food service accounts and vending machine accounts, none of which was at issue in the arbitration. Klinges II, Ex. 1 at ¶¶ 3(g), (h) and (i). The Consent Award also modifies the terms of Paragraph 7.2 of the original Distribution Agreements, which was not at issue in the arbitration. *Id.* at ¶ 11. If this Court had the power to enforce only those provisions relating to issues litigated in the original dispute, whole sections of this Court's Judgment would be rendered moot.

Hornell cannot seriously contend that the Consent Award was not intended to govern the parties' future business relationship or the introduction of packages that did not exist when the Award was entered. Such a position would be completely inconsistent with the clear and unambiguous terms of that Award, which explicitly address the introduction of "new product lines," "new packages" and "new flavors." *Id.* at ¶¶ 7-9. It is also inconsistent with Hornell's motion, made at the conclusion of the arbitration, to enforce the parties' Settlement Agreement as written. In its papers, Hornell made a particular point of noting that counsel for CDDV and CDP "*conceded* that the Letter Agreement governed 'the future business dealings between the parties.'" Klinges II, Ex. 3 at 8 (emphasis added).

### 2. There is Nothing New About the Present Dispute

Although it may be true that the 16 and 20 ounce plastic packages currently being sold by Hornell into Petitioners' territories were not being sold during the arbitration, Hornell's conduct certainly is nothing new. The impetus for the arbitration was Hornell's sales of two single-serve *plastic* packages that Hornell was selling into Petitioners' markets. Klinges II at ¶ 13. Hornell's sales of new single-serve *plastic* packages are neither new nor independent of the provisions of the Consent Award. *Id.* at ¶ 15.

The parties' intent was that disputes arising from the parties' new business terms would be brought to this Court for interpretation and enforcement. *Id.* at ¶ 8. To give effect to the

parties' agreement and this Court's Judgment, Hornell's ham-fisted attempt to avoid a quick resolution of this dispute must be denied.

## II. HORNELL'S SUBSTANTIVE ARGUMENTS MUST BE REJECTED

The most important relief sought in the Motion for Compliance is the entry of an Order declaring that Petitioners are the exclusive distributors of Hornell's new 16 and 20 ounce plastic packages and prohibiting Hornell from selling these "new packages" into Petitioner's territories. That relief unquestionably is warranted here.

### A. The Confirmed Consent Award Does Not Permit Direct or Indirect Sales of Hornell's New Plastic Packages

In the last two pages of its Memorandum, Hornell rehashes the same baseless arguments that it asserted in its letter of June 4, 2008. These arguments were dealt with in Petitioners' Memorandum and need not be addressed in full here. *See* Petitioners' Mem. at 14-16. In short, pursuant to the plain, unambiguous terms of the confirmed Consent Award, different rules are established for new product lines, new flavors and new packages. Klinges II, Ex. 1 at ¶¶ 7-9. These terms must be interpreted according to their plain meanings. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citing *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)). Moreover, the words must be read in such a way as to give meaning to all of them. *Id.*

Hornell does not dispute that 16 and 20 ounce plastic packages are exclusive under the terms of the Distribution Agreements and, therefore, may not be sold by Hornell directly or indirectly into Petitioners' Exclusive Territories. The only substantive issue before this Court is whether the Consent Award otherwise permits these sales. The business terms codified in the Consent Award specify the various Hornell packages by size and material. Klinges II, Ex. 1 at ¶

3. Hornell's suggestion that two different materials (*i.e.*, plastic and glass) are interchangeable is simply untenable.

Similarly absurd is Hornell's contention that a new 20 ounce plastic bottle containing the *exact same iced tea* that has been sold in a 20 ounce glass bottle for more than a decade is a "new product line."[6] Hornell's arguments relating to its 16 and 20 ounce plastic packages are not even consistent with each other. On the one hand, Hornell claims that its 20 ounce plastic package is a "new product line" offered to consumers as an addition to the existing array of glass packages and cans.[7] *See* Hornell's Mem. at 11. On the other hand, Hornell describes its new 16 ounce plastic package as a "swap out" for a 16 ounce glass package that it can distribute pursuant to the exceptions negotiated for that package. *Id.* at 16. Neither of these strained interpretations works.

There also is no merit to Hornell's suggestion that CDDV and CDP have waived exclusivity by refusing to accept the pricing to which other distributors have allegedly agreed. There are no provisions anywhere — not in the Distribution Agreements or the Consent Award — permitting Hornell to dictate the distributor's resale price for such packages, and there are no provisions permitting Hornell to sell such packages directly if the parties cannot agree on price. Klinges II at ¶ 23. This issue was thoroughly litigated in the original arbitration, but Hornell was unable to obtain any concessions from Petitioners in the Consent Award. *Id.* at ¶ 24. Absent an

---

[6] Examples of new product lines are in the handwritten amendments to the Letter Agreement and include "SOHO Natural" soda and vitamin enhanced waters. Klinges II, Ex. 1.

