# EXHIBIT 3

AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK

CANADA DRY DELAWARE VALLEY       )
BOTTLING COMPANY, AND CANADA     )
DRY POTOMAC CORPORATION,         )
                                 )
            Claimants,           )
                                 )         **AAA Case No.**
       -against-                 )         **13 181 01425 05**
                                 )
HORNELL BREWING CO., INC. D/B/A   )
FEROLITO, VULTAGGIO & SONS,       )
                                 )
            Respondent.          )
-------------------------------------------------------

## HORNELL BREWING CO., INC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO ENFORCE THE SETTLEMENT WITH CLAIMANTS

Hornell Brewing Co., Inc., respectfully submits this memorandum of law in support of its motion, in accordance with the procedure stipulated to by the parties before the Panel on November 22, 2006, to enforce the settlement reached with Claimants, Canada Dry Delaware Valley Bottling Company ("CDDV") and Canada Dry Potomac Corporation ("CDP") (collectively, "Claimants"), concluding this Arbitration. For the reasons set forth herein, the motion should be granted in its entirety.

## PRELIMINARY STATEMENT

This is a straightforward motion. On November 14, 2006, the parties entered into a detailed Letter Agreement setting forth the business terms of their settlement, including amendments to the distributor agreements. The centerpiece of the settlement was Canada Dry's agreement that Hornell could sell certain allegedly exclusive products directly in its territory to

#642746 v4 \16932 \003

all of the chain and other accounts that are at issue in this arbitration and for which Canada Dry had been seeking injunctive relief. In consideration, Hornell agreed to the amendment of Paragraph 2.4 of the distributor agreements. The parties also agreed that Canada Dry would meet certain distribution goals on a going forward basis.

Canada Dry's counsel mistakenly represented to this Panel in an e-mail on November 16, 2006, that the parties had "exchanged partially handwritten, partially executed letters, essentially representing a term sheet." Just to the contrary, on November 14, 2006, the respective Chairmen of each party executed the detailed, typewritten Letter Agreement that Canada Dry had prepared and which it had represented set forth its "best and final offer." The Letter Agreement was executed on lines signifying that both Canada Dry and Hornell "Agreed" to its terms. A few changes were memorialized in an annexed handwritten Rider, but that page too was fully executed. Moreover, neither the fully executed Letter Agreement nor Rider provided that they represented a "term sheet" or anything other than a fully binding agreement.

The only terms not set forth in the Letter Agreement were the standard, boilerplate provisions that were to be included in the settlement agreement -- i.e., discontinuance with prejudice of all claims in the arbitration without costs or fees, mutual releases, sharing of costs, notice, confidentiality, etc. These terms had all been agreed to and were never in dispute -- either then or now. As such, Hornell's counsel suggested that these terms simply be recited on the record on November 20, 2006, at which time the parties would request that the Panel adopt the settlement as a Consent Award. Canada Dry's counsel, however, insisted on a written settlement agreement.

#642746 v4 \16932 \003

2

Accordingly, on November 17, 2006, Canada Dry's counsel drafted and provided Hornell with a Settlement Agreement and Mutual Release, the terms of which were consistent with what the parties had agreed to. This should have concluded the settlement. However, after advising Hornell's counsel that the "[b]usiness people at CDP and CDDV want the amendments in stand-alone documents that they can put in their contract files," Canada Dry's counsel drafted so-called "stand alone" "amendment documents," which they attempted to include as exhibits to the settlement agreement. These "stand alone" "amendment documents" actually sought to modify the business terms of the settlement that had already been agreed to in the fully executed Letter Agreement and gave rise to the instant dispute.

As set forth below, the terms of the parties' settlement are fully set forth in the executed Letter Agreement, which contains the business terms and amendments, and in the settlement agreement, which contains the standard settlement "bells and whistles." The Panel should enforce the settlement as written and thereby put an end to this arbitration.


## STATEMENT OF FACTS

### A.    Background Leading Up To Settlement

Hornell and Canada Dry have periodically engaged in settlement negotiations at various times throughout 2006, both prior to and following the commencement of arbitration hearings in September. The centerpiece of any settlement has been Canada Dry's agreement to Hornell's distribution of certain allegedly exclusive AriZona products to specific customers in Canada Dry's territory on a direct basis. These customers include all of the major drug stores, club stores, mass merchandisers, convenience stores and supermarkets at issue in the arbitration

#642746 v4 \16932 \003

3

and to which Hornell is and has been selling to directly in most cases for many years. In consideration, Canada Dry has consistently sought to amend Paragraph 2.4 of the distributor agreements. (See the accompanying Affidavit of Don Vultaggio ("Vultaggio Aff.") ¶ 2.)

