UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CANADA DRY DELAWARE VALLEY BOTTLING COMPANY, et al., <br><br>                              Petitioners, <br><br>           - against - <br><br>HORNELL BREWING CO., INC., D/B/A FEROLITO, VULTAGGIO & SONS, <br><br>                              Respondent. | OPINION AND ORDER <br><br> 07 Civ. 8037 (SHS) (RLE) |

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

On June 24, 2008, Canada Dry Delaware Valley Bottling ("CDDV") and Canada Dry Potomac Corporation ("CDP") (collectively, "Canada Dry") filed a Motion to Compel Compliance and for Contempt against Hornell Brewing Company, Inc. ("Hornell"). Canada Dry alleges that Hornell has violated the terms of a settlement agreement that the Parties stipulated to during arbitration. The agreement was entered as a Consent Award by an arbitration panel, confirmed by a Court Order, and entered as a Judgment. Canada Dry seeks an order (1) compelling Hornell to comply with the Consent Award and (2) finding Hornell in civil contempt. The Honorable Sidney H. Stein referred this motion to the undersigned on October 2, 2008. For the reasons set forth below, Canada Dry's Motion to Compel Compliance and for Contempt is **DENIED**.

## II. BACKGROUND

### A. The Parties

Hornell is a New York Corporation that produces, markets, and sells beverages and other products. (June 24, 2008 Decl. of John Tanglienti ("Tanglienti Decl.") ¶¶ 3-4.) Hornell's core product line is AriZona Iced Tea in a variety of flavors and package sizes. (*Id.* ¶ 5.) Hornell began marketing and manufacturing AriZona Iced Tea in 1992, and it was the top-selling iced tea brand in the United States in 2007. (July 23, 2008 Decl. of Don Vultaggio ("Vultaggio Decl.") ¶ 3; Tanglienti Decl. ¶ 8.)

CDDV and CDP are bottlers and distributors of soft drinks and other beverage products in New Jersey, Maryland, Ohio, Delaware, Virginia, and the District of Columbia. (Vultaggio Decl. ¶ 4.) They are part of the so-called "Honickman Group," which includes other bottling and distribution companies. (*Id.*) The Honickman Group is the sixth largest bottler in the United States, with net sales of over one billion dollars. (*Id.*) In addition to AriZona Iced Tea products, CDDV and CDP also distribute a variety of other beverage products. These include Snapple Iced Teas, Mistic Iced Teas, and Nantucket Nectars, which directly compete with Hornell's AriZona Iced Teas. (*Id.* ¶ 5.)

### B. The Distributor Agreements

In 1997, Hornell entered into two Distributor Agreements with CDDV (the "CDDV Agreements"). Under these agreements, Hornell appointed CDDV its exclusive distributor with respect to certain Hornell products in five counties in Pennsylvania, seven counties in New Jersey, and all of Delaware. (*Id.* ¶ 7.) The A-1 Schedules of the CDDV Agreements authorize CDDV to distribute, on an exclusive basis, "[a]ll non-alcoholic beverage products in all product

2

sizes, except those set forth on Schedule A-2." (*Id*., Ex. B at 37.) The A-2 Schedules authorize CDDV to distribute, on a non-exclusive basis,

> All products in 7.7 ounce cans, tetra packs, 64 ounce bottles, 128 ounce bottles and 16 ounce glass bottles; provided that the products in 16 ounce glass bottles are non-exclusive only as to sales to . . . non-traditional beverage outlets . . . [and] that such non-exclusivity shall not apply as to any such stores located only in the Philadelphia and New York Metropolitan areas.

(*Id*., Ex. B at 38.) In addition to the exceptions to exclusivity in the A-2 Schedules, CDDV's appointment as distributor is not exclusive with respect to new products that Hornell might develop in the future. (*Id.*, Ex. B at ¶ 8.) Paragraph 8 of the CDDV Agreements, entitled "Marketing of Other Products," contemplates that Hornell might, at some time in the future, decide to sell other products in the CDDV Territory, and requires Hornell to offer certain of these to CDDV for exclusive distribution:

> This Agreement shall extend only to those Products specifically set forth in Schedules A-1 and A-2. Manufacturer shall offer to Distributor the right to distribute on an exclusive basis other non-alcoholic beverage products sold in single serve (32 ounces or less) packages that do not require refrigeration which Manufacturer may, at any time in the future during the term hereof, decide to sell in the Territory. . . .