[7] Hornell's assertion is disconnected from reality. Exxon/Mobil has no intention of carrying three single-serve packages of the same flavor. Taglienti II at ¶ 23. In December 2007, Exxon/Mobil advised CDDV and CDP that because it would be buying the new 20 ounce plastic package of AriZona Iced Tea from Hornell, it would discontinue all purchases of 20 ounce glass bottles and 23 ounce Big Cans of AriZona Iced Tea from CDDV and CDP. *Id.* at ¶ 22, Ex. 3. One can surmise that other retailers will react similarly. *Id.* at ¶ 23.

agreement to the contrary, CDDV and CDP have the authority to set their own resale prices without waiving their exclusive distribution rights.

Rather than raise new, relevant arguments to defend its undisputed direct sales of new packages to multiple national and regional chain accounts, Hornell's Memorandum is littered with irrelevant factual averments, many of which are flat wrong. For the record, however, CDDV and CDP submit a Declaration refuting certain of Hornell's factual contentions. *See* Taglienti II at ¶¶ 4-28.

### B. A Finding of Contempt is Appropriate Here

Since the principal relief sought in the Motion for Compliance is an order preventing continued noncompliance with the confirmed Consent Award, this Court need not get bogged down by the secondary contempt issue. However, the relevant portions of the confirmed Consent Award are clear and unambiguous and there is no dispute that Hornell is blatantly and unapologetically violating this Court's Judgment. Accordingly, a finding of contempt is appropriate.

#### 1. The Contempt Standards Have Been Met

The standards for civil contempt are not in dispute. CDDV and CDP must show that this Court's Judgment is clear and unambiguous; that the proof of non-compliance is clear and convincing; and that Hornell has not attempted to comply with the Judgment in a reasonable manner. *Red Ball Interior Demolition Corp. v. Palmadessa*, 947 F. Supp. 116, 212 (S.D.N.Y. 1996). The Consent Award consists of an agreement between the parties to comport themselves in the future pursuant to a delineated set of rules. Hornell's abandonment of these rules within four months of the entry of this Court's Judgment, and its refusal to comply after notice and 60 days to cure its default, warrant a finding of contempt.

### 2. Judicial Estoppel Must Bar Hornell's Assertion that this Court's Judgment is not Clear and Unambiguous

Hornell attempts to avoid a finding of contempt by claiming that Petitioners should be estopped from asserting that the Consent Award is clear and unambiguous enough to satisfy this Court's contempt standards. This argument is backwards. It is true that after the parties agreed to the business terms necessary to resolve the parties' disputes, CDDV and CDP argued that the parties would be better served by more formal documents, given the piecemeal and handwritten nature of the agreement. Klinges II at ¶ 10. In response, Hornell argued to the arbitration panel that there was "nothing indefinite about the terms of the Letter Agreement," and "[i]t should be enforced as written." Klinges II, Ex. 3 at 21-22. Hornell prevailed on that motion, and the Letter Agreement and other documents comprising the settlement were approved by the panel and later confirmed by this Court. Klinges II at ¶¶ 4-5, 11-12.

The two distinct elements of judicial estoppel are as follows: (1) "the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and" (2) "the prior inconsistent position must have been adopted by the court in some manner." *Bates v. Long Island Ry. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993) (footnote omitted). Moreover, the "prior inconsistent assertion need not be made to a court of law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). It is Hornell — as the victor on this particular issue in the prior proceeding — that is estopped from arguing a contrary position.

Furthermore, Hornell never identifies any relevant portion of the Consent Award that is too ambiguous to be enforced. This is the agreement upon which Hornell insisted, and there is no relevant provision so ambiguous or unclear as to excuse its brazen conduct.

### III. HORNELL'S IRRELEVANT PLOY FOR SYMPATHY SHOULD BE IGNORED

Hornell's attempt to paint itself as the struggling and oppressed family business under the thumb of some faceless "behemoth" with ulterior motives should be ignored. Examples of such allegations include how CDDV and CDP favor other brands over AriZona, how the chain accounts insist on direct delivery from Hornell, the motive behind Petitioners' "real goal in filing the Arbitration," and Petitioners' refusal to accept Hornell's pricing on its new packages. Hornell's Mem. at 2-3, 6, 24. If Hornell had any legitimate claims based on its agreements with CDDV and CDP, one would have expected Hornell to have asserted a claim in arbitration under the Distribution Agreements or to have served a notice of breach of the confirmed Consent Award. Rather, Hornell has been content to try to excuse its conduct with irrelevant filler about Petitioners' alleged motives.

In fact, the motives of both parties are the same — to sell a lot of iced tea and make more money. The only real difference is that CDDV and CDP do business within the parameters of their agreements.

WOLFBLOCK LLP

By: /s/ Dana B. Klinges
Dana B. Klinges
Jennifer F. Beltrami
250 Park Avenue
New York, New York 10177
dklinges@wolfblock.com
(212) 986-1116
Attorneys for Petitioners

Dated: New York, New York
August 6, 2008