After fruitless negotiations concerning other possible business resolutions, including the Honickman Group going into partnership with Hornell or another beverage line and a two (2) year "standstill agreement", in October 2006 the parties once again began discussing a business resolution along the lines discussed above. (Vultaggio Aff. ¶ 3.) On November 14, 2006, Harold Honickman faxed to Hornell what he characterized as Canada Dry's *"best and final offer."* This fax was sent to Mr. Vultaggio at the offices of Morrison Cohen LLP, where he was preparing for his deposition on November 16, 2006. The last paragraph of Mr. Honickman's letter stated as follows:

> While I am confident that you and I can resolve this matter quickly and permanently, I cannot let these negotiations drag on or risk interfering with our preparation for the upcoming hearing dates. Accordingly, the terms above represent our best and final offer. If we cannot settle this case in this manner at this time, settlement negotiations will have to be put on hold indefinitely.

(Vultaggio Aff. ¶ 4 & Exh. "A.")

After reviewing Canada Dry's final offer, Hornell's in-house counsel, Martin Cunningham, made a small handful of proposed handwritten changes. At approximately 11:00 p.m. that night, Hornell's CEO, David Menashi, spoke on the telephone with Mr. Honickman. After Mr. Menashi faxed the agreement back to Mr. Honickman and discussed the proposed changes with him, Mr. Honickman indicated that the changes were agreeable and that he would execute the agreement. (Vultaggio Aff. ¶ 5.)

#642746 v4 \16932 \003

Later that night, Mr. Honickman and Lewis Gantman, Canada Dry's General Counsel, telephoned Mr. Menashi and together reviewed the entire agreement. Mr. Honickman insisted on this conference call so that Mr. Gantman could personally discuss and review the proposed changes. (Vultaggio Aff. ¶ 6.) After they reviewed the entire agreement, the handwritten changes made by Mr. Cunningham were crossed out and replaced by a one (1) page handwritten Rider, which was dictated by Mr. Gantman and written by Mr. Honickman's wife. Signature lines were added to the Letter Agreement indicating that its terms had been "Agreed" to by both Canada Dry and Hornell. Identical signature lines were added to the handwritten Rider. This was done with the advice and consent of Canada Dry's general counsel, Mr. Gantman. (Vultaggio Aff. ¶ 7.)

With Mr. Gantman's advice and approval, Mr. Honickman then executed the Letter Agreement and Rider on behalf of Canada Dry and faxed it to Mr. Menashi. Mr. Vultaggio, in turn, then executed the Letter Agreement and Rider on behalf of Hornell. (Vulltaggio Aff. ¶ 7 & Exh. "B.") Following Mr. Vultaggio's execution of the Letter Agreement, Mr. Menashi faxed the fully executed Letter Agreement to Mr. Honickman. The handwritten fax cover sheet stated:

> **Dear Harold: Here is our signed agreement signed by both you and Don. Congratulations. David.**

(Vultaggio Aff. ¶ 8 & Exh. "B.")

The Letter Agreement resolved all of the issues in the arbitration by, among other things, specifically listing those accounts (and exclusive products) to which Hornell may distribute products directly in Canada Dry's territory. (Vultaggio Aff. ¶ 9.) In that regard, the

#642746 v4 \16932 \003

5

Letter Agreement specified the accounts by channel of distribution and name, including all of the accounts with respect to which Canada Dry has sought injunctive or declaratory relief in the arbitration, as follows:

1) <u>All Major Drug Stores</u>:     CVS, Walgreens, Brook's, Eckerd, Rite Aid

2) <u>All Club Stores</u>:     Sam's Club, BJ's and Costco

3) <u>All Mass Merchandisers</u>:     K-Mart, Target and Wal-Mart

4) <u>Aldi's</u>

5) <u>Major Convenience Stores</u>:     Sheetz, Cumberland Farms and High's

6) <u>All Major Supermarkets</u>:     Shop Rite, Pathmark, Super Fresh, Stop & Shop, Safeway and Genuardi's.

The Letter Agreement also amended certain paragraphs in the distributor agreements. Most importantly to Canada Dry, it amended Paragraph 2.4 by deleting that portion that allowed Hornell to sell exclusive products directly to customers in Canada Dry's territory if Canada Dry was not adequately servicing the needs of customers, potential customers or the territory as a whole. This substantial concession was made on Hornell's part in consideration of Canada Dry's agreement to Hornell making direct sales of certain exclusive products to the various accounts listed in the Letter Agreement and Canada Dry's further agreement to certain distribution goals on a going-forward basis. (Vultaggio Aff. ¶ 10.)