(*Id.*) The CDDV Agreements further provide that, should Canada Dry decide to buy any other products that Hornell decides to sell in the future, "such other products shall be entered on Schedules A-1 and A-2 as either Exclusive or Non-Exclusive Products as applicable." (*Id*.)

In 1998, Hornell entered into a similar Distributor Agreement with CDP (the "CDP Agreement"). (Vultaggio Decl. ¶ 9.) The CDP Agreement grants CDP exclusive distribution rights to certain Hornell products in the District of Columbia and in seven counties in Maryland. (*Id*.) In relevant part, Schedule A-1 of the CDP Agreement authorizes CDP to distribute, on an exclusive basis in a defined territory, all non-alcoholic, non-carbonated beverage products in all

product sizes, except for those set forth in Schedule A-2. (*Id.*, Ex. C at 22.) Schedule A-2 authorizes CDP to distribute, on a non-exclusive basis, all 7.7 ounce cans, tetra packs, and all products larger than one liter. (*Id.*, Ex. C at 23.) As with the CDDV Agreements, the CDP Agreement contemplates that Hornell might, at some time in the future, decide to sell other products in the CDP Territory, and requires Hornell to offer certain of these to CDP for exclusive distribution. (*Id.*, Ex. C at 10.) Any future products Hornell decides to sell, and which CDP accepts, must be entered on Schedule A-1 or A-2 as applicable. (*Id.*)

The appointment of CDDV and CDP as distributors of Hornell products under the CDP Agreement and the CDDV Agreements (collectively, the "Distributor Agreements"), is perpetual, subject to the termination clauses within the Agreements. (*Id.*, Ex. B ¶ 1, Ex. C ¶ 1.) The Distributor Agreements also contain identical arbitration clauses. (*Id.* ¶ 11.) The arbitration clauses provide that "[a]ny and all disputes hereunder other than a failure by the Distributor to satisfy its payment obligations to the Manufacturer . . . shall be resolved by arbitration . . . in New York City before three arbitrators." (*Id.,* Ex. B ¶ 20.3(b), Ex. C ¶ 20.3(b).)

**C. The Consent Award**

In 2005, Canada Dry commenced an arbitration pursuant to the Distributor Agreements, alleging that Hornell had breached Canada Dry's exclusive distribution rights with regard to two products: 16 ounce plastic bottles of AriZona "Fresh Choice" Iced Tea products and a new line of AriZona Iced Tea products packaged in one liter plastic bottles. (July 23, 2008 Decl. of Howard Wolfson ("Wolfson Decl.") ¶ 9.) After seventeen months of discovery and six days of hearings before an arbitration panel, the Parties reached a settlement in November 2006. (June 24, 2008 Decl. of Dana Klinges ("Klinges Decl.") ¶ 7.) The business terms of the settlement were set forth

in 1) a letter agreement dated November 14, 2006, that Canada Dry's Chairman forwarded to Hornell, and 2) a one page handwritten Rider, also dated November 14, 2006 (collectively, the "Letter Agreement"). (Decl. of Howard S. Wolfson ("Wolfson Decl.") at ¶ 13.) The only settlement terms not set forth in the Letter Agreement were standard legal provisions set forth in an undated Settlement Agreement and Mutual Release ("Settlement Agreement"). (*Id.*)

The Letter Agreement establishes that the "Fresh Choice" products are non-exclusive. (*Id.*, Ex. 3 ¶ 5.) It further provides that Hornell is permitted to directly distribute certain exclusive products to specific stores and chains in Canada Dry's territory. (*Id.*, Ex. 3 ¶ 3.) For example, Hornell is permitted to directly distribute its full product line to three specific drug store chains, 16 ounce glass bottles and 15.5 ounce cans to three specific club store chains, and 16 ounce and 20 ounce glass bottles to two convenience store chains. (*Id.*) Additionally, any Hornell package greater than one liter is excluded from the Distributor Agreements. (*Id.*, Ex. 3 at 6.) The Letter Agreement deletes a portion of Paragraph 2.4 of the Distributor Agreements that permitted Hornell to directly distribute exclusive products to customers in Canada Dry's territory if Hornell made a good faith determination that the customers' needs were not properly being served by Canada Dry. (*Id.*, Ex. 3 ¶ 1.)