**B.     Canada Dry's Attempt To Alter**
**The Business Terms Of The Settlement**

The Letter Agreement sets forth the parties' resolution of the business and contractual issues raised in the arbitration. This is all carefully detailed in the Letter Agreement,

#642746 v4 \16932 \003

6

which specifically recites in Paragraph 11 that "additional exceptions to exclusivity. . . are being codified in this agreement." The Letter Agreement contemplates that there will be a settlement agreement. However, the settlement agreement was to contain the standard provisions that are usually included in a settlement and that had been agreed to: e.g., mutual releases, discontinuance of all claims in the arbitration with prejudice and without costs or fees to either side, sharing of costs, confidentiality, notice etc., and the two (2) specific provisions mentioned in the Letter Agreement: (1) a provision providing that the settlement would be approved by the Arbitration Panel and confirmed by the United States District Court for the Southern District of New York (see Letter Agreement 12), and (2) a provision allowing each side 60 days to cure any default under the settlement (see Rider to Letter Agreement). (Vultaggio Aff. ¶ 11.)

In light of the settlement, on November 15, 2006, Mr. Honickman's deposition was cancelled. Further, because the provisions to be included in the settlement agreement had all been agreed to and were not at issue, on November 15, 2006, Hornell's outside counsel (Howard S. Wolfson) proposed to Canada Dry's outside counsel (Dana Klinges) that the Letter Agreement be submitted to the Arbitration Panel at the next scheduled hearing date on November 20, 2006 and that, simultaneously therewith, the parties simply recite on the record the terms that were to be included in the settlement agreement. (Vultaggio Aff. ¶ 12.) In response, Ms. Klinges advised Mr. Wolfson via e-mail on November 15, 2006, that "the documents that were exchanged on the business terms" -- i.e., the Letter Agreement -- "contemplate a settlement agreement being drafted and signed." (Vultaggio Aff. ¶ 12 & Exh. "C.") According to Ms. Klinges' e-mail, however, the only exhibit to the settlement agreement would be a form for submission of the Consent Award to the Panel. Notably, Ms. Klinges' e-mail said nothing about

#642746 v4 \16932 \003

7

re-drafting the business terms set forth in the Letter Agreement, let alone about preparing "stand alone" "amendment documents" restating the amendments to the distributor agreements and including them as exhibits to the settlement agreement. (Id.)

On November 16, 2006, Ms. Klinges e-mailed the Panel concerning the settlement. She represented that the parties had "exchanged partially handwritten, partially executed letters, essentially representing a term sheet." (Vultaggio Aff. ¶ 13 & Exh. "D.") Ms. Klinges' e-mail was inaccurate. Although the 1 page Rider to the Letter Agreement was in fact handwritten (at the direction of Canada Dry's General Counsel), the Letter Agreement had been typed by Canada Dry, the Letter Agreement and Rider had both been fully executed by each party, and the fully executed Letter Agreement and Rider were nowhere referred to as a "term sheet" or as anything other than a binding agreement. (Vultaggio Aff. ¶ 13.)

Importantly, in her November 16, 2006 e-mail, Ms. Klinges argued that there was no binding settlement as of yet because a settlement agreement had not been drafted. Notably, Ms. Klinges conceded that the Letter Agreement governed "the future business dealings between the parties", but she argued that a settlement agreement was necessary to address the termination of the arbitration, claims for past damages, fees and costs, releases and "ancillary issues." (Vultaggio Aff. ¶ 14 & Exh. "D.")

Later that day, on November 16, 2006, Ms. Klinges for the first time advised Hornell's counsel that her client was now insisting that the amendments to the distributor agreements that were already set forth in the Letter Agreement be put in what she termed "stand-alone documents that they can put in their contract files." (Vultaggio Aff. ¶ 15 & Exh. "E.")

Ms. Klinges acknowledged that this was "not the way we originally drafted it" in the Letter Agreement. (Id.)

On November 17, 2006, Canada Dry's counsel forwarded a Settlement Agreement and Mutual Release (the "Settlement Agreement") to Hornell's counsel. (Vultaggio Aff. ¶ 16 & Exh. "F.")  The Settlement Agreement contained the standard provisions that the parties had previously agreed to -- i.e., releases, discontinuance of the Arbitration without costs or fees, confirmation of settlement as an Award, confidentiality, sharing of costs, etc. -- and the two (2) specific provisions that the Letter Agreement indicated would be included in the Settlement Agreement.  This "bells and whistles" document, as it was referred to at the arbitration hearing on November 21, 2006, contained the standard settlement terms that had all been agreed to and that were never in dispute -- either then or now. (Vultaggio Aff. ¶ 16.)

However, in an effort to substantively change the terms of the Letter Agreement, Canada Dry's counsel also forwarded to Hornell's counsel two (2) documents that are not referred to in the Letter Agreement, and which they called "amendment documents." (Vultaggio Aff. ¶ 17 & Exhibit "G.")   These documents consisted of two (2) sets of purported "Amendments" to the distributor agreements, which Canada Dry now sought to attach to the Settlement Agreement as exhibits. (Vultaggio Aff. ¶ 17 & Exhibits "H" & "I.")