The Letter Agreement also contemplates the introduction of new product lines by Hornell and states that all new products must be offered on an exclusive basis to Canada Dry subject to two conditions. (*Id.*, Ex. 3 ¶¶ 7, 9.) First, the new products must be offered "on the same terms and conditions as other Exclusive Products." (*Id.*, Ex. 3 ¶ 7.) Second, if Canada Dry elects to accept a new product on an exclusive basis, it is required to purchase a full trailer load of each new product within thirty days of its introduction, and also offer a thirty-day price

5

promotion for that product. (*Id.*, Ex. 3 ¶ 9.)

If either party breached the terms of the settlement, the Settlement Agreement provided for a sixty-day period for the party to cure any defaults before the other party could seek enforcement. (*Id.*, Ex. 4 ¶ 10.) Venue for any action arising out of the interpretation, enforcement, or a breach of the agreement or consent award was established in the Southern District of New York. (*Id.*, Ex. 4 ¶ 13.)

Shortly after the agreement, Canada Dry claimed that it was merely a non-binding term sheet and sought to disaffirm it. (Wolfson Decl. ¶ 14.) Canada Dry asserted that the terms of the settlement were "sloppy" and "incomplete" and the agreement was intended only to be a summary of the deal. (*Id.*, Ex. D.) The Parties agreed the Arbitration Panel should decide whether the settlement was binding. (*Id.* ¶ 14.) After two evidentiary hearings, the Arbitration Panel decided on February 8, 2007, that the Parties were bound by the Letter Agreement and the Settlement Agreement, with the exception that Paragraph 1 of the Settlement Agreement was stricken. (*Id.* ¶ 18, Ex. F) The stricken language contemplated that the Distributor Agreements would be amended by and incorporated into the Settlement Agreement. (*Id.*) Canada Dry subsequently asked the Panel to amend its decision to add a provision that the Parties' Distributor Agreements "are incorporated into and made part of" the Settlement Agreement. (*Id.* at Ex. G.) Hornell opposed this, arguing that Canady Dry was attempting to add a settlement term to which the Parties had not agreed. (*Id.* at Ex. I.)

By Order dated July 12, 2007, the Arbitration Panel corrected its February 8, 2007 Order by adding that the Parties were not bound by the language "and the Amendments" in the first line of Paragraph 8 of the Settlement Agreement, and denying Canada Dry's request to add a

provision incorporating the Distributor Agreements into the Settlement Agreement. (*Id.* at Ex. J.) On August 29, 2007, the Arbitration Panel entered a Consent Award of Arbitrators ("Consent Award") that consisted of the terms set forth in the Letter Agreement and the Settlement Agreement, which were attached to, and comprise, the Consent Award along with the Panel's July 12, 2007 decision. (*Id.* at Ex. K.) Consistent with the Panel's February 8, 2007 and July 12, 2007 decisions, Paragraph 1 and language in the first line of Paragraph 8 of the Settlement Agreement were stricken and do not appear in the copy of the Settlement Agreement annexed to the Consent Award; the effect of this is that the Distributor Agreements are explicitly *not* incorporated into the Consent Award. (*Id.* ¶ 24.) In its Reply, Canada Dry concedes this point (contrary to its initial memorandum), and further notes that the Consent Award is not incorporated into the Distributor Agreements. (Compare Pet'rs' Mem. of Law in Supp. of Mot. to Compel Compliance and for Contempt ("Pet'rs' Mem.") at 14; Klinges Decl. ¶ 10 and Pet'rs' Reply Mem. of Law in Supp. of Mot. to Compel Compliance and for Contempt ("Pet'rs' Reply") at n.4.)

Pursuant to the terms of the settlement, Canada Dry, with Hornell's consent, filed a petition to confirm the Consent Award in this Court. (Klinges Decl. ¶ 18; Wolfson Decl. ¶ 25.) The Award was confirmed by Order on September 28, 2007, and entered as a Judgment on October 1, 2007. (Klinges Decl., Ex.1, Ex. 2.)