The purported "stand-alone" "amendment documents" sought to modify the terms of the Letter Agreement and the parties' settlement by limiting Hornell's right to distribute exclusive products on a direct basis under Paragraph 3 of the Letter Agreement. Thus, the letter Agreement explicitly provides in Paragraph 3 that:

> Hornell shall be permitted to distribute the following specific packages of hot fill Exclusive Products to the following specific customers within the Territories on a direct basis:

In the amendment document to the CDDV Agreements, however, Canada Dry attempted to modify this to read that:

> Manufacturer shall be permitted to distribute the following specific packages of hot filled Exclusive Products to the following specific customers within the Territory on a direct basis, *through F&V Distribution Co., or through a wholesaler or broker specifically named below, but not through Coca-Cola Enterprises, Philadelphia Coca-Cola Bottling Company, the Pepsi Bottling Group, Cadbury Schweppes Americas Beverages, or any other entity*:

(Vultaggio Aff. ¶ 18.)  The language added by Canada Dry, which is italicized above, is not contained in the Letter Agreement and attempts to limit Hornell's right to make direct sales by dictating how they will be made.

Notably, the changes that Canada Dry sought to make to Paragraph 3 of the Letter Agreement are not included in the "stand alone" "amendment document" to the CDP Distributor Agreement -- they are only included in the so-called "stand alone" "amendment document" to the CDDV Distributor Agreements. (Vultaggio Aff. ¶ 19.) This further highlights the manner in which Canada Dry sought to modify the terms of Paragraph 3 of the Letter Agreement, the terms of which are plainly the same in the Letter Agreement for both the CDP Distributor Agreement and the CDDV Distributor Agreements. (Vultaggio Aff. ¶ 19.)[1]

---

[1] The so-called "stand alone" "amendment document" to the CDDV Distributor Agreements -- but not to the CDP Distributor Agreement -- also attempts to limit the manner in which Hornell can make direct sales to Convenience Stores and Supermarkets, attempting to limit this to sales through Liberty USA, Inc. or C&S. These changes, too, are an attempt to modify the terms of the Letter Agreement. (Vultaggio Aff. ¶ 20.)

#642746 v4 \16932 \003

The so-called "stand alone" "amendment documents" also attempt to modify the terms of the Letter Agreement with respect to products larger than 1 liter. Under the plain terms of the Letter Agreement, "any package greater than 1 liter shall be excluded from the distribution agreement." This means exactly what it says: with respect to products larger than 1 liter, Canada Dry has neither the exclusive or non-exclusive right to distribute those products. In the so-called "stand alone" "amendment documents", however, Canada Dry attempted to modify this provision to provide that products larger than 1 liter are non-exclusive products under schedule A-2. (Vultaggio Aff. ¶ 21.)

Similarly, in the so-called "stand alone" "amendment documents", Canada Dry attempted to amend Schedule A-1 of the CDP Distributor Agreement to eliminate the language that excludes carbonated beverages. Thus, Schedule A-1 of the CDP Distributor Agreement currently provides: "Distributor is authorized to distribute on an exclusive basis (herein the "Exclusive Products"): All non-alcoholic, non-carbonated beverage products. . . ." (Vultaggio Aff. ¶ 22 & Exh. "J.") In the "stand alone" "amendment document" to the CDP Agreement, Canada Dry attempted to alter the definition in Schedule A-1 by eliminating the phrase "non-carbonated", thereby making carbonated beverages part of the CDP Distributor Agreement. Such an amendment is not provided for anywhere in the Letter Agreement. The so-called "stand alone" "amendment documents" also contain a number of other provisions that attempt to alter or modify the terms of the Letter Agreement. (Vultaggio Aff. ¶ 22.)

Apparently, Canada Dry had a change of heart and decided to try to modify the terms of the Letter Agreement following the public announcement by Coca Cola Enterprises, Inc. ("CCE") on November 15, 2006, that it had entered into an agreement to begin distributing

#642746 v4 \16932 \003

11

three (3) flavors of a new 34 ounce package of AriZona Iced Tea beginning in February 2007. (Vultaggio Aff. ¶ 23.)