**D. Alleged Violations of the Consent Award**

In the fall of 2007, Hornell informed Canada Dry that it planned to introduce a line of AriZona Iced Tea products in 16 ounce plastic bottles and 20 ounce plastic bottles. (Taglienti Decl. ¶ 44.) The 20 ounce plastic bottle was designed to serve as a cheaper alternative to the 20

ounce glass bottle, and its non-breakable plastic packaging allowed for wider distribution; the 16 ounce plastic bottle was intended to eventually replace the 16 ounce glass bottles. (July 23, 2008 Declaration of John Welsh ("Welsh Decl.") ¶¶ 2-3, 28.) Throughout January and February of 2008, Canada Dry told Hornell that the new bottles were exclusive products under the terms of the Distributor Agreements. (Taglienti Decl. ¶¶ 46-47.)

On February 4, 2008, Hornell offered to sell 24-pack cases of the 20 ounce plastic bottles to Canada Dry for $15, provided that Canada Dry resold the cases to retailers for $18.99. (Welsh Decl. ¶ 5.) Hornell offered to sell 24-pack cases of the 16 ounce plastic bottles under the same terms and conditions that it sold the 16 ounce glass bottles to supermarkets. (Welsh Decl. ¶ 31.) Under those terms, Hornell offered to sell Canada Dry 12-pack cases of the 16 ounce plastic bottles for a net price of $5.75 a case, provided that Canada Dry promised to resell the cases for the same price. (*Id.* ¶ 30.) Hornell promised to pay Canada Dry $1.00 for every 16 ounce plastic bottle case it sold. (*Id.*) Canada Dry informed Hornell that it was interested in distributing the new plastic bottles, but that it would not agree to the required price for the resale of the product. (Taglienti Decl. ¶ 50-51.)

On March 27, 2008, Hornell informed Canada Dry that based on its refusal to buy the new products, Hornell had decided to sell the 20 ounce plastic bottles directly to Exxon/Mobil, and the 16 ounce plastic bottles to various other stores. (Taglienti Decl. ¶ 54.) On April 1, 2008, Canada Dry sent the first of three default notices to Hornell, informing it that its sales of the 16 ounce and the 20 ounce plastic bottles were in violation of the Distributor Agreements and the Settlement Agreement. (Klinges Decl., Exs. 5-7.) Hornell responded on June 4, 2008, admitting that it made the sales, but asserting that the products were non-exclusive. (*Id.*, Ex. 8.)

On June 24, 2008, Canada Dry filed the instant action, seeking an order that Hornell comply with the Consent Award and finding Hornell in contempt. Canada Dry argues that Hornell's sales of the 16 ounce and 20 ounce plastic bottles violate the terms of the Consent Award and requests the "entry of an Order declaring that [they] are the exclusive distributors of Hornell's new 16 and 20 ounce plastic packages and prohibiting Hornell from selling these 'new packages' into [their] territories." (Pet'rs' Reply at 6.)

### III. DISCUSSION

**A. The Arbitration Clauses in the Distributor Agreements**

Hornell argues that this Court is not the proper forum for the dispute Canada Dry raises because it arises under the Distributor Agreements, which require arbitration. (Resp't's Mem. of Law in Opp'n to Pet'rs' Mot. to Compel Compliance and for Contempt ("Resp't's Mem.") at 2.) It notes that Canada Dry's "own statement of [its] claim is that the 16 [ounce plastic bottles] and 20 [ounce plastic bottles] are exclusive products under Schedule A to the Distributor Agreements – not the Consent Award." (*Id.* at n.2.) Because the Consent Award does not incorporate the Distributor Agreements, Hornell maintains that Canada Dry's remedy is to commence a fresh arbitration in accordance with the arbitration clause in the Parties' Distributor Agreements. (Resp't's Mem. at 18; Vultaggio Decl., Ex. B ¶ 20.3(b), Ex. C ¶ 20.3(b).) Hornell maintains further that, although it might assert a defense based upon the Consent Award, this does not change the fact that Canada Dry's claim arises under the Distributor Agreements.

Canada Dry responds by asserting that its motion is properly before this Court because it arises under the terms of the Consent Award, insofar as Canada Dry disputes that "Paragraph 3(b) of the Letter Agreement permits Hornell to sell 16 ounce glass bottles and 15.5 ounce cans

9

directly to BJ's Wholesale Club and Sam's Club – but not the 16 and 20 ounce plastic packages being sold directly by Hornell to those customers." (Pet'rs' Reply at 2.) Canada Dry also argues that the 16 and 20 ounce plastic packages are "new packages" of an existing product line, as opposed to "new product lines" as discussed in Paragraphs 7 and 9 of the Letter Agreement. (*Id.*) Canada Dry asserts that the 16 and 20 ounce plastic bottles are exclusive under the terms of the Distributor Agreements, and thus the only substantive issue before the Court is whether the Consent Award otherwise permits these sales. (*Id.* at 6.)