By letter dated November 20, 2006, Hornell's counsel advised Canada Dry's counsel that the so-called "stand alone" "amendment documents" sought to vary the terms of the executed Letter Agreement and were rejected by Hornell. Mr. Wolfson's letter read as follows:

> As you know, by letter dated November 14, 2006, Hornell Brewing Co., Inc. ("Hornell") and Canada Dry Delaware Valley Bottling Co., ("CDDV") and Canada Dry Potomac Corporation ("CDP") (collectively "Canada Dry") executed an agreement setting forth the terms upon which they had agreed to resolve the business issues between them that are at issue in the arbitration (the "Letter Agreement"). The Letter Agreement along with a Settlement Agreement were to be presented to the Arbitration Panel (the "Panel") to be adopted as the Panel's Award.
>
> We had proposed that the Letter Agreement be presented to the Panel today and that we recite on the record the terms of the accompanying Settlement Agreement (i.e., releases, discontinuance of the arbitration, etc.), none of which are in dispute. You preferred to draft a Settlement Agreement instead of just reciting those terms on the record and forwarded it to me on Friday. Since it reflects what our respective clients agreed to (except for the so-called "Amendments"), we have no problem with it.
>
> We do have a problem with your clients' attempt to renegotiate the business terms in the executed Letter Agreement by drafting two (2) so-called Amendments. The Amendments attempt to modify and alter in several significant respects the business terms of the settlement the parties agreed to, as set forth in the executed Letter Agreement. For just one example, the draft of the so-called CDDV Amendment attempts to modify Paragraph 3 of the Letter Agreement in multiple respects. The terms of the Letter Agreement, including the language amending certain provisions in the Distribution Agreements, were agreed to after painstaking negotiations and Hornell has no intention of allowing your clients to now renege on or modify those terms.
>
> We intend to present the settlement to the Arbitration Panel tomorrow and request that they adopt it as their Award and terminate the Arbitration. We request that your clients comply with the settlement by joining in this request.

Should your clients breach the terms of the settlement by refusing to comply with its terms, Hornell will take all steps necessary to enforce it. In that regard, we reserve all of Hornell's claims and causes of action against your clients.

(Vultaggio Aff. ¶ 24 & Exh. "K.") Canada Dry has, as the Panel is aware, refused to abide by the settlement, necessitating the instant motion.

### Argument

### THE PANEL SHOULD ENFORCE THE SETTLEMENT

"It is black letter law...that settlement agreements are contracts and must therefore be construed according to the general principles of contract law." Hostentric Techs., Inc. v. Republic Thunderbolt, LLC, No. 04 Civ. 1621, 2005 U.S. Dist. LEXIS 11130 at *10 (S.D.N.Y. June 9, 2005); In re Crazy Eddie Sec. Litig., 714 F. Supp. 1285, 1294 (E.D.N.Y. 1989) ("[a]greements to settle litigation are contracts governed by ordinary principles of contract law"). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Hostentric, 2005 U.S. Dist. LEXIS 11130 at *12, (quoting Register.Com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004). However, not all terms of a contract need be fixed with absolute certainty:

> at some point virtually every agreement can be said to have a degree of indefiniteness...While there must be a manifestation of mutual assent to essential terms, parties should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions.

Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923 (1989).) To be enforceable as a contract, an agreement only needs to contain the terms deemed material by the parties to their bargain. Four Seasons Hotels, Ltd. v. Vinnik, 127 A.D.2d

#642746 v4 \16932 \003

13

310, 321, 515 N.Y.S.2d 1, 9 (1st Dep't 1987); V'Soske v. Barwick, 404 F.2d 495, 500 (2d Cir. 1968), cert denied, 394 U.S. 921 (1969) ("it is also plain that all the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy.")

Most importantly, "[o]nce reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing." Hostentric, 2005 U.S. Dist LEXIS at *12-13, (quoting MacDonald v. Dragone Classic Motor Cars, No. 95 Civ. 499, 2003 U.S. Dist. LEXIS 14587 at *6 (D. Conn. Apr. 29, 2003); see also Stefanovich v. Boisvert, 271 A.D.2d 727, 728, 705 N.Y.S.2d 436, 438 (3d Dep't 2000) (defendants' "change of heart" did not provide a valid basis for modifying the terms of a settlement); U.S. v. U.S. Currency In The Sum of Six Hundred Sixty Thousand, Two Hundred Dollars, 423 F. Supp. 2d 14, 33 (E.D.N.Y. 2006) (holding that "[w]hen a party makes a deliberate, strategic choice to settle, [it] cannot be relieved of such choice merely because [the] assessment of the consequences was incorrect. This Court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart").

In the case at bar, the parties reached agreement on the business terms of a settlement and amendments to their distributor agreements, all of which is set forth in the fully executed Letter Agreement. To the extent the Letter Agreement contemplated that there would be a formal settlement agreement containing the standard "bells and whistles," those terms are not in dispute and were set forth in the Settlement Agreement drafted by Canada Dry's counsel.

#642746 v4 \16932 \003

14

Taken together, the Letter Agreement and Settlement Agreement (except for the so-called "stand alone" "amendment documents" that Canada Dry's counsel sought to improperly add as exhibits) set forth all of the material terms of the parties' settlement and should be enforced as written.