   **1. Legal Standard**

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (citing *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 570-71 (Brennan, J., concurring)). "The arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in the original) (citations omitted). Therefore, if a party calls for the arbitration of a dispute, arbitrability is decided by asking: (1) is there an agreement to arbitrate, and (2) does the dispute fall within that agreement? *United States Fire Ins. Co. v. Nat'l Gypsum Co.*, 101 F.3d 813, 816 (2d Cir. 1996), *cert denied*, *United States Fire Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 521 U.S. 1120 (1997). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs.*, 474 U.S. at 649; *see also First*

*Options*, 514 U.S. at 944-45; *Painewebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (quoting *AT&T Techs.*, 475 U.S. at 649) (absent "clear and unmistakable" evidence that the parties agreed to arbitrate arbitrability, it is the role of the courts, not the arbitrator, to decide arbitrability).

"When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944. However, "once a court finds there is an agreement to arbitrate some issues, . . . ambiguity as to whether an issue is within the scope of an arbitration is resolved in favor of arbitrability." *Nat'l Gypsum Co.*, 101 F.3d at 817 (citing *First Options*, 514 U.S. 944-45); *see also Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 24-25 (1983). Therefore, once a valid arbitration agreement is found to exist between uncontested parties to that agreement, broadly sweeping provisions such as those providing that "any and all controversies . . . shall be determined by arbitration[,]" have led courts to the conclusion that the parties intended to arbitrate issues of arbitrability. *Bybyk*, 81 F.3d at 1199; *see also Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 74 (2d Cir. 1997) (general arbitration clause covering all issues of interpretation was sufficiently clear and unmistakable, even in the absence of specific language that issues of arbitrability should be arbitrated).

Under the Federal Arbitration Act, parties to an arbitration award may agree to have a district court confirm the award and enter it as a judgment. 9 U.S.C. § 9. After a district court confirms an arbitration award, the award is docketed as if it is a judgment of that court and it has the "same force and effect, in all respects, and [is] subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the

11

court in which it is entered." 9 U.S.C. § 13. When a court confirms an arbitration award and enters it as a judgment, the court has "ancillary jurisdiction over subsequent proceedings necessary . . . to enforce the judgment." *Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) (quoting *Dulce v. Dulce*, 233 F.3d 143, 146 (2d Cir. 2000)). "In the context of an arbitration, the judgment to be enforced encompasses the terms of the confirmed arbitration awards and may not enlarge upon those terms." *Id.* Accordingly, the scope of a court's power to enforce the judgment only extends to the subject matter covered by the judgment, and "when a petition for enforcement [of a consent award] involves a new dispute . . . enforcement must be denied." *Hellman v. Program Printing, Inc.*, 400 F. Supp. 915, 918 (S.D.N.Y. 1975) (citations omitted). "Unless 'it is beyond argument that there is no material factual difference between the new dispute and the one decided in the prior arbitration that would justify an arbitrator's reaching a different conclusion,' the case must go to fresh arbitration rather than to the court for judicial enforcement." *International Chemical Workers Union, Local No. 227 v. BASF Wyandotte Corp.*, 774 F.2d 43, 46 (2d Cir. 1986) (quoting *Derwin v. General Dynamics Corp.*, 719 F.2d 484, 491 (1st Cir. 1983)).

### 2. Application to the Present Dispute

Under Paragraph 20.3(b) of the Parties' Distributor Agreements, "any and all disputes . . . other than a failure by [Canada Dry] to satisfy its payment obligations to [Hornell] . . . shall be resolved by arbitration." Paragraph 13 of the Settlement Agreement provides that "[n]otwithstanding the arbitration provisions in the CDDV Agreements and the CDP Agreement, the venue for any action arising out of the interpretation, enforcement or a breach of this Agreement or the Consent Award" shall be this Court. Thus, the threshold inquiry in the instant

dispute is whether it arises under the Distributor Agreements or the Consent Award.