To the extent Canada Dry has articulated any basis for its argument that there is no binding settlement, it argues as follows:

1)    The Letter Agreement allegedly is not enforceable because there needs "to be a formal set of documents", including a signed settlement agreement. (See Transcript of November 21, 2006 at p. 1487; Exhibit "A" annexed hereto and Ms. Klinges' November 15 and November 16, 2006 e-mails to Panel); and

2)    There must have been no meeting of the minds because the so-called "stand-alone" "amendment documents" Canada Dry's counsel drafted were rejected by Hornell. (See November 21, 2006 transcript. at p. 1487.)

Each of these arguments is easily disposed of.

**A.    The Letter Agreement Is Enforceable As Written; Along With The Settlement Agreement, It Sets Forth The Terms Of the Parties' Settlement**

First, even assuming _arguendo_ the parties contemplated a "formal document" besides or instead of the Letter Agreement, this does not render the Letter Agreement ineffectual. The courts in New York have regularly rejected this very argument. See Carney v. Carozza, 16 A.D.3d, 867, 868, 792 N.Y.S.2d 642, 644 (3d Dept 2005) ("Contrary to his contention that the signed document contemplated a future agreement, even if the parties contemplated a more formal typewritten agreement, the essential terms were all set forth in the handwritten version,

thus binding all parties to that agreement.")  As the First Department stated in <u>TAJ Int'l Corp. v.</u>
<u>Edward G. Bashian & Sons, Inc.</u>, 251 A.D.2d 98, 101, 674 N.Y.S.2d 307, 309 (1st Dep't 1998):

> even where parties contemplate a more formal agreement
> or, indeed, a 'fuller agreement, a document may
> nonetheless be enforceable where it contains essential or
> material terms of the agreement 'and otherwise manifests
> [the parties] mutual intent to be bound.

<u>See</u>  <u>Keis Distribs., Inc. v. Northern Distrib. Co., Inc.</u>, 226 A.D.2d 967, 967-969, 641 N.Y.S.2d
417, 419 (3d Dep't 1996) (fact that parties failed to sign a much more detailed "closing and
consulting agreement" did not render their earlier signed letter agreement unenforceable,
especially where the signed document "did not condition consummation of the transaction upon
the completion and signing of a definitive agreement."); <u>Conopco, Inc. v. Wathne Ltd.</u>, 190
A.D.2d 587, 587, 593 N.Y.S.2d 787, 787 (1st Dept 1993) ("A contract does not necessarily lack
all effect merely because it expresses the idea that something is left to future agreement.  The
Letter Agreement contains all of the essential terms of the contract, and the fact that the parties
intended to negotiate a 'fuller agreement' does not negate its legal effect."); <u>see also</u> <u>Henri</u>
<u>Assocs. v. Saxony Carpet Co.</u>, 249 A.D.2d 63, 66-67, 671 N.Y.S.2d 46, 49-50 (1st Dep't 1998)
(relying on <u>Conopco</u> to hold that the parties letter agreement was an enforceable contract and the
notation that the estimate it was "subject to the final selection and confirmation of the area"
merely indicated "the parties' anticipation that the contract price would change"); <u>Kochiam Int'l</u>
<u>v. Communication Control Sys.</u>, 243 A.D.2d 284, 285, 663 N.Y.S.2d 966, 967 (1st Dep't 1997)
("the letter contains all the material terms of the parties' agreement, and otherwise manifests
their mutual intent to be bound notwithstanding that a formal agreement was contemplated");
<u>Daniels v. Banks</u>, 136 A.D.2d 675, 676, 523 N.Y.S.2d 1013, 1014-1015 (2d Dep't 1988); <u>Church</u>

#642746 v4 \16932 \003

16

of God v. Fourth Church of Christ, Scientist of Brooklyn, 76 A.D.2d 712, 715, 431 N.Y.S.2d 834, 837 (2d Dep't 1980) ("Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed"), aff'd 54 N.Y.2d 742, 442 N.Y.S.2d 986 (1981).

For example, in V'Soske, 404 F.2d at 495, the court held that an informal exchange of correspondence resulted in an enforceable contract for the purchase of a business for approximately $1.7 million even though the parties contemplated the subsequent execution of a more formal agreement. The court rejected appellees' contention that a binding contract never came into being because too many important terms were left unsettled and the parties encountered difficulties agreeing on certain terms in subsequent drafts of formal agreements proposed by appellees. Much like the instant action, the court reasoned that almost all of the issues raised by appellees arose because appellees sought to amend the agreement reached in the correspondence to include new terms. "Such negotiations on new provisions do not defeat the original agreement of the parties," which contained all of the terms essential to the agreement. Id. at 500.