Canada Dry's opening memorandum asserts that, under the terms of the Distributor Agreements, all packages smaller than one liter are exclusive unless specifically exempted on the A-2 Schedules, and that because neither the 16 ounce nor 20 ounce plastic bottles appear on the A-2 Schedules, Canada Dry has exclusive distribution rights to them. (Pet'rs.' Mem. at 14.) Anticipating Hornell's defenses, Canada Dry further argues that the sales of these new packages are not subject to any exceptions to exclusivity provided by the Letter Agreement. (*Id.*) In response, Hornell contends that these products are not exclusive under Schedules A-1 and A-2 of the Distributor Agreements. (Resp't's Mem. at 2.) Hornell then asserts defenses based upon the Consent Award; specifically, it argues that under Paragraphs 7 and 9 of the Letter Agreement, Hornell agreed to offer new products to Canada Dry on an exclusive basis, but subject to two conditions; and that in the case of the 16 and 20 ounce plastic bottles here at issue, Canada Dry did not meet these conditions. (Resp't's Mem. at 22.)

Canada Dry counters, in a footnote in its Reply, that whether it met the conditions set forth in the Letter Agreement is irrelevant, because "exclusivity is not conditioned on compliance with this provision and [this issue is] unripe because Hornell has never served a notice of default or given Petitioners an opportunity to cure." (Pet'rs.' Reply at n.3.) Canada Dry further argues that the new 16 and 20 ounce plastic bottles are not new products that Hornell was required to offer it, but rather, that they were merely new packages of extant products to which Canada Dry had already been granted exclusive distribution rights under the A-1 Schedules of the Distributor Agreements. (*Id.* at 5.)

### a. Canada Dry's Motion Arises under the Distributor Agreements

Canada Dry attempts to simultaneously assert that this Court has jurisdiction over the present dispute because it arises under the Consent Award, yet also argues that the conditions on exclusivity set forth in the Consent Award do not apply to its claim. Canada Dry cannot have it both ways. As Hornell correctly notes, the fact that it asserts a defense based on the Letter Agreement does not change the fact that Canada Dry's claim arises under the Distributor Agreements. *See, e.g., Sullivan v. American Airlines, Inc.*, 424 F.3d 267, 276 (2d Cir. 2005) (whether claim "arises under" federal law is determined by allegations in plaintiff's complaint and not by defenses raised by defendant); *Altman v. Bayer Corp.*, 125 F.Supp. 2d 666, 670 (S.D.N.Y. 2000) (whether a claim "arises under" patent law is determined from plaintiff's statement of his own claim and not by defenses interposed by defendant, "even if both parties admit that the defense is the only question truly at issue in the case.") In Canada Dry's opening Memorandum it asserts that the Consent Award incorporates the Distributor Agreements. This would ostensibly give this Court jurisdiction to decide any disputes arising under either those Agreements or the Consent Award. However, Canada Dry concedes in its Reply that the Consent Award does not, in fact, incorporate the Distributor Agreements. It then attempts to re-frame its motion by arguing that neither the exceptions to exclusivity provided in Paragraph 3(b) nor the requirements for exclusivity provided in Paragraph 9 of the Consent Award apply to the plastic bottles at issue. The Court finds that, regardless of any defenses Hornell asserts based upon the Letter Agreement, Canada Dry's claim that the 16 and 20 ounce plastic bottles are exclusive products under the A-1 Schedules of the Distributor Agreements does not arise under the Consent Award, as these Schedules were not modified by the Consent Award. Pursuant to the

Arbitration Clauses in the Distributor Agreements, Canada Dry's remedy in the present dispute is to commence an arbitration.

## IV. CONCLUSION

Because Canada Dry's claim that the 16 and 20 ounce plastic bottles newly introduced by Hornell are exclusive under the A-1 Schedules of the Distributor Agreements, the Court finds that the instant dispute arises under the Distributor Agreements. The Distributor Agreements were expressly not incorporated into the Consent Award; therefore, the proper forum for this dispute is arbitration, as provided by Paragraph 20.3(b) of the Distributor Agreements. Because this Court does not have jurisdiction to interpret the Parties' intent with respect to the Distributor Agreements, Canada Dry's motion is **DENIED** in its entirety. This resolves docket entry number 7.

**SO ORDERED this 31st day of March 2009**
**New York, New York**

*[signature]*

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**