Similarly, in Hostentric Techs., Inc., 2005 U.S. Dist. LEXIS 11130, at *16 Hostentric filed suit against Republic seeking a declaratory judgment that Republic had acquiesced in the termination of a lease by accepting Hostentric's surrender of the premises. The facts showed that on September 21, 2004, counsel for Republic had sent counsel for Hostentric

#642746 v4 \16932 \003

17

an e-mail setting forth his client's "final settlement offer" and demanding a response before a deposition scheduled for the following morning. Later that evening, counsel for Hostentric responded in an e-mail and accepted the settlement offer. Republic's counsel responded again and asked Hostentric's counsel to send drafts of the necessary papers, including the stipulation of discontinuance. On September 22, 2004, counsel for Hostentric confirmed the settlement in a fax. On September 27, 2004, Republic's counsel e-mailed Hostentric's counsel a draft stipulation of settlement that included an indemnification provision that was never discussed and had not been included in the September 21st settlement e-mails. After Hostentric refused to sign the stipulation of settlement because Republic refused to remove the indemnification language, Hostentric moved to enforce the settlement as set forth in the parties' exchange of e-mails.

The court held that the e-mailed offer and acceptance between Hostentric and Republic formed a valid and binding contract. The court concluded that Republic's counsel had made a final offer in writing to Hostentric that stated "(or at least objectively appeared to state) all material terms, and Hostentric accepted the offer. . . . Republic's (alleged) undisclosed intent is irrelevant. " Id. at *16. Although Republic argued that it did not intend to be bound in the absence of a formal executed stipulation of settlement, the court disagreed, noting that "[i]t is well established that parties are bound to the terms of a contract even though it is not signed [or even written.]" Id. at *16. Further, the court held that:

> To overcome the reasonable inference we draw from the language of the correspondence that the parties did indeed intend thereby to create a binding contract, [Republic] must do more than merely point to the circumstance that a formal document was contemplated: they must show either that both parties understood that their correspondence was to be of no legal effect or that Hostentric had reason to know that

#642746 v4 \16932\003

18

> [Republic] contemplated that no obligations should arise
> until a formal contract was executed.  But [Republic has]
> referred to no evidence substantiating either of these
> possibilities, and we do not find them supported by our
> independent review of the evidence.

Id. at *20.  See In re Crazy Eddie Sec. Litig., 714 F. Supp. at 1295; Four Seasons, 127 A.D.2d at

321, 515 N.Y.S.2d at 9.

 This case is far stronger than Hostentric.  First, the Letter Agreement, which

Canada Dry described as its "best and final offer," was specifically accepted by Hornell.

Moreover, unlike in Hostentric, the terms of the settlement are not only set forth in writing, but

the writing was actually executed by all parties on lines signifying that they *"Agreed"* to its

terms.   In such circumstances, the four-part test used in Hostentric is arguably not even

applicable.  See Hostentric Tech., Inc. 2005 U.S. Dist. LEXIS 11130, at *13 fn. 5.

 Second, the Letter Agreement plainly does not condition consummation of the

settlement upon the parties' entry into a more "formal" document or agreement, as Canada Dry's

counsel mistakenly argues.  Cf., Kreiss v. McCown De Leeuw & Co., 37 F. Supp. 2d 294, 301

(S.D.N.Y. 1999) (term sheet expressly reserved the parties right not to be bound by document in

the absence of their entry into a more definitive agreement).  If Canada Dry had intended the

Letter Agreement not to be binding in the absence of a more "formal" agreement, as it now

argues, "then the burden was upon [Canada Dry], as the drafter of the document, to so specify

and its failure to do so must not operate to [Hornell's] detriment." Keis Distribs., 226 A.D. 2d at

969, 641 N.Y.S.2d at 420.

 Third, in her own e-mail and statements to this Panel, Canada Dry's counsel

conceded that the only necessary additional document was a settlement agreement containing the

#642746 v4 \16932 \003

19

standard "bells and whistles", like releases, dismissal of claims, confidentiality etc. (Vultaggio

Aff. ¶ 14.)   She further conceded that the Letter Agreement governed "the future business

dealings between the parties." (Vultaggio Aff. ¶¶ 12-14 & Exh. "D.")  The terms to be included

in the settlement agreement were never in dispute.  It was always the parties' understanding that

the settlement would end the arbitration, that all claims would be dismissed with prejudice and

without costs or fees, that the costs of the arbitration would be shared, that there would be mutual

releases etc.  This is confirmed by the Settlement Agreement drafted by Canada Dry's counsel.

The Panel can enforce these terms even though the Settlement Agreement was not signed.  See

Hostentric, 2005 U.S. Dist. LEXIS 11130 at *16 ("It is well established that parties are bound to

the terms of a contract even though it is not signed"); Irving R. Boody & Co. v. Win Holdings

Int'l, Inc., 213 F. Supp. 2d 378, 381 (S.D.N.Y. 2002) ([i]t is well settled in New York…that

contract formation is not dependent on a signature"); Evolution Online Sys., Inc. v. Koninklijke

Nederland N.V., 41 F. Supp. 2d 447, 449 (S.D.N.Y. 1999) ("While none of the written drafts

exchanged between the parties was signed, an analysis of the relevant factors leads to the

conclusion that the parties had reached agreement on the essential terms of their arrangement").

Fourth, there is nothing in the Letter Agreement stating that "stand-alone"

"amendment documents" would be attached as exhibits to the settlement agreement.  Canada

Dry's counsel confirmed this on November 15, 2006, when she acknowledged that the only

necessary exhibit to the settlement agreement would be a form of Consent Award to be

submitted to the Panel. (Vultaggio Aff. ¶ 12 & Exh. "C.")  It was only on November 16, 2006,

that Canada Dry's counsel advised Hornell's counsel that Canada Dry would not abide by the

terms of the Letter Agreement, allegedly under the guise that the:

#642746 v4 \16932 \003

20

> Business people at CDP and CDDV want the amendments
> in stand-alone documents that they can put in their contract
> files, which is not the way we originally drafted it.

(Vultaggio Aff. ¶ 15 & Exh. "E.")  However, by that time it was too late for Canada Dry to

change the terms of the settlement it had agreed to in the Letter Agreement "merely because [its]

assessment of the consequences was incorrect."  Acot v. New York Med. College, 99 Fed. Appx.

317, 318, No. 03-7832, 2004 U.S. App. LEXIS 10245 at *3 (2d Cir. May 25, 2004); see also

Hostentric, 2005 U.S. Dist. LEXIS 11130 at *13; Stefanovich, 271 A.D.2d at 728, 705 N.Y.S.2d

at 438; U.S. Currency, 423 F. Supp. 2d at 33.

        In sum, the Letter Agreement sets forth all of the material business terms of the

parties' settlement, was executed by each party and nowhere provides that it will not be binding

in the absence of a more formal agreement.  It should be enforced as written.  To the extent the

Letter Agreement contemplated a formal settlement agreement containing standard provisions

for mutual releases, discontinuance of the arbitration, sharing of costs, confidentiality, etc. -- the

provisions that Canada Dry's counsel argued were missing from the Letter Agreement in her

November 16, 2006 e-mail to the Panel -- there is no dispute that these terms were part of the

settlement.  Moreover, the Panel need not guess as to the scope of the releases or other

provisions, notwithstanding that they consist of standard legal jargon.  See Hostentric, supra,

2005 U.S. Dist. LEXIS 11130.  Rather, the Panel can enforce these terms as drafted in the

Settlement Agreement by Canada Dry's own counsel.

#642746 v4 \16932\003

21

**B.**     **Canada Dry Cannot Repudiate The Settlement By Arguing That**
**The Letter Agreement Is Ambiguous Or Fails For Indefiniteness**

At the Hearing on November 21, 2006, Canada Dry's counsel argued for the first time that they were concerned "that there's not a meeting of the minds as to the fundamental agreement here." (Transcript of November 21, 2006 at p. 1487). This argument requires little of the Panel's time.

Courts routinely reject attempts to avoid contracts on the grounds that the material terms are allegedly indefinite and that there was, therefore, no meeting of the minds. As the court stated in Cappelli Enters. v. F&J Continental Food Corp., 16 A.D.3d 609, 610, 792 N.Y.S.2d 553, 554 (2d Dep't 2005), "the courts should endeavor to hold parties to their bargain and the definiteness doctrine is a doctrine of last resort." See Cobble Hill, 74 N.Y.2d at 483, 548 N.Y.S.2d at 923.

There is nothing indefinite about the terms of the Letter Agreement. More importantly, Canada Dry cannot render its terms indefinite or posit that there was "no meeting of the minds" by unilaterally drafting, subsequent to the parties' entry into the Letter Agreement, "stand-alone" "amendment documents" that attempt to modify the Letter Agreement's terms.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Panel grant Hornell's motion in its entirety and enter a Consent Award terminating the arbitration in accordance with the terms of the parties' settlement.

Dated: New York, New York
         December 15, 2006

Respectfully submitted,

MORRISON COHEN, LLP

By: _Howard S. Wolfson_
Howard S. Wolfson
David S. Goldstein
909 Third Avenue
New York, New York 10022
(212) 735-8600
*Attorneys for Hornell Brewing Co., Inc.*
*d/b/a Ferolito, Vultaggio & Sons*

#642746 v4 \16932 \003

23